**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

|  |  |
|---|---|
| PARTEC AG and BF EXAQC AG,<br><br>*Plaintiffs*,<br><br>v.<br><br>MICROSOFT CORPORATION,<br><br>*Defendant.* | Civil Action No. 2:24-cv-00433-RWS-RSP<br><br>**JURY TRIAL DEMANDED**<br><br><br>**PUBLIC VERSION** |
| MICROSOFT CORPORATION,<br><br>*Counterclaimant*,<br><br>v.<br><br>PARTEC AG and BF EXAQC AG,<br><br>*Counterclaim-Defendants.* |  |

**MICROSOFT'S FIRST AMENDED ANSWER
AND AFFIRMATIVE AND OTHER DEFENSES
AND ORIGINAL COUNTERCLAIMS**

Microsoft Corporation ("Defendant," "Counterclaimant," or "Microsoft") hereby responds to Complaint For Patent Infringement ("Complaint") brought by ParTec AG ("ParTec") and BF exaQC AG ("BFX") (collectively, "Plaintiffs" or "Counterclaim-Defendants"), as follows.

## ANSWER TO PLAINTIFFS' COMPLAINT

## THE PARTIES

1.      Microsoft is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 1 of the Complaint, and on that basis, denies each and every allegation therein.

2.      Microsoft is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 2 of the Complaint, and on that basis, denies each and every allegation therein.

3.      Microsoft admits it is a corporation with its principal place of business at One Microsoft Way, Redmond, Washington 89052.  Microsoft admits—for the purpose of this litigation only—that it is registered to do business in Texas.  Microsoft admits—for purpose of this litigation only—that it may be served with process via its registered agent Corporation Service Company, 211 E. 7th Street, Suite 620, Austin, Texas 78701.  Microsoft denies the remaining allegations in Paragraph 3 of the Complaint.

## JURISDICTION AND VENUE

4.      Microsoft admits that this action purports to be brought under 28 U.S.C. §§ 1331 and 1338(a), under the patent laws of the United States, 35 U.S.C. §§ 1 *et seq.*  To the extent implied, Microsoft denies that it infringes any of Plaintiffs' patents.

5.      Microsoft denies that it has committed any acts of infringement in this District or the State of Texas, or anywhere else.  Microsoft denies that venue is proper in this District pursuant

to 28 U.S.C. § 1400(b).  Microsoft denies any remaining allegations in Paragraph 5 of the Complaint.

6.      Microsoft admits that Paragraph 6 appears to contain screenshots from the identified hyperlink to Microsoft's website.  Microsoft denies that it has "seven corporate offices in the State of Texas, employing hundreds of persons."  Microsoft denies that it has a corporate office in Frisco, Texas.  Microsoft denies any remaining allegations in Paragraph 6 of the Complaint.

7.      Microsoft admits that Paragraph 7 appears to contain a screenshot from the identified hyperlink to Collin Central Appraisal District's website.  Microsoft denies any remaining allegations in Paragraph 7 of the Complaint.

8.      Microsoft admits that Paragraph 8 appears to contain a screenshot from the identified hyperlink to Denton CAD Property Search's website.  Microsoft denies any remaining allegations in Paragraph 8 of the Complaint.

9.      Microsoft admits that Paragraph 9 appears to contain screenshots from the identified hyperlinks to Best Buy's website.  Microsoft denies that it operates Microsoft Windows Stores within Best Buy retail locations located throughout this District.  Microsoft denies that it operates Microsoft Windows Stores at 2800 N Central Expy, Plano, TX 75074; 3333 Preston Rd Suite 200, Frisco, TX 75034; or 2601 S Stemmons Fwy, Ste 300, Lewisville, TX 75067.  Microsoft denies any remaining allegations in Paragraph 9 of the Complaint.

10.     Microsoft denies that it operates "Microsoft Windows Stores" within Best Buy stores.  Microsoft denies that "Microsoft Windows Stores" are "regular and established places of business for Microsoft."  Microsoft admits that Paragraph 10 appears to contain quotes from Microsoft's and third party websites.  Microsoft is without knowledge or information sufficient to

form a belief as to the truth of the allegation relating to non-party Samsung in Paragraph 10 of the Complaint, and on that basis, denies it.  Microsoft denies any remaining allegations in Paragraph 10 of the Complaint.

11.     Microsoft denies that it is "responsible for" or that it "controls the day-to-day operations" of Microsoft Windows Stores within Best Buy.  Microsoft admits that Paragraph 11 appears to contain quotes from Microsoft's and third party websites.  Microsoft denies any remaining allegations in Paragraph 11 of the Complaint.

12.     Microsoft denies that it maintains Microsoft Windows Stores within Best Buy retail locations.  Microsoft denies that it has "approximately $2 million of property" at Aligned Data Center, at 2800 Summit Ave, Plano, TX 75074, within this District.  Microsoft admits that Paragraph 12 appears to contain a screenshot from a third party website.  Microsoft denies any remaining allegations in Paragraph 12 of the Complaint.

13.     Microsoft denies that it "maintains data services at this location," as the statement is vague and ambiguous.  Microsoft denies any remaining allegations in Paragraph 13 of the Complaint.

14.     Microsoft denies that any of its products or services infringes any patents in this District and the State of Texas, or anywhere else.  Microsoft admits that Paragraph 14 appears to contain a screenshot from Microsoft's website.  Microsoft admits that there is a point of present (POP) location in Plano, Texas, but denies any remaining allegations in Paragraph 14 of the Complaint.

15.     Microsoft admits that Paragraph 15 appears to contain a screenshot and quotes from Microsoft's website.  Microsoft admits that there is an "Azure public MEC with AT&T edge zone"

in the "Dallas metro" area, which is outside this District. Microsoft denies any remaining allegations in Paragraph 15 of the Complaint.

16.    Microsoft admits that there is an Azure data center at 5150 Rogers Rd., San Antonio, TX, which is outside this District. Microsoft admits that Paragraph 16 appears to contain a screenshot from the identified hyperlink to a third party website. Microsoft denies any remaining allegations in Paragraph 16 of the Complaint.

17.    Microsoft admits that Paragraph 17 appears to contain a screenshot from the identified hyperlink to Microsoft's website. Microsoft denies any remaining allegations in Paragraph 17 of the Complaint.

18.    Microsoft denies that any of its hardware, products or services, including any of its Azure AI services or products, infringes any patents in this District and the State of Texas, or anywhere else. Microsoft admits that it sells and offers to sell products and services throughout the United States. Microsoft admits that Paragraph 18 appears to contain a screenshot from the identified hyperlink to Microsoft's website. Microsoft denies any remaining allegations in Paragraph 18 of the Complaint.

19.    Microsoft admits that it sells and offers to sell products and services throughout the United States. Microsoft admits that Paragraph 19 appears to contain a screenshot from the identified hyperlink to Microsoft's website. Microsoft denies any remaining allegations in Paragraph 19 of the Complaint.

20.    Microsoft denies that any of its products or services infringes any patents in this District and the State of Texas, or anywhere else. Microsoft admits that its Azure AI services and products are available to customers throughout the United States. Microsoft denies any remaining allegations in Paragraph 20 of the Complaint.

21.     Microsoft admits that Paragraph 21 appears to cite to the identified hyperlinks to a third party website.  Microsoft denies that it uses CoreWeave's datacenter in Plano, Texas for any of its products or services, including Azure AI workloads.  Microsoft further denies that it is investing in the Condor Galaxy 3 AI supercomputer being built in Dallas, Texas, by the Abu Dhabi, United Arab Emirates-based technology holding group G42.  Microsoft denies any remaining allegations in Paragraph 21 of the Complaint.

22.     Microsoft denies that it has committed any acts of infringement in this District, the State of Texas, or anywhere else.  Microsoft denies any remaining allegations in Paragraph 22 of the Complaint.

23.     Microsoft denies that it has a regular and established physical place of business in this District.  Microsoft denies that it has committed any acts of infringement in this District, the State of Texas, or anywhere else.  Microsoft denies that venue is proper in this District.  Microsoft denies any remaining allegations in Paragraph 23 of the Complaint.

## **PARTEC AND BFX**

24.     Microsoft is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 24 of the Complaint and, on that basis, denies each and every allegation therein.

25.     Microsoft is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 25 of the Complaint and, on that basis, denies each and every allegation therein.

26.     Microsoft is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 26 of the Complaint and, on that basis, denies each and every allegation therein.

27.     Microsoft is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 27 of the Complaint and, on that basis, denies each and every allegation therein.

28.     Microsoft is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 28 of the Complaint and, on that basis, denies each and every allegation therein.

29.     Microsoft is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 29 of the Complaint and, on that basis, denies each and every allegation therein.

30.     Microsoft is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 30 of the Complaint and, on that basis, denies each and every allegation therein.

31.     Microsoft is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 31 of the Complaint and, on that basis, denies each and every allegation therein.

32.     Microsoft is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 32 of the Complaint and, on that basis, denies each and every allegation therein.

33.     Microsoft is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 33 of the Complaint and, on that basis, denies each and every allegation therein.

34.     Microsoft is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 34 of the Complaint and, on that basis, denies each and every allegation therein.

35.     Microsoft is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 35 of the Complaint and, on that basis, denies each and every allegation therein.

36.     Microsoft is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 36 of the Complaint and, on that basis, denies each and every allegation therein.

37.     Microsoft is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 37 of the Complaint and, on that basis, denies each and every allegation therein.

38.     Microsoft is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 38 of the Complaint and, on that basis, denies each and every allegation therein.

## THE ASSERTED PATENTS

39.     Microsoft admits that the Plaintiffs appear to assert causes of action for infringement of United States Patent No. 10,142,156 (the "'156 Patent"), United States Patent No. 11,934,883 (the "'883 Patent"), and United States Patent No. 11,537,442 (the "'442 Patent") (collectively, the "Asserted Patents").  Microsoft denies that it infringes any of the Asserted Patents.  Microsoft denies the sufficiency of Plaintiffs' infringement contentions.  Microsoft also denies that there is any cause of action for infringement of any of the Asserted Patents.  To the extent implied, Microsoft denies that the Asserted Patents are valid.  Microsoft denies any remaining allegations in Paragraph 39 of the Complaint.

40.     Microsoft admits that Exhibit A appears to be a copy of the '156 Patent.  Microsoft admits that the face of the '156 Patent indicates that the '156 Patent is titled "Computer Cluster Arrangement for Processing a Computation Task and Method for Operation Thereof."  Microsoft admits that the face of the '156 Patent indicates that the issue date for the '156 Patent is November 27, 2018.  To the extent implied, Microsoft denies that the '156 Patent is valid.  Microsoft denies any remaining allegations in Paragraph 40 of the Complaint.

41.     Microsoft admits that Exhibit B appears to be a copy of the '883 Patent.  Microsoft admits that the face of the '883 Patent indicates that the '883 Patent is titled "Computer Cluster Arrangement for Processing a Computation Task and Method for Operation Thereof."  Microsoft admits that the face of the '883 Patent indicates that the issue date for the '883 Patent is March 19, 2024.  Microsoft admits that the face of the '883 Patent indicates that the '883 Patent purports to be designated a continuation of the application that resulted in the '156 Patent.  To the extent implied, Microsoft denies that the '883 Patent is valid.  Microsoft denies the remaining allegations in Paragraph 41 of the Complaint.

42.     Microsoft denies each and every allegation in Paragraph 42 of the Complaint.

43.     Microsoft admits that the faces of the '156 and '883 Patents indicate that Thomas Lippert is named as an inventor of the '156 and '883 Patents.  Microsoft is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 43 of the Complaint and, on that basis, denies each and every allegation therein.

44.     Microsoft is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 44 of the Complaint and, on that basis, denies each and every allegation therein.

45.    Microsoft is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 45 of the Complaint and, on that basis, denies each and every allegation therein.

46.    Microsoft admits that Exhibit C appears to be a copy of the '442 Patent.  Microsoft admits that the face of the '442 Patent indicates that the '442 Patent is titled "Application Runtime Determined Dynamical Allocation of Heterogenous Compute Resources."  Microsoft admits that the face of the '442 Patent indicates that the issue date for the '442 Patent is December 27, 2022.  To the extent implied, Microsoft denies that the '442 Patent is valid.  Microsoft denies any remaining allegations in Paragraph 46 of the Complaint.

47.    Microsoft admits that the face of the '442 Patent indicates that Thomas Lippert and Bernhard Frohwitter are named as inventors of the '442 Patent.  Microsoft denies that Bernhard Frohwitter is "also well-known in the supercomputing field."  Microsoft is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 47 of the Complaint and, on that basis, denies each and every allegation therein.

48.    To the extent implied, Microsoft denies that any of the Asserted Patents is valid.  Microsoft is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 48 of the Complaint and, on that basis, denies each and every allegation therein.

49.    To the extent implied, Microsoft denies that any of the Asserted Patents is valid.  Microsoft is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 49 of the Complaint and, on that basis, denies each and every allegation therein.

50.    Microsoft denies that it infringes any of the Asserted Patents.  To the extent implied, Microsoft denies that any of the Asserted Patents is valid.  Microsoft is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 50 of the Complaint and, on that basis, denies each and every allegation therein.

## THE INVENTIONS OF THE ASSERTED PATENTS

51.    Microsoft denies each and every allegation in Paragraph 51 of the Complaint.

52.    Microsoft denies each and every allegation in Paragraph 52 of the Complaint.

53.    Microsoft denies each and every allegation in Paragraph 53 of the Complaint.

## MICROSOFT'S USE OF PARTEC'S PATENTED TECHNOLOGY

54.    Microsoft admits that Paragraph 54 appears to contain quotes from Microsoft's website.  Microsoft denies that any of its products or services, including the Microsoft Azure AI system or infrastructure, infringes any of Plaintiffs' patents.  Microsoft denies any remaining allegations in Paragraph 54 of the Complaint.

55.    Microsoft admits that Paragraph 55 appears to contain quotes from Microsoft's website.  Microsoft denies any remaining allegations in Paragraph 55 of the Complaint.

56.    Microsoft admits that Paragraph 56 appears to contain an image from Microsoft's website.  Microsoft denies any remaining allegations in Paragraph 56 of the Complaint.

57.    Microsoft admits that Paragraph 57 appears to contain quotes from Microsoft's website and a YouTube page.  Microsoft denies each and every allegation in Paragraph 57 of the Complaint.

58.    Microsoft admits that Paragraph 58 appears to contain a quote from a YouTube page.  Microsoft denies any remaining allegations in Paragraph 58 of the Complaint.

59.     Microsoft admits that Paragraph 59 appears to contain a quote from Microsoft's website and a screenshot from a YouTube page.  Microsoft denies any remaining allegations in Paragraph 59 of the Complaint.

60.     Microsoft admits that Paragraph 60 appears to contain a quote from a YouTube page.  Microsoft denies any remaining allegations in Paragraph 60 of the Complaint.

61.     Microsoft admits that Paragraph 61 appears to contain a screenshot and a quote from a YouTube page.   Microsoft denies any remaining allegations in Paragraph 61 of the Complaint.

62.     Microsoft admits that Paragraph 62 appears to cite to the identified hyperlinks from third party websites.  Microsoft admits that TOP500 appears to have ranked certain Microsoft products.  Microsoft denies any remaining allegations in Paragraph 62 of the Complaint.

63.     Microsoft admits that Paragraph 63 appears to cite to the identified hyperlink from a third party website.   Microsoft denies any remaining allegations in Paragraph 63 of the Complaint.

64.     Microsoft admits that Paragraph 64 appears to contain quotes from Microsoft's website.  Microsoft denies any remaining allegations in Paragraph 64 of the Complaint.

65.     Microsoft admits that Paragraph 65 appears to contain a screenshot and quotes from Microsoft's website.   Microsoft denies any remaining allegations in Paragraph 65 of the Complaint.

66.     Microsoft admits that Paragraph 66 appears to contain an image and quotes from Microsoft's website.   Microsoft denies any remaining allegations in Paragraph 66 of the Complaint.

67.     Microsoft admits that Paragraph 67 appears to contain an image and a quoted word from Microsoft's website.  Microsoft denies any remaining allegations in Paragraph 67 of the Complaint.

68.     Microsoft admits that Paragraph 68 appears to contain quotes from a YouTube page.  Microsoft denies any remaining allegations in Paragraph 68 of the Complaint.

69.     Microsoft admits that Paragraph 69 appears to contain a screenshot and quotes from a YouTube page.  Microsoft denies any remaining allegations in Paragraph 69 of the Complaint.

70.     Microsoft denies that any of its products or services, including Azure AI infrastructure, practices any technology taught by any of the Asserted Patents.  Microsoft admits that Paragraph 70 appears to contain quotes from YouTube pages and a third party website.  To the extent implied, Microsoft denies that any of its products or services, including Azure AI infrastructure, infringes any of the Asserted Patents or that the Asserted Patents are valid.

71.     Microsoft admits that Paragraph 71 appears to contain an annotated screenshot from Microsoft's website.  Microsoft admits that it recently released 2024 Q1 numbers.  Microsoft's financial reports speak for themselves.  Microsoft denies any remaining allegations in Paragraph 71 of the Complaint.

72.     Microsoft admits that Paragraph 72 appears to contain a quote from a third party website.  Microsoft denies any remaining allegations in Paragraph 72 of the Complaint.

73.     Microsoft admits that Paragraph 73 appears to refer to a document available on a third party website.  Microsoft denies any remaining allegations in Paragraph 73 of the Complaint.

74.     Microsoft is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 74 of the Complaint and, on that basis, denies each and every allegation therein.

## COUNT ONE
## INFRINGEMENT OF U.S. PATENT NO. 10,142,156

75.     Microsoft repeats and incorporates by reference its responses to the allegations contained in each preceding paragraph as if fully set forth herein.

76.     Microsoft denies that it infringes the '156 Patent.  Microsoft denies any remaining allegations in Paragraph 76 of the Complaint.

77.     Microsoft admits that Paragraph 77 appears to quote from the '156 Patent. Microsoft denies that it infringes the '156 Patent.  Microsoft denies any remaining allegations in Paragraph 77 of the Complaint.

78.     Microsoft denies that Microsoft's Azure AI system "meets every element of this claim."  Microsoft admits that Paragraph 78 appears to contain a screenshot and quote from a YouTube page.  Microsoft denies any remaining allegations in Paragraph 78 of the Complaint.

79.     Microsoft admits that Paragraph 79 appears to contain quotes from Microsoft's website and a screenshot from a YouTube page.  Microsoft denies any remaining allegations in Paragraph 79 of the Complaint.

80.     Microsoft denies that Microsoft's Azure AI system "is a computer-cluster booster system for processing a computation task."  Microsoft admits that Paragraph 80 appears to contain a quote from a YouTube page.  Microsoft denies any remaining allegations in Paragraph 80 of the Complaint.

81.     Microsoft denies that Microsoft's Azure AI system "includes a plurality of hardware computation nodes."  Microsoft admits that Paragraph 81 appears to contain quotes from Microsoft's and third party websites and a screenshot from a YouTube page.  Microsoft denies any remaining allegations in Paragraph 81 of the Complaint.

82.    Microsoft denies that Microsoft's Azure AI system includes "computation nodes [that] interface with a communication infrastructure—for example, the CPU cores interface using InfiniBand."  Microsoft admits that Paragraph 82 appears to contain quotes from Microsoft's and third party websites.  Microsoft denies any remaining allegations in Paragraph 82 of the Complaint.

83.    Microsoft denies that Microsoft's Azure AI system includes "computation nodes [that] are arranged to jointly compute a first part of a computation task."  Microsoft admits that Paragraph 83 appears to contain a screenshot from a YouTube page.  Microsoft denies any remaining allegations in Paragraph 83 of the Complaint.

84.    Microsoft denies that Microsoft's Azure AI system "includes a plurality of hardware boosters, each with a compute capacity."  Microsoft admits that Paragraph 84 appears to contain quotes from Microsoft's website and third party websites and screenshots from YouTube pages.  Microsoft denies any remaining allegations in Paragraph 84 of the Complaint.

85.    Microsoft denies that "[t]he hardware boosters of Azure—*e.g.*, the GPUs—can be arranged to compute at least a second, specific part of the computation task after having been assigned to at least one hardware computation node and under control of that at least one hardware computation node."  Microsoft admits that Paragraph 85 appears to contain a screenshot from a YouTube page.  Microsoft denies any remaining allegations in Paragraph 85 of the Complaint.

86.    Microsoft admits that Paragraph 86 appears to contain a quote from Microsoft's website.  Microsoft denies any remaining allegations in Paragraph 86 of the Complaint.

87.    Microsoft denies that Microsoft's Azure AI system includes "hardware boosters [that] interface with the communication infrastructure."  Microsoft admits that Paragraph 87 appears to contain a quote from Microsoft's website and a screenshot from a YouTube page.  Microsoft denies any remaining allegations in Paragraph 87 of the Complaint.

88.     Microsoft denies that Microsoft's Azure AI system "includes a resource manager arranged to assign hardware boosters (*e.g.*, GPUs) to computation nodes (*e.g.*, CPU cores) that, at the start of processing a computation task, establishes an initial assignment by using a predetermined assignment metric (*e.g.*, utilization) specified as a function of at least one of a group of assignment parameters."  Microsoft admits that Paragraph 88 appears to contain quotes from Microsoft's website and public documentation and an image from a third party website.  Microsoft denies any remaining allegations in Paragraph 88 of the Complaint.

89.     Microsoft denies that Microsoft's Azure AI system includes a "resource manager— [that] during the processing of a computation task—can update the predetermined assignment metric and establish a dynamic assignment by using the predetermined assignment metric that was updated."  Microsoft admits that Paragraph 89 appears to contain quotes and a screenshot from Microsoft's website and public documentation and a YouTube page.  Microsoft denies any remaining allegations in Paragraph 89 of the Complaint.

90.     Microsoft denies that "in the Microsoft Azure AI system, the hardware computation nodes and the hardware boosters are configured such that during processing of a computation task, assignments of computation nodes and boosters can be provided such that the hardware computation nodes are arranged to communicate with the hardware boosters and at least one of the hardware boosters is assigned to and shared by more than one of the hardware computation nodes such that the compute capacity of the hardware booster(s) is shared by more than one of the plurality of hardware computation nodes."  Microsoft admits that Paragraph 90 appears to contain quotes from Microsoft's website.  Microsoft denies any remaining allegations in Paragraph 90 of the Complaint.

91.     Microsoft denies that in Microsoft's Azure AI system, "each of the hardware boosters is assignable to each of the computation nodes."  Microsoft admits that Paragraph 91 appears to contain a quote from Microsoft's website.  Microsoft denies any remaining allegations in Paragraph 91 of the Complaint.

92.     Microsoft denies that it infringes the '156 Patent.  Microsoft denies that it "has combined all elements of the claimed system and thus 'made' the system."  Microsoft admits that Paragraph 92 appears to contain a screenshot from a YouTube page.  Microsoft denies any remaining allegations in Paragraph 92 of the Complaint.

93.     Microsoft admits that Paragraph 93 appears to contain quotes from third party websites.  Microsoft denies that it infringes the '156 Patent.  Microsoft denies any remaining allegations in Paragraph 93 of the Complaint.

94.     Microsoft admits that Paragraph 94 appears to contain a quote from a third party website and screenshots from the identified hyperlinks to Microsoft's website.  Microsoft admits that it sells and offers to sell products and services to customers throughout the United States. Microsoft denies that it infringes the '156 Patent.  Microsoft denies any remaining allegations in Paragraph 94 of the Complaint.

95.     Microsoft denies that it infringes the '156 Patent.  Microsoft denies any remaining allegations in Paragraph 95 of the Complaint.

96.     Microsoft denies that it infringes the '156 Patent.  Microsoft denies any remaining allegations in Paragraph 96 of the Complaint.

97.     Microsoft admits that it is aware that the Complaint asserts the '156 Patent.

98.     Microsoft admits that Paragraph 98 appears to contain a quote and a screenshot from a YouTube page.  Microsoft denies that it infringes the '156 Patent.  Microsoft denies any remaining allegations in Paragraph 98 of the Complaint.

99.     Microsoft admits that Paragraph 99 appears to contain a quote and a screenshot from Microsoft's website.  Microsoft denies that it infringes the '156 Patent.  Microsoft denies any remaining allegations in Paragraph 99 of the Complaint.

100.     Microsoft admits that Paragraph 100 appears to contain quotes and a screenshot from Microsoft's website.  Microsoft denies that it infringes the '156 Patent.  Microsoft denies any remaining allegations in Paragraph 100 of the Complaint.

101.     Microsoft admits that Paragraph 101 appears to contain screenshots from the identified hyperlinks to Microsoft's website.  Microsoft denies that it infringes the '156 Patent.  Microsoft denies any remaining allegations in Paragraph 101 of the Complaint.

102.     Microsoft admits that Paragraph 102 appears to contain quotes and a screenshot from Microsoft's website.  Microsoft denies that it infringes the '156 Patent.  Microsoft denies any remaining allegations in Paragraph 102 of the Complaint.

103.     Microsoft admits that Paragraph 103 appears to contain screenshots from the identified hyperlinks to Microsoft's website.  Microsoft denies that it infringes the '156 Patent.  Microsoft denies any remaining allegations in Paragraph 103 of the Complaint.

104.     Microsoft admits that Paragraph 104 appears to contain screenshots from the identified hyperlinks to Microsoft's website.  Microsoft denies that it infringes the '156 Patent.  Microsoft denies any remaining allegations in Paragraph 104 of the Complaint.

105.    Microsoft admits that Paragraph 105 appears to contain a screenshot and quote from Microsoft's website and a YouTube page.  Microsoft denies that it infringes the '156 Patent.  Microsoft denies any remaining allegations in Paragraph 105 of the Complaint.

106.    Microsoft denies that it infringes the '156 Patent.  Microsoft denies any remaining allegations in Paragraph 106 of the Complaint.

107.    Microsoft denies that it infringes the '156 Patent.  Microsoft denies any remaining allegations in Paragraph 107 of the Complaint.

108.    Microsoft denies that it infringes the '156 Patent.  Microsoft denies any remaining allegations in Paragraph 108 of the Complaint.

109.    Microsoft denies each and every allegation in Paragraph 109 of the Complaint.

## COUNT TWO
## INFRINGEMENT OF U.S. PATENT NO. 11,934,883

110.    Microsoft repeats and incorporates by reference its responses to the allegations contained in each preceding paragraph as if fully set forth herein.

111.    Microsoft denies that it infringes the '883 Patent.  Microsoft denies any remaining allegations in Paragraph 111 of the Complaint.

112.    Microsoft admits that Paragraph 112 appears to quote from the '883 Patent.  Microsoft denies that it infringes the '883 Patent.  Microsoft denies any remaining allegations in Paragraph 112 of the Complaint.

113.    Microsoft denies that Microsoft's Azure AI system "meets every element of this claim."  Microsoft admits that Paragraph 113 appears to contain a screenshot and quote from a YouTube page.  Microsoft denies any remaining allegations in Paragraph 113 of the Complaint.

114.    Microsoft admits that Paragraph 114 appears to contain quotes from Microsoft's website and a screenshot from a YouTube page.  Microsoft denies any remaining allegations in Paragraph 114 of the Complaint.

115.    Microsoft denies that Microsoft's Azure AI system "is a computer cluster system for processing a computation task."  Microsoft admits that Paragraph 115 appears to contain a quote from a YouTube page.  Microsoft denies any remaining allegations in Paragraph 115 of the Complaint.

116.    Microsoft denies that Microsoft's Azure AI system "includes a plurality of hardware computation nodes."  Microsoft admits that Paragraph 116 appears to contain quotes from Microsoft's website and a screenshot from a YouTube page.  Microsoft denies any remaining allegations in Paragraph 116 of the Complaint.

117.    Microsoft denies that Microsoft's Azure AI system "includes a plurality of hardware boosters."  Microsoft admits that Paragraph 117 appears to contain quotes from Microsoft's website and a screenshot from a YouTube page.  Microsoft denies any remaining allegations in Paragraph 117 of the Complaint.

118.    Microsoft denies that Microsoft's Azure AI system "includes a resource manager." Microsoft admits that Paragraph 118 appears to contain quotes from Microsoft's website and public documentation and an image from a third party website.  Microsoft denies any remaining allegations in Paragraph 118 of the Complaint.

119.    Microsoft denies that Microsoft's Azure AI system includes "hardware computation nodes and the hardware boosters [that] each interface with a communication infrastructure."  Microsoft admits that Paragraph 119 appears to contain quotes from Microsoft's

website and a screenshot from a YouTube page.  Microsoft denies any remaining allegations in Paragraph 119 of the Complaint.

120.    Microsoft denies that Microsoft's Azure AI system includes a "resource manager [that] is arranged to assign a selected hardware booster to a hardware computation node for computation of a part of the computation task."  Microsoft admits that Paragraph 120 appears to contain a screenshot from a YouTube page.  Microsoft denies any remaining allegations in Paragraph 120 of the Complaint.

121.    Microsoft admits that Paragraph 121 appears to contain a quote from Microsoft's website.  Microsoft denies any remaining allegations in Paragraph 121 of the Complaint.

122.    Microsoft denies that Microsoft's Azure AI system includes a "resource manager [that] is arranged to provide assignment information to the first hardware computation node after the assignment of the selected hardware booster so as to enable the first hardware computation node to outsource the part of the computation task to the assigned selected hardware booster under control of the first hardware computation node."  Microsoft denies any remaining allegations in Paragraph 122 of the Complaint.

123.    Microsoft denies that Microsoft's Azure AI system includes a "resource manager [that] is arranged to initialize a static assignment and further to establish a dynamic assignment during the processing of the computation task."  Microsoft admits that Paragraph 123 appears to contain quotes from Microsoft's website and public documentation and an image from a third party website.  Microsoft denies any remaining allegations in Paragraph 123 of the Complaint.

124.    Microsoft denies that Microsoft's Azure AI system includes a "resource manager [that] is arranged to accomplish the assignments as a function of a predetermined assignment metric by providing the static assignment at the start of the processing of the computation task by

using the predetermined assignment metric." Microsoft admits that Paragraph 124 appears to contain quotes from Microsoft's public documentation. Microsoft denies any remaining allegations in Paragraph 124 of the Complaint.

125.    Microsoft denies that Microsoft's Azure AI system includes a "resource manager [that] is arranged to accomplish the assignments as a function of a predetermined assignment metric by updating the predetermined assignment metric during the processing of the computation task." Microsoft admits that Paragraph 125 appears to contain a screenshot and quotes from Microsoft's website and public documentation and YouTube pages. Microsoft denies any remaining allegations in Paragraph 125 of the Complaint.

126.    Microsoft denies that it infringes the '883 Patent. Microsoft denies that it "has combined all elements of the claimed system and thus 'made' the system." Microsoft admits that Paragraph 126 appears to contain a screenshot from a YouTube page. Microsoft denies any remaining allegations in Paragraph 126 of the Complaint.

127.    Microsoft admits that Paragraph 127 appears to contain quotes from third party websites. Microsoft denies that it infringes the '883 Patent. Microsoft denies any remaining allegations in Paragraph 127 of the Complaint.

128.    Microsoft admits that Paragraph 128 appears to contain a quote from a third party website and screenshots from the identified hyperlinks to Microsoft's website. Microsoft admits that it sells and offers to sell products and services to customers throughout the United States. Microsoft denies that it infringes the '883 Patent. Microsoft denies any remaining allegations in Paragraph 128 of the Complaint.

129.    Microsoft denies that it infringes the '883 Patent. Microsoft denies any remaining allegations in Paragraph 129 of the Complaint.

130.    Microsoft denies that it infringes the '883 Patent.  Microsoft denies any remaining allegations in Paragraph 130 of the Complaint.

131.    Microsoft admits that it is aware that the Complaint asserts the '883 Patent.

132.    Microsoft admits that Paragraph 132 appears to contain a screenshot and quote from a YouTube page.  Microsoft denies that it infringes the '883 Patent.  Microsoft denies any remaining allegations in Paragraph 132 of the Complaint.

133.    Microsoft admits that Paragraph 133 appears to contain a quote and a screenshot from Microsoft's website.  Microsoft denies that it infringes the '883 Patent.  Microsoft denies any remaining allegations in Paragraph 133 of the Complaint.

134.    Microsoft admits that Paragraph 134 appears to contain quotes and a screenshot from Microsoft's website.  Microsoft denies that it infringes the '883 Patent.  Microsoft denies any remaining allegations in Paragraph 134 of the Complaint.

135.    Microsoft admits that Paragraph 135 appears to contain screenshots from the identified hyperlinks to Microsoft's website.  Microsoft denies that it infringes the '883 Patent.  Microsoft denies any remaining allegations in Paragraph 135 of the Complaint.

136.    Microsoft admits that Paragraph 136 appears to contain quotes and a screenshot from Microsoft's website.  Microsoft denies that it infringes the '883 Patent.  Microsoft denies any remaining allegations in Paragraph 136 of the Complaint.

137.    Microsoft admits that Paragraph 137 appears to contain screenshots from the identified hyperlinks to Microsoft's website.  Microsoft denies that it infringes the '883 Patent.  Microsoft denies any remaining allegations in Paragraph 137 of the Complaint.

138.    Microsoft admits that Paragraph 138 appears to contain screenshots from the identified hyperlinks to Microsoft's website.  Microsoft denies that it infringes the '883 Patent. Microsoft denies any remaining allegations in Paragraph 138 of the Complaint.

139.    Microsoft admits that Paragraph 139 appears to contain a screenshot and quote from Microsoft's website and a YouTube page.  Microsoft denies that it infringes the '883 Patent. Microsoft denies any remaining allegations in Paragraph 139 of the Complaint.

140.    Microsoft denies that it infringes the '883 Patent.  Microsoft denies any remaining allegations in Paragraph 140 of the Complaint.

141.    Microsoft denies that it infringes the '883 Patent.  Microsoft denies any remaining allegations in Paragraph 141 of the Complaint.

142.    Microsoft denies that it infringes the '883 Patent.  Microsoft denies any remaining allegations in Paragraph 142 of the Complaint.

143.    Microsoft denies each and every allegation in Paragraph 143 of the Complaint.

## COUNT THREE
## INFRINGEMENT OF U.S. PATENT NO. 11,537,442

144.    Microsoft repeats and incorporates by reference its responses to the allegations contained in each preceding paragraph as if fully set forth herein.

145.    Microsoft denies that it infringes the '442 Patent.  Microsoft denies any remaining allegations in Paragraph 145 of the Complaint.

146.    Microsoft admits that Paragraph 146 appears to quote from the '442 Patent. Microsoft denies that it infringes the '442 Patent.  Microsoft denies any remaining allegations in Paragraph 146 of the Complaint.

147.    Microsoft denies that Microsoft's Azure AI system "meets every element of this claim."  Microsoft admits that Paragraph 147 appears to contain a screenshot and quote from a YouTube page.  Microsoft denies any remaining allegations in Paragraph 147 of the Complaint.

148.    Microsoft admits that Paragraph 148 appears to contain quotes from Microsoft's website.  Microsoft denies any remaining allegations in Paragraph 148 of the Complaint.

149.    Microsoft denies that Microsoft's Azure AI system "includes a plurality of computation nodes."  Microsoft admits that Paragraph 149 appears to contain a quote from Microsoft's website and a screenshot from a YouTube page.  Microsoft denies any remaining allegations in Paragraph 149 of the Complaint.

150.    Microsoft denies that Microsoft's Azure AI system "includes a plurality of booster nodes."  Microsoft admits that Paragraph 150 appears to contain a quote from Microsoft's website and a screenshot from a YouTube page.  Microsoft denies any remaining allegations in Paragraph 150 of the Complaint.

151.    Microsoft denies that Microsoft's Azure AI system includes "computation nodes and booster nodes [that] can be arranged to compute a computation task."  Microsoft admits that Paragraph 151 appears to contain a screenshot from a YouTube page.  Microsoft denies any remaining allegations in Paragraph 151 of the Complaint.

152.    Microsoft denies that in Microsoft's Azure AI system, "computation task comprises sub-tasks."  Microsoft admits that Paragraph 152 appears to contain a quote from Microsoft's public documentation.  Microsoft denies any remaining allegations in Paragraph 152 of the Complaint.

153.    Microsoft denies that Microsoft's Azure AI system, "in a first computing iteration, assigns and processes the plurality of sub-tasks by at least a portion of the plurality of computation

nodes and at least a portion of the plurality of booster nodes in a first distribution." Microsoft admits that Paragraph 153 appears to contain quotes from Microsoft's website and public documentation. Microsoft denies any remaining allegations in Paragraph 153 of the Complaint.

154. Microsoft denies that "the Azure AI infrastructure generates, using information relating to the processing of the plurality of subtasks by at least the portion of the plurality of computation nodes and at least the portion of the plurality of booster nodes, a further distribution of the plurality of sub-tasks between the plurality of computation nodes and the plurality of booster nodes for processing thereby in a further computing iteration." Microsoft admits that Paragraph 154 appears to contain a screenshot and quotes from Microsoft's website and public documentation and YouTube pages. Microsoft denies any remaining allegations in Paragraph 154 of the Complaint.

155. Microsoft denies that it infringes the '442 Patent. Microsoft denies that it "uses the Azure AI infrastructure to run the computation tasks of its customers—again, performing each step of the claimed method." Microsoft admits that Paragraph 155 appears to contain quotes from third party websites. Microsoft denies any remaining allegations in Paragraph 155 of the Complaint.

156. Microsoft denies that it infringes the '442 Patent. Microsoft denies any remaining allegations in Paragraph 156 of the Complaint.

157. Microsoft denies that it infringes the '442 Patent. Microsoft denies any remaining allegations in Paragraph 157 of the Complaint.

158. Microsoft admits it is aware that the Complaint asserts the '442 Patent.

159.    Microsoft admits that Paragraph 159 appears to contain a screenshot and quote from a YouTube page.  Microsoft denies that it infringes the '442 Patent.  Microsoft denies any remaining allegations in Paragraph 159 of the Complaint.

160.    Microsoft admits that Paragraph 160 appears to contain a quote and a screenshot from Microsoft's website.  Microsoft denies that it infringes the '442 Patent.  Microsoft denies any remaining allegations in Paragraph 160 of the Complaint.

161.    Microsoft admits that Paragraph 161 appears to contain quotes and a screenshot from Microsoft's website.  Microsoft denies any remaining allegations in Paragraph 161 of the Complaint.

162.    Microsoft admits that Paragraph 162 appears to contain screenshots from the identified hyperlinks to Microsoft's website.  Microsoft denies that it infringes the '442 Patent.  Microsoft denies any remaining allegations in Paragraph 162 of the Complaint.

163.    Microsoft admits that Paragraph 163 appears to contain a screenshot and quotes from Microsoft's website.  Microsoft denies any remaining allegations in Paragraph 163 of the Complaint.

164.    Microsoft admits that Paragraph 164 appears to contain screenshots from the identified hyperlinks to Microsoft's website.  Microsoft denies that it infringes the '442 Patent.  Microsoft denies any remaining allegations in Paragraph 164 of the Complaint.

165.    Microsoft admits that Paragraph 165 appears to contain screenshots from the identified hyperlinks to Microsoft's website.  Microsoft denies that it infringes the '442 Patent.  Microsoft denies any remaining allegations in Paragraph 165 of the Complaint.

166.    Microsoft admits that Paragraph 166 appears to contain a screenshot and quote from Microsoft's website and a YouTube page.  Microsoft denies that it infringes the '442 Patent.  Microsoft denies any remaining allegations in Paragraph 166 of the Complaint.

167.    Microsoft denies that it infringes the '442 Patent.  Microsoft denies any remaining allegations in Paragraph 167 of the Complaint.

168.    Microsoft denies that it infringes the '442 Patent.  Microsoft denies any remaining allegations in Paragraph 168 of the Complaint.

169.    Microsoft denies that it infringes the '442 Patent.  Microsoft denies any remaining allegations in Paragraph 169 of the Complaint.

170.    Microsoft denies the allegation in Paragraph 170 of the Complaint.

## RESPONSE TO DEMAND FOR JURY TRIAL

171.    Microsoft admits that Plaintiffs seek a jury trial for all issues so triable.

## RESPONSE TO PRAYER FOR RELIEF

Microsoft denies the underlying allegations of Plaintiffs' Prayer for Relief against Microsoft, denies that Plaintiffs are entitled to any relief whatsoever, and requests that the Court deny all relief to Plaintiffs, enter judgment in favor of Microsoft, and award Microsoft its attorneys' fees as the prevailing parties in the action.

## GENERAL DENIAL

Microsoft denies infringement of any claim of the Asserted Patents, denies that any claims of the Asserted Patents are valid, and denies that Plaintiffs are entitled to the relief requested or any other relief.  Microsoft denies the allegations and characterizations in the Complaint unless expressly admitted in the preceding paragraphs.  Microsoft denies any allegations that may be implied or inferred from the headings contained in the Complaint.  Any admitted factual allegation

is admitted only as to the specific admitted fact(s), and not as to any purported conclusion, characterization, implication, or speculation that may follow from the fact(s) as admitted.

## **MICROSOFT'S AFFIRMATIVE AND OTHER DEFENSES**

Microsoft asserts the following defenses in response to the allegations in Plaintiffs' Complaint, undertaking the burden of proof only as to those defenses deemed affirmative defenses by law, regardless of how such defenses are denominated herein. Microsoft reserves the right to assert any additional defenses as they become known during the course of this action or to the extent they are not otherwise deemed affirmative defenses by law.

### **First Defense: Failure To State A Claim**

Plaintiffs have failed to state a claim on which relief can be granted because Microsoft has not performed and is not performing any act in violation of any right validly belonging to Plaintiffs.

### **Second Defense: Noninfringement**

Microsoft does not infringe and has not infringed, directly, indirectly, contributorily, or by inducement, either literally or under the doctrine of equivalents, or otherwise, any valid and enforceable claim of the Asserted Patents. Microsoft incorporates by reference its response to Counterclaim-Defendants' Interrogatory No. 6.

### **Third Defense: Patent Invalidity**

Plaintiffs' purported claims for infringement of the Asserted Patents are barred because every claim of the Asserted Patents is invalid and/or unenforceable for failing to meet one or more of the requisite statutory and decisional requirements and/or conditions for patentability specified in 35 U.S.C. §§ 101, 102, 103, 112, and/or 116, the non-statutory doctrine of double patenting, and the rules, regulations, and laws pertaining thereto.

Microsoft incorporates by reference all invalidity contentions and IPR proceedings with respect to any Asserted Patent. Without prejudice to the bases of invalidity identified in those contentions, Microsoft identifies certain exemplary grounds of invalidity below.

**Statutory Bar**

The asserted claims of the Asserted Patents are invalid for failure to comply with the applicable statutory bars relating to commercial sales, public uses, and/or other disclosures to the public.

*'156 Patent*

(i)    The '156 Patent was filed as U.S. Patent Application No. 13/861,429 on April 12, 2013, which claims priority to PCT/EP2011/067888, a national stage application with a filing date of October 13, 2011.

(ii)   Parastation V5 is prior art under at least pre-AIA 35 U.S.C. 102(b). Parastation V5 was commercially sold or offered for sale, or otherwise in public use, in the United States by at least October 12, 2010, which is more than one year before the date of the application for patent in the United States. As just one example, a document dated July 12, 2010 reflects that "current open source ParaStation V5" was offered via a commercial license to a United States company—Intel Corporation—prior to October 12, 2010. ParTec_00000045, at -349. Around the same time, in September 2010, ParTec published a manual for Parastation V5 indicating the software was available for license. *See, e.g.* MSFT_PARTEC_000710490; MSFT_PARTEC_000710445. Prior to October 12, 2010, the open-source code for Parastation V5 could be downloaded from the Internet by a member of the public

in the United States. [1] *See, e.g.*, MSFT_PARTEC_000711231-MSFT_PARTEC_000711559.

(iii)    Parastation V5 disclosed, suggested, and/or rendered obvious each element of each asserted claim of the '156 Patent, as demonstrated in the chart designated Exhibit 156-12 to Microsoft's Invalidity Contentions, which is incorporated by reference hereto.

(iv)    The asserted claims of the '156 Patent are invalid under the statutory bars of pre-AIA 35 U.S.C. § 102.

### *'883 Patent*

(v)    The '883 Patent was filed as U.S. Patent Application No. 17/196,665 on March 9, 2021, as a continuation of U.S. Patent Application No. 13/861,429 on April 12, 2013, which claims priority to PCT/EP2011/067888, a national stage application with a filing date of October 13, 2011.

(vi)    Parastation V5 is prior art under at least pre-AIA 35 U.S.C. 102(b). Parastation V5 was commercially sold or offered for sale, or otherwise in public use, in the United States by at least October 12, 2010, which is more than one year before the date of the application for patent in the United States. As just one example, a document dated July 12, 2010 reflects that "current open source ParaStation V5" was offered via a commercial license to a United States company—Intel Corporation—prior to October 12, 2010. ParTec_00000045, at -349. Around the same time, in September 2010, ParTec published a manual for Parastation V5 indicating the software was

---

[1] *See, e.g.*, https://github.com/ParaStation/psmpi/tree/818e86c6de1745d94848f35bb1d249df297ca764/mpich2

available for license. *See, e.g.* MSFT_PARTEC_000710490; MSFT_PARTEC_000710445. Prior to October 12, 2010, the open-source code for Parastation V5 could be downloaded from the Internet by a member of the public in the United States. [2] *See, e.g.*, MSFT_PARTEC_000711231-MSFT_PARTEC_000711559.

(vii)    Parastation V5 disclosed, suggested, and/or rendered obvious each element of each asserted claim of the '883 Patent, as demonstrated in the chart designated Exhibit 883-12 to Microsoft's Invalidity Contentions, which is incorporated by reference hereto.

(viii)   The asserted claims of the '883 Patent are invalid under the statutory bars of pre-AIA 35 U.S.C. § 102.

### *'442 Patent*

(ix)    The '156 Patent was filed as U.S. Patent Application No. 16/963,749 on March 9, 2021, as national stage entry of PCT/EP2019/051615 filed January 23, 2019, which purports to claim priority to EP 18152903, allegedly filed January 23, 2018.

(x)    Parastation V5 is prior art under at least 35 U.S.C. 102(a)(1) and not excepted under § 102(b)(1)(A)-(B). Parastation V5 was in public use, on sale, or otherwise available to the public before the effective filing date of the claimed invention by at least January 22, 2018, which is more than one year before the effective filing date of the claimed invention. As just one example, a document dated July 12, 2010 reflects that "current open source ParaStation V5" and was offered via a

---

[2] *See, e.g.*, https://github.com/ParaStation/psmpi/tree/818e86c6de1745d94848f35bb1d249df297ca764/mpich2

commercial license or otherwise in public use prior to January 2018. ParTec_00000045, at -349.  ParTec published manuals for Parastation containing an open-source license that could be accepted by a member of the public prior to January 2018. *See*, *e.g.* MSFT_PARTEC_000710490; MSFT_PARTEC_000710445.  Prior to prior to January 2018, the open-source code for Parastation V5 could be downloaded from the Internet by a member of the public.[3] *See, e.g.*, MSFT_PARTEC_000711231- MSFT_PARTEC_000711559.

(xi)    Parastation V5 disclosed, suggested, and/or rendered obvious each element of each asserted claim of the '442 Patent, , as demonstrated in the chart designated Exhibit 442-13 to Microsoft's Invalidity Contentions, which is incorporated by reference hereto.

(xii)   The asserted claims of the '442 Patent are invalid under the statutory bars of 35 U.S.C. § 102(a)(1).

**Incorrect Inventorship**

The Asserted Patents are invalid for incorrect inventorship, and/or for claiming derived subject matter.  On information and belief, each of Norbert Eicker, Sebastian Rinke, Felix Wolf, and Daniel Becker contributed substantially to the conception of the invention(s) claimed in at least one claim of each of the '156 Patent, '883 Patent, and '442 Patent, as demonstrated in Microsoft's invalidity contentions and by at least the additional facts identified below.

***Norbert Eicker***

---

[3] *See, e.g.*,  https://github.com/ParaStation/psmpi/tree/818e86c6de1745d94848f35bb1d249df297ca764/mpich2

(i)     Norbert Eicker is a professor at Bergische Universität Wuppertal who formerly worked at the Julich Supercomputing Centre (JSC), beginning in 2004. MSFT_PARTEC_000711215.[4]  Eicker's responsibilities included the design and implementation of experimental and production cluster systems, including the JUROPA supercomputer.  Eicker was also involved in the development of QPACE. Eicker is also the architect of the DEEP system, implementing a heterogeneous cluster-booster architecture.   Around August 2013, Eicker held dual appointments at JSC and the University of Wuppertal.  MSFT_PARTEC_000711215.

(ii)    Eicker's research included:

- U. Detert, A. Thomasch, **N. Eicker** & J. Broughton eds., *JULI Project – Final Report* (2007), MSFT_PARTEC_000710740

- H. Baier, H. Boettiger, M. Drochner, **N. Eicker**, U. Fischer, Z. Fodor, A. Frommer, C. Gomez, G. Goldrian, S. Heybrock, D. Hierl, M. Husken, T. Huth, B. Krill, J. Lauritsen, **T. Lippert**, T. Mauer, B. Mendi, N. Meyer, A. Nobile, I. Ouda, M. Pivanti, D. Pleiter, M. Ries, A. Schafer, H. Schick, F. Schifano, H. Simma, S. Solbrig, T. Streuer, K.-H. Sulanke, R. Tripiccione, J.-S. Vogt, T. Wettig & F. Winter, *QPACE – A QCD Parallel Computer Based on Cell Processors* (2009), MSFT_PARTEC_000711561

- N. Attig, F. Berberich, U. Detert, **N. Eicker**, T. Eickermann, P. Gibbon, W. Gurich, W. Homberg, A. Illich, S. Rinke, M Stephan, K. Wolkersdorfer & **T. Lippert**, *Entering the Petaflop-Era: New Developments in Supercomputing* (2010), MSFT_PARTEC_000710797

- D.A. Mallon, **N. Eicker**, M.E. Innocenti, G. Lapenta, **T. Lippert** & E. Suarez, *On The Scalability of the Clusters-Booster Concept* (2012), MSFT_PARTEC_000711218

- **N. Eicker, T. Lippert**, T. Moschny, E. Suarez, *The DEEP Project: Pursuing Cluster-Computing In The Many-Core Era* (2013), MSFT_PARTEC_000711591

- **N. Eicker, T. Lippert**, E. Suarez, T. Moschny, *The DEEP Project: Pursuing Cluster-Computing In The Many-Core Era* – HUCAA'13 Slides (2013), MSFT_PARTEC_000711599

---

[4] https://www.fz-juelich.de/en/ias/jsc/news/news-items/news-flashes/2013/2013-10-eicker-prof

- **N. Eicker & T. Lippert**, *An Accelerated Cluster-Architecture for the Exascale* (2014), MSFT_PARTEC_000490082.

(iii)     Many features conceived by Eicker in his research are claimed in the '156 and '883 patents.

| Eicker's Research | '883 Patent |
|---|---|
| *The JULI project aimed at developing and evaluating a parallel compute cluster based on IBM's BladeCenter H with JS21 nodes, QLogic's InfiniPath network components and ParTec's ParaStation software. The project was carried out as a collaboration of Forschungszentrum Jülich GmbH, IBM Deutschland GmbH, QLogic Corporation¹ and ParTec Cluster Competence Center GmbH. This report details the milestones and results of the project.*<br><br>*JULI Project – Final Report*, Abstract | 1. A computer cluster system for processing a computation task, comprising:<br>a plurality of hardware computation nodes, a plurality of hardware boosters, and a resource manager, the plurality of hardware computation nodes and the plurality of hardware boosters each interfacing a communication infrastructure; |
| Apart from these complications, maintenance and administration of the JULI cluster is well supported by the respective software components. CSM, as already mentioned, provides for full hardware control and, in addition to that, cluster configuration and monitoring features and proved to be very reliable and flexible in the tested Linux cluster environment. The integration of additional software components for user administration (NIS), data management (NFS and GPFS) and job handling (*Torque* and *LoadLeveler*) was straightforward and the coexistence of QLogic MPI and the IBM and GNU compilers revealed no problems.<br><br>**3.4   CPU and Memory** *(Norbert Eicker, Thomas Lippert)*<br><br>*3.4.1   Architecture*<br><br>JULI consists of 56 IBM JS21 BladeServers. Each BladeServer is equipped with 2 Dual-Core PowerPC 970MP CPUs running at 2.5 GHz [17]. The PowerPC CPU has a pipelined, super-scalar architecture. Each core features two full-blown floating-point units (FPU) with 21 stages. Every FPU allows one double-precision multiply-add operation per cycle. Altogether this leads to a theoretical peak-performance of 10 GFlop/s per core.<br><br>*JULI Project – Final Report*, 9 | the resource manager being arranged to:<br>assign a selected hardware booster to the plurality of hardware boosters to a first hardware computation node of the plurality of hardware computation nodes for computation of a part of the computation task,<br>provide assignment information to the first hardware computation node after the assignment of the selected hardware booster so as to enable the first hardware computation node to outsource the part of the computation task to the assigned selected hardware booster under control of the first hardware computation node,<br>initialize a static assignment and further to establish a dynamic assignment during the processing of the computation task, |
| **3.11   Benchmarks and Applications**<br><br>*3.11.1   The Intel MPI Benchmark (Norbert Eicker, Thomas Lippert)*<br><br>Depending on the programming model, often MPI intra-node communication is required within a parallel application⁴. Therefore we investigate both intra-node and inter-node communication performance. We employ the Intel MPI Benchmark (IMB) [8].<br><br>*JULI Project – Final Report*, 23-24 | accomplish the assignments as a function of a predetermined assignment metric:<br>provide the static assignment at the start of the processing of the computation task by using the predetermined assignment metric, and<br>update the predetermined assignment metric during the processing of the computation task. |
| *Software packaging*<br><br>The *GridMonitor* is available as three RPM packages. These packages are:<br>• *psccollect*: includes the central *collector*, database and agents.<br>• *psgridmon*:   comprises all PHP scripts and configuration files for the web server providing the graphical user interface.<br>• *psgridmon-doc*: provides all the documentation (HTML, PDF and man).<br><br>Installation of the *psccollect* package is required on all cluster nodes, the *psgridmon* packages must be installed on the web server node. Installing the *psgridmon-doc* packages is not required, but highly recommended. In particular, installing this package on the web server will provide online documentation within the *GridMonitor*.<br><br>*JULI Project – Final Report*, 16 | 4. The computer cluster system according to claim **1**, wherein said predetermined assignment metric is formed according to at least one of a group of metric specification techniques, said group of metric specification techniques comprising: a temporal logic, an assignment matrix, an assignment table, a probability function, and a cost function.<br>5. The computer cluster system according to claim **1**, wherein said predetermined assignment metric is specified as a function of at least one of a group of assignment parameters, said group of assignment parameters comprising: resource information, cost information, complexity information, scalability information, a computation log record, compiler information, priority information, and a time stamp. |
| *Inter-node communication*<br><br>The inter-node communication makes use of the InfiniPath MPI library. We ran all tests for both types of memory. However, we saw almost no differences. We conclude that the memory bandwidth is not a bottleneck for the inter-node communication.<br><br>*JULI Project – Final Report*, 25 | 6. The computer cluster system according to claim **1**, wherein said assignment of the selected hardware booster to the first hardware computation node triggers at least one of a group of signals, said group of signals comprising: a remote procedure call, a parameter handover, and a data transmission. |
| **3.5   InfiniPath Network**<br><br>*3.5.1   Concept (Norbert Eicker)*<br><br>The InfiniPath network [18, 19] of JULI is devoted to MPI applications. 10-Gigabit technology is used for this network: QLogic's implementation of the InfiniBand standard called InfiniPath. Its most remarkable feature is an extremely low latency compared to other implementations of InfiniBand. The main difference of the InfiniPath implementation lies in the architecture of the host channel adapter (HCA). While all other solutions use a full-fledged CPU in order to implement the protocol, QLogic was able to map the logic on a state machine and to realize it within an ASIC.<br><br>While QLogic's solution is based on a special hardware implementation, the wire-protocol is perfectly conforming with the InfiniBand standard. As a result, standard InfiniBand switches can be employed. In the case of JULI a Voltaire ISR 9096 switch has been chosen with three line-cards summing up to a total of 72 ports.<br><br>*JULI Project – Final Report*, 11-12 | 7. The computer cluster system according to claim **1**, wherein each hardware computation node of the plurality of hardware computation nodes and each hardware booster of the plurality of hardware boosters respectively interfaces said communication infrastructure via an interfacing unit.<br>8. The computer cluster system according to claim **7**, wherein said interfacing unit comprises at least one of a group of components, said group of components comprising:<br>a virtual interface, a stub, a socket, a network controller, and a network device.<br>9. The computer cluster system according to claim **1**, wherein said communication infrastructure comprises at least one of a group of components, said group of components comprising: a bus, a communication link, a switching unit, a router, and a high speed network. |

| Eicker's Research | '883 Patent |
|---|---|
| **3.4.1  Architecture**<br><br>JULI consists of 56 IBM JS21 BladeServers. Each BladeServer is equipped with 2 Dual-Core PowerPC 970MP CPUs running at 2.5 GHz [17]. The PowerPC CPU has a pipelined, super-scalar architecture. Each core features two full-blown floating-point units (FPU) with 21 stages. Every FPU allows one double-precision multiply-add operation per cycle. Altogether this leads to a theoretical peak-performance of 10 GFlop/s per core.<br><br>Furthermore, each PPC 970MP CPU carries a vector-extension, called VMX-unit.  It is - more or less - comparable with Intel's and AMD's SSE units.  However, a VMX can only handle single-precision numbers.  Since the VMX-unit is also fully pipelined and capable to conduct one multiply-add operation on 128-bit registers in every cycle, the peak-performance for single-precision operations even reaches 20 GFlop/s per core. (In real life this theoretical number is limited by memory bandwidth, however.)<br><br>*JULI Project – Final Report*, 9 | **10**. The computer cluster system according to claim **1**, wherein each hardware computation node of the plurality of hardware computation nodes comprises at least one of a group of components, said group comprising: a multi-core processor, a cluster, a computer, a workstation, and a multi purpose processor.<br><br>**11**. The computer cluster system according to claim **1**, wherein said selected hardware booster comprises at least one of a group of components, said group of components comprising: a many-core processor, a scalar processor, a co-processor, a graphical processing unit, a cluster of many-core processors, and a monolithic processor. |

| Eicker's Research | 156 Patent |
|---|---|
| **2   QPACE Architecture**<br><br>QPACE [4, 5, 6] is a distributed-memory parallel computer based on the IBM PowerXCell 8i [12] processor. This hybrid processor contains one PowerPC Processor Element (PPE) and 8 Synergistic Processing Elements (SPE). Each SPE has 256 KB on-chip memory, called local store (LS), and runs one single thread.  Memory transfers between main memory and local store are possible via DMA operations. The memory controller as well as an I/O interface (Rambus FlexIO) is integrated into the processor. Regarding double precision (DP) floating point performance, one SPE can execute up to 4 operations per cycle. Thus, clocked at 3.2 GHz, the 8 SPEs on a PowerXCell 8i processor yield a DP peak performance of 102.4 GFlops. Each compute node, called node card, comprises one PowerX-Cell 8i CPU, 4 GiB of DDR2 main memory, and a network processor (NWP) which is implemented on a Xilinx V5-LX110T FPGA (Field Programmable Gate Array). The PowerXCell 8i is directly connected to the NWP via its I/O interface. The network processor provides access to 3 different interconnects: Gigabit Ethernet, signal tree network, and 3D torus network. The power consumption of a single node card is about 130 W. One QPACE rack houses 256 node cards (35 kW) and yields 26 TFlops DP peak performance. This leads to a power efficiency of about 1.5 W/GFlops (peak).<br><br>*QPACE – A QCD Parallel Computer*, 17 | **1**. A computer cluster-booster system for processing a computation task, comprising:<br><br>a plurality of hardware computation nodes, each of which interfaces with a communication infrastructure, at least two of the hardware computation nodes being arranged to jointly compute at least a first part of said computation task;<br><br>a plurality of hardware boosters, each hardware booster having a compute capacity, at least one hardware booster of the plurality of hardware boosters being arranged to compute at least a second, specific part of said computation task after having been assigned to at least one hardware computation node and under control of that at least one hardware computation node, the at least one hardware booster interfacing with the communication infrastructure; and |
| The front-end systems of the currently deployed QPACE installations consist of 8 IBM System x Linux servers. A login server acts as central user access point where users can login to submit jobs and manage their data. The so-called master server acts as central system control and monitoring instance. All other servers will be used to provide fast disk storage access. The number of disks attached to these servers is sufficient to sustain a bandwidth of up to 2 GBytes/sec.<br><br>*QPACE – A QCD Parallel Computer*, 17 | a resource manager being arranged to assign the at least one hardware booster to the at least one hardware computation node, including: |
| one QPACE rack is about 32 kW. The 3-dimensional torus network interconnects the node cards with nearest-neighbor communication links, driven by a lean custom protocol optimized for low latences. For the physical layer of the links q10 Gigabit Ethernet PHYs are used providing a bandwidth of 1 GB/s per link and direction.<br><br>*Entering the Petaflop Era*, 10 | at a start of processing of said computation task, establishing an initial assignment by using a predetermined assignment metric specified as a function of at least one of a group of assignment parameters, and during said processing of said computation task: (i) updating the predetermined assignment metric, and (ii) establishing a dynamic assignment by using the predetermined assignment metric that was updated, and |
| **4.4   QPACE – World Champion in Green Computing**<br><br>QPACE (Quantum Chromodynamics Parallel Computing on the Cell) is a next-generation massively parallel and scalable computer architecture optimized for lattice quantum chromodynamics (LQCD), *cf.* Figure 4. It has been developed in co-operation between several academic institutions together with the IBM development laboratory in Böblingen, Germany, under the framework of the SFB/TR 55, directed by the University of Regensburg.<br>At JSC, a 4-rack QPACE system is installed. It is a sister system to a machine at Wuppertal<br><br><br>Figure 4. Exterior Setup QPACE<br><br>*Entering the Petaflop-Era*, 9.<br><br>The QPACE node cards are interconnected as a 3-dimensional torus.  The largest partition which fits on a single backplane is of size $(x, y, z) = (1, 4, 8)$. To increase the number of nodes in the y-direction cables connecting backplanes in the vertical direction have to be used.  Similarly, in the x-direction backplanes are connected in the horizontal direction. In order to have some flexibility in re-partitioning the machine we make use of a feature of the network PHYs used on the node cards, which come with two serial interfaces. Controlled by software it is possible to select either the primary or the redundant interface. By connecting some of these redundant interfaces to additional backplane lines it is possible to partition the machine in different ways. In Fig. 5 we<br><br>*QPACE – A QCD Parallel Computer*, 10 | wherein the plurality of hardware computation nodes and the plurality of hardware boosters are configured such that during processing of said computation task, assignments of hardware computation nodes and hardware boosters can be provided such that at least (i) at least one of the plurality of hardware computation nodes is arranged to communicate with at least one of the plurality of hardware boosters, (ii) at least one of the plurality of hardware boosters is assigned to and shared by more than one of the plurality of hardware computation nodes such that the compute capacity of the at least one of the plurality of hardware boosters is shared between the more than one of the plurality of hardware computation nodes, and (iii) each of the hardware boosters is assignable to each of the hardware computation nodes.<br><br>**11**. The computer cluster system according to claim **1**, wherein each hardware computation node from among the plurality of hardware computation nodes comprises at least one of a group of components, said group of components comprising: a multi-core processor, a cluster, a computer, a workstation, and a multi-purpose processor.<br><br>**12**. The computer cluster system according to claim **1**, wherein said selected one hardware booster comprises at least one of a group of components, said group of components comprising: a multi-core processor, a scalar processor, a co-processor, a graphical processing unit, a cluster of multi-core processors, and a monolithic processor. |

| Eicker's Research | 156 Patent |
|---|---|
| At JSC, a 4-rack QPACE system is installed. It is a sister system to a machine at Wuppertal University. The building block is a node card comprising an IBM PowerXCell 8i processor and a custom FPGA-based network processor. 32 node cards are mounted on a single backplane and eight backplanes are arranged inside one rack, hosting a total of 256 node cards. The closed node card housing, which is connected to a liquid-cooled cold plate, acts as a heat conductor thus making QPACE a highly energy-efficient system. To remove the generated heat a cost-efficient liquid cooling system has been developed which enables high packaging densities. The maximum power consumption of one QPACE rack is about 32 kW. The 3-dimensional torus network interconnects the node cards with nearest-neighbour communication links, driven by a lean custom protocol optimized for low latencies. For the physical layer of the links q10 Gigabit Ethernet PHYs are used providing a bandwidth of 1 GB/s per link and direction. Figure 4. Energy Saver QPACE.<br><br>*Entering the Petaflop Era*, 9-10 | **8.** The computer cluster system according to claim **1**, wherein each hardware computation node from among the plurality of hardware computation nodes and the at least one hardware booster respectively interface with said communication infrastructure via a first interfacing unit and a second interfacing unit.<br>**9.** The computer cluster system according to claim **8**, wherein each of said first interfacing unit and said second interfacing unit comprises at least one of a group of components, said group of components comprising: a virtual interface, a stub, a socket, a network controller, and a network device.<br>**10.** The computer cluster system according to claim **1**, wherein said communication infrastructure comprises at least one of a group of components, said group of components comprising: a bus, a communication link, a switching unit, a router, and a high speed network. |

(iv)    On information and belief, Eicker contributed substantially to the conception of the invention(s) claimed in at least one claim of each of the '156 and '883 patents, but is not named an inventor on either patent. Eicker's inventorship is corroborated by, among other things, contemporaneous documents establishing Eicker's participation in conception. *See, e.g.*, ParTec_00000045, at -374–386. On information and belief, Eicker's conception of the claimed invention was communicated to the named inventor, Thomas Lippert. *See, e.g.*, *id.* Eicker's contribution to the conception of a dynamic accelerator-cluster architecture is further independently corroborated by his co-authorship with Thomas Lippert on papers concerning those inventions. The '156 and '883 patents are therefore invalid for improper inventorship and for claiming derived subject matter.

(v)    Many features conceived by Eicker in his research are claimed in the '442 patent.



| Eicker's Research | '442 Patent |
|---|---|

**The DEEP Project** – Slides, 31

**1.** A method of operating a heterogeneous computing system comprising a plurality of computation nodes and a plurality of booster nodes, at least one of the plurality of computation nodes and a plurality of booster nodes being arranged to compute a computation task, the computation task comprising a plurality of sub-tasks, the method comprising:
in a first computing iteration, assigning and processing the plurality of sub-tasks by at least a portion of the plurality of computation nodes and at least a portion of the plurality of booster nodes in a first distribution; and generating, using information relating to the processing of the plurality of sub-tasks by at least the portion of the plurality of computation nodes and at least the portion of the plurality of booster nodes, a further distribution of the plurality of sub-tasks between the plurality of computation nodes and the plurality of booster nodes for processing thereby in a further computing iteration.

**7.** The method according to claim **1**, wherein the information is used to provide a grouping of sub-tasks in at least one of the first computing iteration and the further computing iteration.

**The DEEP Project** – Slides, 21

**2.** The method according to claim **1**, wherein an application manager receives the information and determines the further distribution.

**3.** The method according to claim **2**, wherein a resource manager determines the assignment of the plurality of sub-tasks to the plurality of computation nodes and the plurality of booster nodes for the first computing iteration as a function of the computation task and wherein the application manager receives the information and processes the information as input to the resource manager such that the resource manager dynamically alters further distribution during the computing of the computation task.

**4.** The method according to claim **3**, wherein the resource manager receives the information such that the resource manager dynamically alters assignment of the plurality of computation nodes and the plurality of booster nodes to each other during the computation of the computation task.

**5.** The method according to claim **1**, wherein daemons operate in the plurality of computation nodes and the plurality of booster nodes to generate the information.

**8.** The method according to claim **3**, wherein a daemon operating at a node generates a measure of a loading of the node during processing of a sub-task of the plurality of sub-tasks.

The proposed architecture provides several advantages:

- The Cluster element allows to run complex kernels. There is no restriction to run parallel kernels with complicated communication-patterns or highly irregular codes as on todays highly-scalable MPP machines.

- The Booster element is able to run highly-scalable kernels in the most energy-efficient way. The limitations of today's accelerated Clusters are avoided by enabling the compute-elements – i.e. the accelerators in the BNs – to do direct communication to remote BNs.

- It cannot be expected that the ratio between the amount of work to be executed on the commodity CPU and the accelerator is fixed between different applications or even between different kernels of one applications. The proposed architecture supports this fact by virtualizing the accelerator. The accelerator is no longer part of the CN and assigning CNs and BNs might be done dynamically.

- At the same time the dynamical assignment of CNs and BNs improves resiliency. Faulty accelerator do not affect CNs and vice versa.

**An Accelerated Cluster-Architecture**, 116

**9.** A heterogeneous computing system comprising:
a plurality of computation nodes and a plurality of booster nodes for computing one or more tasks comprising multiple sub-tasks;
a communication interface connecting the plurality of computation nodes with each other and the plurality of booster nodes;
a resource manager for assigning at least a portion of the plurality of booster nodes and at least a portion of the plurality of computation nodes to each other for the computing of the one or more tasks in a first computing iteration; and
an application manager configured to receive information from daemons operating in at least the portion of the plurality of computation nodes and at least the portion of the plurality of booster nodes to update a distribution of the multiple sub-tasks between the plurality of computation nodes and the plurality of booster nodes in a further computing iteration.

**10.** The heterogeneous computing system according to claim **9**, wherein the resource manager receives the information such that the resource manager dynamically alters assignment of the plurality of computation nodes and the plurality of booster nodes to each other.

(vi)      On information and belief, Eicker contributed substantially to the conception of the

invention(s) claimed in at least one claim the '442 patent, but is not named an

inventor on that patent.  Eicker's inventorship is corroborated by, among other

things, contemporaneous documents establishing Eicker's participation in conception. *See, e.g.*, ParTec_00000045, at -374–386. On information and belief, Eicker's conception of the claimed invention was communicated to the named inventors, Thomas Lippert and Bernhard Frohwitter. *See, e.g.*, *id.*; ParTec_00001955. Further, the '442 patent purports to be a development of the system disclosed in the '156 and '883 patents, to which Eicker should also be named an inventor. '442 Patent, 1:22-25. The '442 Patent is therefore invalid for improper inventorship and for claiming derived subject matter.

### *Sebastian Rinke*

(vii)    Sebastian Rinke is a professor at the University of Leipzig who formerly worked as a research assistant at the Julich Supercomputing Centre (JSC), from 2009-2010. MSFT_PARTEC_000710590.[5] In 2010, Rinke became a research assistant at the German Research School for Simulation (GRS) at Aachen University. By 2018, Rinke had transitioned to the Technical University of Darmstadt, and he joined the University of Leipzig as a Professor in 2024. Rinke's contributions to the joint research efforts among those schools is the development of an accelerator/booster, including a torus network of booster nodes, which Rinke had developed and published by 2010.

(viii)    Rinke's research included:

- **S. Rinke**, H Boettiger & B. Krill, QPACE: Energy-Efficient High Performance Computing (2010), MSFT_PARTEC_000711582

- N. Attig, F. Berberich, U. Detert, N. Eicker, T. Eickermann, P. Gibbon, W. Gurich, W. Homberg, A. Illich, **S. Rinke**, M Stephan, K. Wolkersdorfer & **T. Lippert**, Entering

---

[5] https://fim.htwk-leipzig.de/en/fakultaet/personen/professorinnen-und-professoren/sebastian-rinke

the Petaflop-Era: New Developments in Supercomputing (2010), MSFT_PARTEC_000710797

- **S. Rinke**, D. Becker, **T. Lippert**, S. Prabhakaran, L. Westphal & F. Wolf, A Dynamic Accelerator-Cluster Architecture (2012), MSFT_PARTEC_000710232

(ix)     Many features conceived by Rinke in his research are claimed in the '156 and '883 patents.

| Rinke's Research | '883 Patent |
|---|---|
| The front-end systems of the currently deployed QPACE installations consist of 8 IBM System x Linux servers. A login server acts as central user access point where users can login to submit jobs and manage their data. The so-called master server acts as central system control and monitoring instance. All other servers will be used to provide fast disk storage access. The number of disks attached to these servers is sufficient to sustain a bandwidth of up to 2 GBytes/sec.<br><br>*QPACE – A QCD Parallel Computer*, 17 | 13. A method for operating a computer cluster arrangement for processing a computation task, comprising: computing at least a first part of a computation task by at least two of a plurality of computation nodes, each computation node of the plurality of computation nodes interfacing a communication infrastructure; |
| The QPACE node cards are interconnected as a 3-dimensional torus. The largest partition which fits on a single backplane is of size $(x,y,z) = (1,4,8)$. To increase the number of nodes in the y-direction cables connecting backplanes in the vertical direction have to be used. Similarly, in the x-direction backplanes are connected in the horizontal direction. In order to have some flexibility in re-partitioning the machine we make use of a feature of the network PHYs used on the node cards, which come with two serial interfaces. Controlled by software it is possible to select either the primary or the redundant interface. By connecting some of these redundant interfaces to additional backplane lines it is possible to partition the machine in different ways. In Fig. 5 we<br><br>*QPACE – A QCD Parallel Computer*, 10 | assigning a selected booster of a plurality of boosters to a first computation node of the plurality of computation nodes by a resource manager, for computation of a second part of said computation task, said assignment being accomplished as a function of a predetermined assignment metric wherein the resource manager provides assignment information to the first computation node after the assignment of the selected booster enabling the first computation node to outsource the second part of the computation task to the assigned selected booster under control of the first computation node; |
| one QPACE rack is about 32 kW. The 3-dimensional torus network interconnects the node cards with nearest-neighbour communication links, driven by a lean custom protocol optimized for low latencies. For the physical layer of the links q10 Gigabit Ethernet PHYs are used providing a bandwidth of 1 GB/s per link and direction.<br><br>*Entering the Petaflop Era*, 10 | updating the predetermined assignment metric during the processing of the computation task; and establishing a dynamic assignment during the processing of the computation task by using the updated predetermined assignment metric. |
| <br><br>Figure 5: The picture shows 8 node cards which by switching between PHY interfaces in 1 dimension (here: z-direction) can be connected either as 1 ring of 8 or 2 rings of 4 node cards.<br><br>*QPACE – A QCD Parallel Computer*, 12 | 14. The method of claim 13, wherein the first computation node is included in the at least two of the plurality of computation nodes. |

| Rinke's Research | 156 Patent |
|---|---|
| **2   QPACE Architecture**<br><br>QPACE [4, 5, 6] is a distributed-memory parallel computer based on the IBM PowerXCell 8i [12] processor. This hybrid processor contains one PowerPC Processor Element (PPE) and 8 Synergistic Processor Elements (SPE). Each SPE has 256 KB on-chip memory, called local score (LS), and runs one single thread. Memory transfers between main memory and local store are possible via DMA operations. The memory controller as well as an IO interface (Rambus FlexIO) is integrated into the processor. Regarding double precision (DP) floating point performance, one SPE can execute up to 4 operations per cycle. Thus, clocked at 3.2 GHz, the 8 SPEs on a PowerXCell 8i processor yield a DP peak performance of 102.4 GFlops. Each compute node, called node card, comprises one PowerX-Cell 8i CPU, 4 GiB of DDR2 main memory, and a network processor (NWP) which is implemented on a Xilinx V5-LX110T FPGA (Field Programmable Gate Array). The PowerXCell 8i is directly connected to the NWP via its I/O interface. The network processor provides access to 3 different interconnects: Gigabit Ethernet, signal tree network, and 3D torus network. The power consumption of a single node card is about 130 W. One QPACE rack houses 256 node cards (15 kW) and yields 26 TFlops DP peak performance. This leads to a power efficiency of about 1.5 W/GFlops (peak). | 1. A computer cluster-booster system for processing a computation task, comprising:<br>a plurality of hardware computation nodes, each of which interfaces with a communication infrastructure, at least two of the hardware computation nodes being arranged to jointly compute at least a first part of said computation task;<br>a plurality of hardware boosters, each hardware booster having a compute capacity, at least one hardware booster of the plurality of hardware boosters being assigned to at least one hardware computation node and under control of that at least one hardware computation node, the at least one hardware booster interfacing with the communication infrastructure; and |
| <br><br>Figure 7: Algathers (Numbers below a circle denote data blocks available on the corresponding process) (a) Neighbour exchange algorithm [13] (b) Modification of neighbour exchange algorithm<br><br>Figure 8: Data transfer in Scatters (Numbers below a circle denote data blocks available on the corresponding process)<br><br>*QPACE: Energy Efficient High Performance*, 8-9 | a resource manager being arranged to assign the at least one hardware booster to the at least one hardware computation node, including:<br>at a start of computation of said computation task, establishing an initial assignment by using a predetermined assignment metric specified as a function of at least one of a group of assignment parameters, and during said processing of said computation task: (i) updating the predetermined assignment metric; and (ii) establishing a dynamic assignment by using the predetermined assignment metric that was updated, and |

40

| Rinke's Research | 156 Patent |
|---|---|

**Rinke's Research:**

Since torus low-level and thus torus MPI communication is only possible between neighbours in the torus, TCP/IP over Gigabit Ethernet is used as alternative for message passing between non-neighbours in the torus network. The selection of torus or Ethernet communication is performed on a per message basis by Open MPI. This is possible because during initialization each BTL component (tcp and tnw in this case) informs Open MPI about which MPI processes it can reach. On QPACE, the tcp component can reach all processes. In case that both torus and Ethernet are available for transmitting an MPI message, the torus interconnect is chosen.

*QPACE: Energy Efficient High Performance*, 1

**4.1 Memory Considerations**

The HPL stores the matrix in the main memory of the compute nodes and uses the SPEs as accelerators for computation. To leverage the computational power of the PowerXCell 8i processor, each node card should store a fraction of the matrix large enough to minimize communication between nodes. On the other side, too much computational load per node may lead to performance degradation in comparison to using more compute nodes with less load each. The reason is that, in this case, the additional time caused by overloading a node with computation is greater than the time for communication using more nodes. In our experiments, however, the size of the main memory (4 GiB per node) and not the performance of the SPEs was the limiting factor.

*QPACE: Energy Efficient High Performance*, 4



At JSC, a 4-rack QPACE system is installed. It is a sister system to a machine at Wuppertal University. The building block is a node card comprising an IBM PowerXCell 8i processor and a custom FPGA-based network processor. 32 node cards are mounted on a single backplane and eight backplanes are arranged inside one rack, hosting a total of 256 node cards. The closed node card housing, which is connected to a liquid-cooled cold plate, acts as a heat conductor thus making QPACE a highly energy-efficient system. To remove the generated heat a cost-efficient liquid cooling system has been developed which enables high packaging densities. The maximum power consumption of one QPACE rack is about 32 kW. The 3-dimensional torus network interconnects the node cards with nearest-neighbour communication links, driven by a lean custom protocol optimized for low latencies. For the physical layer of the links q10 Gigabit Ethernet PHYs are used providing a bandwidth of 1 GB/s per link and direction.

Figure 4.  Energy Saver QPACE.

*Entering the Petaflop-Era*, 9.

**156 Patent:**

wherein the plurality of hardware computation nodes and the plurality of hardware boosters are configured such that during processing of said computation task, assignments of hardware computation nodes and hardware boosters can be provided such that at least (i) at least one of the plurality of hardware computation nodes is arranged to communicate with at least one of the plurality of hardware boosters, (ii) at least one of the plurality of hardware boosters is assigned to and shared by more than one of the plurality of hardware computation nodes such that the compute capacity of the at least one of the plurality of hardware boosters is shared between the more than one of the plurality of hardware computation nodes, and (iii) each of the hardware boosters is assignable to each of the hardware computation nodes.

**8.** The computer cluster system according to claim 1, wherein each hardware computation node from among the plurality of hardware computation nodes and the at least one hardware booster respectively interface with said communication infrastructure via a first interfacing unit and a second interfacing unit.

**9.** The computer cluster system according to claim 8, wherein each of said first interfacing unit and said second interfacing unit comprises at least one of a group of components, said group of components comprising: a virtual interface, a stub, a socket, a network controller, and a network device.

**10.** The computer cluster system according to claim 1, wherein said communication infrastructure comprises at least one of a group of components, said group of components comprising: a bus, a communication link, a switching unit, a router, and a high speed network.

**11.** The computer cluster system according to claim 1, wherein each hardware computation node from among the plurality of hardware computation nodes comprises at least one of a group of components, said group of components comprising: a multi-core processor, a cluster, a computer, a workstation, and a multi-purpose processor.

**12.** The computer cluster system according to claim 1, wherein said at least one hardware booster comprises at least one of a group of components, said group of components comprising: a multi-core processor, a scalar processor, a co-processor, a graphical processing unit, a cluster of multi-core processors, and a monolithic processor.

(x)     On information and belief, Rinke contributed substantially to the conception of the invention(s) claimed in at least one claim of each of the '156 and '883 patents, but is not named an inventor on either patent. Rinke's inventorship is corroborated by, among other things, contemporaneous documents establishing Rinke's participation in conception. *See, e.g.*, ParTec_00000045, at -404–410. On information and belief, Rinke's conception of the claimed invention was communicated to the named inventor, Thomas Lippert. *See, e.g.*, *id.* Rinke's contribution to the conception of a dynamic accelerator-cluster architecture is further independently corroborated by his co-authorship with Thomas Lippert on a

paper concerning those inventions.  The '156 and '883 patents are therefore invalid for improper inventorship and for claiming derived subject matter.

(xi)    Many features conceived by Rinke in his research are claimed in the '442 patent.

| Rinke's Research | '442 Patent |
|---|---|
| To address this limitation, we propose a novel accelerator-cluster architecture in which network-attached accelerators are dynamically assigned to compute nodes. This allows not only their optimal utilization but also a more precise match between application requirements and accelerator hardware. We outline the general concept of our dynamic architecture and show that it can offer substantial benefits to certain classes of applications without significantly harming the performance of others.<br><br>*A Dynamic Accelerator-Cluster Architecture* | **1**. A method of operating a heterogeneous computing system comprising a plurality of computation nodes and a plurality of booster nodes, at least one of the plurality of computation nodes and a plurality of booster nodes being arranged to compute a computation task, the computation task comprising a plurality of sub-tasks, the method comprising: |
| <br>*A Dynamic Accelerator-Cluster Architecture* | in a first computing iteration, assigning and processing the plurality of sub-tasks by at least a portion of the plurality of computation nodes and at least a portion of the plurality of booster nodes in a first distribution; and generating, using information relating to the processing of the plurality of sub-tasks by at least the portion of the plurality of computation nodes and at least the portion of the plurality of booster nodes, a further distribution of the plurality of sub-tasks between the plurality of computation nodes and the plurality of booster nodes for processing thereby in a further computing iteration. |
| The software stack (Figure 4) of our dynamic accelerator-cluster architecture consists of a front-end on every compute node and a back-end on every accelerator. The front-end translates API calls into requests which are redirected to the back-end, where a daemon receives those requests and executes them on the CUDA-enabled GPU using the CUDA driver API. The front-end talks to the back-end using a handle that uniquely identifies an assigned accelerator, enabling transparent communication between the compute node and the accelerator. Figure 4 illustrates this software stack, which is extensible to any accelerator programming interface and therefore not restricted to CUDA by design.<br><br>Figure 4.  Dynamic accelerator-cluster software architecture with CUDA back-end.<br><br>*A Dynamic Accelerator-Cluster Architecture* | **2**. The method according to claim **1**, wherein an application manager receives the information and determines the further distribution.<br>**3**. The method according to claim **2**, wherein a resource manager determines the assignment of the plurality of sub-tasks to the plurality of computation nodes and the plurality of booster nodes for the first computing iteration as a function of the computation task and wherein the application manager receives the information and processes the information as input to the resource manager such that the resource manager dynamically alters their distribution during the computing of the computation task.<br>**4**. The method according to claim **3**, wherein the resource manager receives the information such that the resource manager dynamically alters assignment of the plurality of computation nodes and the plurality of booster nodes to each other during the computation of the computation task.<br>**5**. The method according to claim **1**, wherein daemons operate in the plurality of computation nodes and the plurality of booster nodes to generate the information.<br>**8**. The method according to claim **3**, wherein a daemon operating at a node generates a measure of a loading of the node during processing of a sub-task of the plurality of sub-tasks. |

(xii)    On information and belief, Rinke contributed substantially to the conception of the invention(s) claimed in at least one claim of the '442 patent, but is not named an inventor on that patent.  Rinke's inventorship is corroborated by, among other things, contemporaneous documents establishing Rinke's participation in conception. *See, e.g.*, ParTec_00000045, at -404–410.  On information and belief,

Rinke's conception of the claimed invention was communicated to the named inventors, Thomas Lippert and Bernhard Frohwitter. *See, e.g.*, *id.*; ParTec_00001955. Rinke's contribution to the conception of a dynamic accelerator-cluster architecture is further independently corroborated by his co-authorship with Thomas Lippert on a paper concerning those purported inventions. Further, the '442 patent purports to be a development of the system disclosed in the '156 and '883 patents, to which Rinke should also be named an inventor. '442 Patent, 1:22-25. The '442 Patent is therefore invalid for improper inventorship and for claiming derived subject matter.

### Felix Wolf

(xiii)     Felix Wolf is a professor at Technical University Darmstadt who formerly worked at the Julich Supercomputing Centre (JSC), until 2011. MSFT_PARTEC_000711662.[6] In 2006, Wolf was made an Assistant Professor at the German Research School for Simulation (GRS) at Aachen University. In 2009, Wolf was made a Full Professor at Aachen University/GRS, and by 2011 Wolf had left JSC entirely. Since 2015, Wolf has been a Full Professor at Technical University Darmstadt. One of Wolf's contributions to the joint research efforts between these groups was supplying the idea of dynamic resource management and developing that feature for the JSC/GRS clusters, which Wolf had published by 2009 at Aachen University/GRS with Daniel Becker. Wolf was also the dissertation advisor for Daniel Becker.[7]

---

[6] https://www.parallel.informatik.tu-darmstadt.de/laboratory/team/wolf/wolf.html
[7] D. Becker, *Timestamp Synchronization of Concurrent Events* (2009) (**F. Wolf,** advisor), MSFT_PARTEC_000710592.

(xiv)    Wolf's research included:

- D. Becker, **F. Wolf**, W. Frings, M Geimer, B.J.N. Wylie & B. Mohr., Automatic Trace-Based Performance Analysis of Metacomputing Applications (2007), MSFT_PARTEC_000710214

- D. Becker, W. Frings & **F. Wolf**, Performance Evaluation and Optimization of Parallel Grid Computing Applications (2008), MSFT_PARTEC_000710797

- **F. Wolf**, D. Becker, M. Geimer, B.J.N. Wylie, Scalable Performance Analysis Methods for the Next Generation of Supercomputers (2008), MSFT_PARTEC_000710581

- D. Becker, Timestamp Synchronization of Concurrent Events (2009) (**F. Wolf, advisor**), MSFT_PARTEC_000710592

- **F. Wolf**, D. Bohme, M. Geimer, M.-A. Hermanns, B. Mohr, Z. Szebenyi & B.J.N. Wylie, Performance Tuning in the Petascale Era (2010), MSFT_PARTEC_000710224

- S. Rinke, D. Becker, **T. Lippert**, S. Prabhakaran, L. Westphal & **F. Wolf**, A Dynamic Accelerator-Cluster Architecture (2012), MSFT_PARTEC_000710232

(xv)    Many features conceived by Wolf in his research are claimed in the '156 and '883 patents.

| Wolf's Research | 156 Patent |
|---|---|
|  A metacomputer consists of several independent and potentially heterogeneous parallel systems (metahosts), which are connected by network links to a single unit. The metahosts' internal network is usually based on a fast interconnect, such as SCI, Myrinet, Infiniband, or a proprietary network. Metahosts belonging to the same organization are typically connected via a local area network. Distant metahosts, which often belong to different organizations, are typically linked by a wide-area interconnection. Figure 2 shows the schematic view of a metacomputer including its external and internal networks.<br><br>**Figure 2. Schematic view of a metacomputer including its external and internal networks.**<br><br>*Automatic Trace-Based Performance Analysis*, 3, 5 | **1.** A computer cluster-booster system for processing a computation task, comprising:<br>a plurality of hardware computation nodes, each of which interfaces with a communication infrastructure, at least two of the hardware computation nodes being arranged to jointly compute at least a first part of said computation task;<br>a plurality of hardware boosters, each hardware booster having a compute capacity, at least one hardware booster of the plurality of hardware boosters being arranged to compute at least a second, specific part of said computation task after having been assigned to at least one hardware computation node and under control of that at least one hardware computation node, the at least one hardware booster interfacing with the communication infrastructure; and |
| Trace). Trace applies a three-dimensional domain decomposition with nearest-neighbor communication. The algorithm is based on a parallel version of the conjugate gradient (CG) method. In contrast, Partrace tracks individual particles. Every 10-15 seconds, Trace sends the velocity field in a chunk of 200 MB in parallel to Partrace for further processing. In addition, Partrace sends steering information to Trace. The entire simulation is provided as a single executable that integrates the two submodels written in FORTRAN and C++ using a wrapper written in C. It is worth noting that our toolset can, in principle, also handle separate executables. The application was instrumented by inserting directives which were automatically translated into tracing API calls by a preprocessor.<br><br>vironments. For this purpose, we have developed an extension to the SCALASCA toolkit consisting of the following components:<br><br>1. Extended runtime configuration management capable of identifying the metahost an application process is running on, a prerequisite needed for the remaining items.<br><br>2. A hierarchical mechanism for synchronizing event timings that is able to deal with substantially different latencies in external and internal networks.<br><br>3. Extended trace archive management permitting the creation of multiple partial trace archives, which is required in the absence of a shared file system between metahosts.<br><br>*Automatic Trace-Based Performance Analysis*, 7-8 | a resource manager being arranged to assign the at least one hardware booster to the at least one hardware computation node, including:<br>at a start of processing of said computation task, establishing an initial assignment by using a predetermined assignment metric specified as a function of at least one of a group of assignment parameters, and during said processing of said computation task: (i) updating the predetermined assignment metric, and (ii) establishing a dynamic assignment by using the predetermined assignment metric that was updated, and |

| Wolf's Research | 156 Patent |
|---|---|
| (b) Hierarchical synchronization of time stamps with off-set measurements between all local slave processes and their local master.<br><br>Table 3. Detailed configurations of the three-metahost and one-metahost experiments.<br><br>| | Experiment 1 | Experiment 2 |<br>|---|---|---|<br>| Partrace | XD1:<br>8 nodes<br>2 processes/node | IBM AIX POWER:<br>1 node<br>16 processes/node |<br>| Trace | FH-BRS:<br>2 nodes<br>4 processes/node<br>CAESAR:<br>4 nodes<br>2 processes/node | IBM AIX POWER:<br>1 node<br>16 processes/node |<br><br>*Automatic Trace-Based Performance Analysis*, 5, 7 | wherein the plurality of hardware computation nodes and the plurality of hardware boosters are configured such that during processing of said computation task, assignments of hardware computation nodes and hardware boosters can be provided such that at least (i) at least one of the plurality of hardware computation nodes is arranged to communicate with at least one of the plurality of hardware boosters, (ii) at least one of the plurality of hardware boosters is assigned to and shared by more than one of the plurality of hardware computation nodes such that the compute capacity of the at least one of the plurality of hardware boosters is shared between the more than one of the plurality of hardware computation nodes, and (iii) each of the hardware boosters is assignable to each of the hardware computation nodes. |
| **4.2   Space-Efficient Time-Series Call-Path Profiling**<br><br>While call-path profiling is an established method of linking a performance problem to the context in which it occurs, generating call-path profiles separately for thousands of iterations may exceed the available buffer space — especially when the call tree is large and more than one metric is collected. We therefore developed a runtime approach for the semantic compression of call-path profiles[13] based on incremental clustering of a series of single-iteration profiles that scales in terms of the number of iterations without sacrificing important performance details. Our approach offers low runtime overhead by using only a condensed version of the profile data when calculating distances and accounts for process-dependent variations by making all clustering decisions locally.<br><br>*Performance Tuning in the Petascale Era*, 7 | **2.** The computer cluster system according to claim **1**, wherein said predetermined assignment metric is formed according to at least one of a group of metric specification techniques, said group of metric specification techniques comprising: a temporal logic, an assignment matrix, an assignment table, a probability function, and a cost function.<br><br>**3.** The computer cluster system according to claim **2**, wherein said group of assignment parameters comprise one or more of: resource information, cost information, complexity information, scalability information, a computation log record, compiler information, priority information, and a time stamp. |

| Wolf's Research | '883 Patent |
|---|---|
| **Figure 2. Schematic view of a metacomputer including its external and internal networks.**<br><br>(b) Hierarchical synchronization of time stamps with off-set measurements between all local slave processes and their local master.<br><br>*Automatic Trace-Based Performance Analysis*, 3-5 | **1.** A computer cluster system for processing a computation task, comprising:<br>  a plurality of hardware computation nodes, a plurality of hardware boosters, and a resource manager, the plurality of hardware computation nodes and the plurality of hardware boosters each interfacing a communication infrastructure;<br>  the resource manager being arranged to:<br>  assign a selected hardware booster of the plurality of hardware boosters to a first hardware computation node of the plurality of hardware computation nodes for computation of a part of the computation task,<br>  provide assignment information to the first hardware computation node after the assignment of the selected hardware booster so as to enable the first hardware computation node to outsource the part of the computation task to the assigned selected hardware booster under control of the first hardware computation node,<br>  initialize a static assignment and further to establish a dynamic assignment during the processing of the computation task, |

| Wolf's Research | '883 Patent |
|---|---|
| **4.2 Space-Efficient Time-Series Call-Path Profiling**<br><br>While call-path profiling is an established method of linking a performance problem to the context in which it occurs, generating call-path profiles separately for thousands of iterations may exceed the available buffer space — especially when the call tree is large and more than one metric is collected. We therefore developed a runtime approach for the semantic compression of call-path profiles[13] based on incremental clustering of a series of single-iteration profiles that scales in terms of the number of iterations without sacrificing important performance details. Our approach offers low runtime overhead by using only a condensed version of the profile data when calculating distances and accounts for process-dependent variations by making all clustering decisions locally.<br><br>*Performance Tuning in the Petascale Era*, 7<br><br><br><br>**Figure 3.2:** Algorithms that calculate the clock errors through the differences of message transfer times in both directions between two processes.<br><br>*Timestamp Synchronization of Concurrent Events*, 39 | **2.** The computer cluster system according to claim **1**, wherein the resource manager is arranged to perform said assignment of the selected hardware booster to the first hardware computation node as a function of the predetermined assignment metric, the assignment being static at a start of processing of the computation task and a dynamic assignment during processing of the computation task.<br><br>**3.** The computer cluster system according to claim **1**, wherein the resource manager is arranged to perform the dynamic assignment in response to specific computation task observations.<br><br>**4.** The computer cluster system according to claim **1**, wherein said predetermined assignment metric is formed according to at least one of a group of metric specification techniques, said group of metric specification techniques comprising: a temporal logic, an assignment matrix, an assignment table, a probability function, and a cost function.<br><br>**5.** The computer cluster system according to claim **1**, wherein said predetermined assignment metric is specified as a function of at least one of a group of assignment parameters, said group of assignment parameters comprising: resource information, cost information, complexity information, scalability information, a computation log record, compiler information, priority information, and a time stamp.<br><br>**6.** The computer cluster system according to claim **1**, wherein said assignment of the selected hardware booster to the first hardware computation node triggers at least one of a group of signals, said group of signals comprising: a remote procedure call, a parameter handover, and a data transmission. |

(xvi)      On information and belief, Wolf contributed substantially to the conception of the invention(s) claimed in at least one claim of each of the '156 and '883 patents, but is not named an inventor on either patent. Wolf's inventorship is corroborated by, among other things, contemporaneous documents establishing Wolf's participation in conception. *See, e.g.*, ParTec_00000045, at -404–410. On information and belief, Wolf's conception of the claimed invention was communicated to the named inventor, Thomas Lippert. *See, e.g., Id.* Wolf's contribution to the conception of a dynamic accelerator-cluster architecture is further independently corroborated by his co-authorship with Thomas Lippert on a paper concerning those inventions. The '156 and '883 patents are therefore invalid for improper inventorship and for claiming derived subject matter.

(xvii)      Many features conceived by Wolf in his research are claimed in the '442 patent.

| Wolf's Research | '442 Patent |
|---|---|
| To address this limitation, we propose a novel accelerator-cluster architecture in which network-attached accelerators are dynamically assigned to compute nodes. This allows not only their optimal utilization but also a more precise match between application requirements and accelerator hardware. We outline the general concept of our dynamic architecture and show that it can offer substantial benefits to certain classes of applications without significantly harming the performance of others.<br><br>*A Dynamic Accelerator-Cluster Architecture* | **1**. A method of operating a heterogeneous computing system comprising a plurality of computation nodes and a plurality of booster nodes, at least one of the plurality of computation nodes and a plurality of booster nodes being arranged to compute a computation task, the computation task comprising a plurality of sub-tasks, the method comprising: |
| <br>(b) Dynamic assignment.<br><br>*A Dynamic Accelerator-Cluster Architecture* | in a first computing iteration, assigning and processing the plurality of sub-tasks by at least a portion of the plurality of computation nodes and at least a portion of the plurality of booster nodes in a first distribution; and generating, using information relating to the processing of the plurality of sub-tasks by at least the portion of the plurality of computation nodes and at least the portion of the plurality of booster nodes, a further distribution of the plurality of sub-tasks between the plurality of computation nodes and the plurality of booster nodes for processing thereby in a further computing iteration.<br><br>**2**. The method according to claim **1**, wherein an application manager receives the information and determines the further distribution. |
| The software stack (Figure 4) of our dynamic accelerator-cluster architecture consists of a front-end on every compute node and a back-end on every accelerator. The front-end translates API calls into requests which are redirected to the back-end, where a daemon receives those requests and executes them on the CUDA-enabled GPU using the CUDA driver API. The front-end talks to the back-end using a handle that uniquely identifies an assigned accelerator, enabling transparent communication between the compute node and the accelerator. Figure 4 illustrates this software stack, which is extensible to any accelerator programming interface and therefore not restricted to CUDA by design.<br><br><br>Figure 4. Dynamic accelerator-cluster software architecture with CUDA back-end.<br><br>*A Dynamic Accelerator-Cluster Architecture* | **3**. The method according to claim **2**, wherein a resource manager determines the assignment of the plurality of sub-tasks to the plurality of computation nodes and the plurality of booster nodes for the first computing iteration as a function of the computation task and wherein the application manager receives the information and processes the information as input to the resource manager such that the resource manager dynamically alters further distribution during the computing of the computation task.<br>**4**. The method according to claim **3**, wherein the resource manager receives the information such that the resource manager dynamically alters assignment of the plurality of computation nodes and the plurality of booster nodes to each other during the computation of the computation task.<br>**5**. The method according to claim **1**, wherein daemons operate in the plurality of computation nodes and the plurality of booster nodes to generate the information.<br>**8**. The method according to claim **3**, wherein a daemon operating at a node generates a measure of a loading of the node during processing of a sub-task of the plurality of sub-tasks. |

(xviii)   On information and belief, Wolf contributed substantially to the conception of the invention(s) claimed in at least one claim of the '442 patent, but is not named an inventor on that patent. Wolf's inventorship is corroborated by, among other things, contemporaneous documents establishing Wolf's participation in conception. *See, e.g.*, ParTec_00000045, at -404–410. On information and belief, Wolf's conception of the claimed invention was communicated to the named inventors, Thomas Lippert and Bernhard Frohwitter. *See, e.g., id.*;

ParTec_00001955.  Wolf's contribution to the conception of a dynamic accelerator-cluster architecture is further independently corroborated by his co-authorship with Thomas Lippert on a paper concerning those inventions.  Further, the '442 patent purports to be a development of the system disclosed in the '156 and '883 patents, to which Wolf should also be named an inventor.  '442 Patent, 1:22-25.  The '442 Patent is therefore invalid for improper inventorship and for claiming derived subject matter.

### *Daniel Becker*

(xix)  Daniel Becker is an industry and academic researcher employed by Siemens AG. Becker received his Ph.D. from RWTH Aachen University in 2009. MSFT_PARTEC_000710777.[8]  Becker's dissertation, *Timestamp Synchronization of Concurrent Events*, was supervised by Felix Wolf and published in 2009.  Part of the dissertation work was done at JSC.   MSFT_PARTEC_000710592.  In his dissertation, Becker acknowledges that his work "would have never been possible without the enthusiastic supervision and guidance of [his] advisor Prof. Dr. Felix Wolf."[9]  Becker also thanks Thomas Lippert, whose role in the effort is described as having provided a "supportive research environment."[10]  By 2011, Becker was employed in the Corporate Technology department of Siemens AG. MSFT_PARTEC_000710777

(xx)  Becker's research included:

---

[8] https://www.software-factory-4-0.de/en/industry-day-2/
[9] D. Becker, *Timestamp Synchronization of Concurrent Events* (2009), at Acknowledgements. MSFT_PARTEC_000710592.
[10] *Id.*

- **D. Becker**, F. Wolf, W. Frings, M Geimer, B.J.N. Wylie & B. Mohr., Automatic Trace-Based Performance Analysis of Metacomputing Applications (2007), MSFT_PARTEC_000710214

- F. Wolf, **D. Becker**, M. Geimer, B.J.N. Wylie, Scalable Performance Analysis Methods for the Next Generation of Supercomputers (2008), MSFT_PARTEC_000710581

- **D. Becker**, W. Frings & F. Wolf, Performance Evaluation and Optimization of Parallel Grid Computing Applications (2008), MSFT_PARTEC_000710797

- **D. Becker**, Timestamp Synchronization of Concurrent Events (2009) (F. Wolf, advisor), MSFT_PARTEC_000710592

- S. Rinke, **D. Becker**, **T. Lippert**, S. Prabhakaran, L. Westphal & F. Wolf, A Dynamic Accelerator-Cluster Architecture (2012), MSFT_PARTEC_000710232

(xxi)    Many features conceived by Becker in his research are claimed in the '156 and '883 patents.

| Becker's Research | 156 Patent |
|---|---|
|  *Figure 7.1: Network topology of the Viola grid section used for the experiments.* *Timestamp Synchronization of Concurrent Events*, 83 | **1.** A computer cluster-booster system for processing a computation task, comprising: a plurality of hardware computation nodes, each of which interfaces with a communication infrastructure, at least two of the hardware computation nodes being arranged to jointly compute at least a first part of said computation task; a plurality of hardware boosters, each hardware booster having a compute capacity, at least one hardware booster of the plurality of hardware boosters being arranged to compute at least a second, specific part of said computation task after having been assigned to at least one hardware computation node and under control of that at least one hardware computation node, the at least one hardware booster interfacing with the communication infrastructure; and |
| The co-scheduling of jobs on different clusters in the Viola grid is managed by the grid middleware UNICORE [47] which has been enhanced by adding a meta-scheduler for the simultaneous allocation of compute and network resources. Bierbaum et al. [14] described this UNICORE-based infrastructure supporting the co-allocation of metacomputing resources in more detail, with special emphasis on the intricate task of coordinating network allocation with application startup. Viola uses MetaMPICH [15], the grid-enabled MPICH-based MPI implementation developed at RWTH Aachen University, to establish direct connections to the external network from each node. MetaMPICH supports these direct connections through a multi-device architecture that *Timestamp Synchronization of Concurrent Events*, 83 | a resource manager being arranged to assign the at least one hardware booster to the at least one hardware computation node, including: establishing an initial assignment by using a predetermined assignment metric specified as a function of at least one of a group of assignment parameters, and during said processing of said computation task: (i) updating the predetermined assignment metric, and (ii) establishing a dynamic assignment by using the predetermined assignment metric that was updated, and |
|  *Figure 6.8: Hierarchical offset measurements between each local worker process and their local master.* *Timestamp Synchronization of Concurrent Events*, 79 | wherein the plurality of hardware computation nodes and the plurality of hardware boosters are configured such that during processing of said computation task, assignments of hardware computation nodes and hardware boosters can be provided such that at least (i) at least one of the plurality of hardware computation nodes is arranged to communicate with at least one of the plurality of hardware boosters, (ii) at least one of the plurality of hardware boosters is assigned to and shared by more than one of the plurality of hardware computation nodes such that the compute capacity of the at least one of the plurality of hardware boosters is shared between the more than one of the plurality of hardware computation nodes, and (iii) each of the hardware boosters is assignable to each of the hardware computation nodes. |

| Becker's Research | 156 Patent |
|---|---|
|  **Figure 3.2:** Algorithms that calculate the clock errors through the differences of message transfer times in both directions between two processes. *Timestamp Synchronization of Concurrent Events*, 39 | **2.** The computer cluster system according to claim **1**, wherein said predetermined assignment metric is formed according to at least one of a group of metric specification techniques, said group of metric specification techniques comprising: a temporal logic, an assignment matrix, an assignment table, a probability function, and a cost function.  **3.** The computer cluster system according to claim **2**, wherein said group of assignment parameters comprise one or more of: resource information, cost information, complexity information, scalability information, a computation log record, compiler information, priority information, and a time stamp. |

| Becker's Research | '883 Patent |
|---|---|
| **Figure 6.8:** Hierarchical offset measurements between each local worker process and their local master.  **Figure 7.1:** Network topology of the Viola grid section used for the experiments *Timestamp Synchronization of Concurrent Events*, 79-83  The co-scheduling of jobs on different clusters in the Viola grid is managed by the grid middleware UNICORE [47] which has been enhanced by adding a meta-scheduler for the simultaneous allocation of compute and network resources. Bierbaum et al. [14] described this UNICORE-based infrastructure supporting the co-allocation of metacomputing resources in more detail, with special emphasis on the intricate task of coordinating network allocation with application startup.  Viola uses MetaMPICH [15], the grid-enabled MPICH-based MPI implementation developed at RWTH Aachen University, to establish direct connections to the external network from each node. MetaMPICH supports these direct connections through a multi-device architecture that *Timestamp Synchronization of Concurrent Events*, 83 | **1.** A computer cluster system for processing a computation task, comprising: a plurality of hardware computation nodes, a plurality of hardware boosters, and a resource manager, the plurality of hardware computation nodes and the plurality of hardware boosters each interfacing a communication infrastructure; the resource manager being arranged to: assign a selected hardware booster of the plurality of hardware boosters to a first hardware computation node of the plurality of hardware computation nodes for computation of a part of the computation task, provide assignment information to the first hardware computation node after the assignment of the selected hardware booster so as to enable the first hardware computation node to outsource the part of the computation task to the assigned selected hardware booster under control of the first hardware computation node, initialize a static assignment and further to establish a dynamic assignment during the processing of the computation task, |

| | | |
|---|---|---|
| • Formulate patterns that refer to metacomputing-specific performance problems, such as load balancing. This requires the ability to identify the metahost a process is living on and to distinguish between different metahosts during analysis. Later we will see that this subrequirement is also a prerequisite for an improved synchronization of time stamps.  The first two requirements address goal one, while the third requirement addresses both goals one and two. In the remainder of this section, we describe the pieces needed to create a metacomputing-enabled trace-analysis infrastructure that satisfies the requirements listed above. *Automatic Trace-Based Performance Analysis*, 8 | The contribution of this work is twofold. First, we have made the performance analysis technique of automatic pattern search in event traces available to metacomputing environments. For this purpose, we have developed an extension to the SCALASCA toolkit consisting of the following components:  1. Extended runtime configuration management capable of identifying the metahost an application process is running on, a prerequisite needed for the remaining items.  2. A hierarchical mechanism for synchronizing event timings that is able to deal with substantially different latencies in external and internal networks. | initialize a static assignment and further to establish a dynamic assignment during the processing of the computation task, accomplish the assignments as a function of a predetermined assignment metric: provide the static assignment at the start of the processing of the computation task by using the predetermined assignment metric, and update the predetermined assignment metric during the processing of the computation task. |

| Becker's Research | '883 Patent |
|---|---|
| **4.2  Space-Efficient Time-Series Call-Path Profiling**<br><br>While call-path profiling is an established method of linking a performance problem to the context in which it occurs, generating call-path profiles separately for thousands of iterations may exceed the available buffer space — especially when the call tree is large and more than one metric is collected. We therefore developed a runtime approach for the semantic compression of call-path profiles[13] based on incremental clustering of a series of single-iteration profiles that scales in terms of the number of iterations without sacrificing important performance details. Our approach offers low runtime overhead by using only a condensed version of the profile data when calculating distances and accounts for process-dependent variations by making all clustering decisions locally.<br><br>*Performance Tuning in the Petascale Era*, 7<br><br><br><br>**Figure 3.2:** Algorithms that calculate the clock errors through the differences of message transfer times in both directions between two processes.<br><br>*Timestamp Synchronization of Concurrent Events*, 39 | **2.** The computer cluster system according to claim **1**, wherein the resource manager is arranged to perform said assignment of the selected hardware booster to the first hardware computation node as a function of the predetermined assignment metric, the assignment being static at a start of processing of the computation task and a dynamic assignment during processing of the computation task.<br><br>**3.** The computer cluster system according to claim **1**, wherein the resource manager is arranged to perform the dynamic assignment in response to specific computation task characteristics.<br><br>**4.** The computer cluster system according to claim **1**, wherein said predetermined assignment metric is formed according to at least one of a group of metric specification techniques comprising: a temporal logic, an assignment matrix, an assignment table, a probability function, and a cost function.<br><br>**5.** The computer cluster system according to claim **1**, wherein said predetermined assignment metric is specified as a function of at least one of a group of assignment parameters, said group of assignment parameters comprising: resource information, cost information, complexity information, scalability information, a computation log record, compiler information, priority information, and a time stamp.<br><br>**6.** The computer cluster system according to claim **1**, wherein said assignment of the selected hardware booster to the first hardware computation node triggers at least one of a group of signals, said group of signals comprising: a remote procedure call, a parameter handover, and a data transmission. |

(xxii)  On information and belief, Becker contributed substantially to the conception of the invention(s) claimed in at least one claim of each of the '156 and '883 patents, but is not named an inventor on either patent.  Becker's inventorship is independently corroborated by, among other things, contemporaneous documents establishing Becker's participation in conception.  ParTec_00000045, at -404–410. On information and belief, Becker's conception of the claimed invention was communicated to the named inventor, Thomas Lippert.  *See, e.g.*, *id.*  Becker's contribution to the conception of a dynamic accelerator-cluster architecture is further independently corroborated by his co-authorship with Thomas Lippert on a paper concerning those purported inventions.  The '156 and '883 patents are therefore invalid for improper inventorship and for claiming derived subject matter.

(xxiii)  Many features conceived by Becker in his research are claimed in the '442 patent.



| Becker's Research | '442 Patent |
|---|---|
| To address this limitation, we propose a novel accelerator-cluster architecture in which network-attached accelerators are dynamically assigned to compute nodes. This allows not only their optimal utilization but also a more precise match between application requirements and accelerator hardware. We outline the general concept of our dynamic architecture and show that it can offer substantial benefits to certain classes of applications without significantly harming the performance of others.<br><br>*A Dynamic Accelerator-Cluster Architecture* | 1. A method of operating a heterogeneous computing system comprising a plurality of computation nodes and a plurality of booster nodes, at least one of the plurality of computation nodes and a plurality of booster nodes being arranged to compute a computation task, the computation task comprising a plurality of sub-tasks, the method comprising: |
| *A Dynamic Accelerator-Cluster Architecture* | in a first computing iteration, assigning and processing the plurality of sub-tasks by at least a portion of the plurality of computation nodes and at least a portion of the plurality of booster nodes in a first distribution; and generating, using information relating to the processing of the plurality of sub-tasks by at least the portion of the plurality of computation nodes and at least the portion of the plurality of booster nodes, a further distribution of the plurality of sub-tasks between the plurality of computation nodes and the plurality of booster nodes for processing thereby in a further computing iteration. |
| The software stack (Figure 4) of our dynamic accelerator-cluster architecture consists of a front-end on every compute node and a back-end on every accelerator. The front-end translates API calls into requests which are redirected to the back-end, where a daemon receives those requests and executes them on the CUDA-enabled GPU using the CUDA driver API. The front-end talks to the back-end using a handle that uniquely identifies an assigned accelerator, enabling transparent communication between the compute node and the accelerator. Figure 4 illustrates this software stack, which is extensible to any accelerator programming interface and therefore not restricted to CUDA by design.<br><br>Figure 4. Dynamic accelerator-cluster software architecture with CUDA back-end.<br><br>*A Dynamic Accelerator-Cluster Architecture* | 2. The method according to claim 1, wherein an application manager receives the information and determines the further distribution.<br><br>3. The method according to claim 2, wherein a resource manager determines the assignment of the plurality of sub-tasks to the plurality of computation nodes and the plurality booster nodes for the first computing iteration as a function of the computation task and wherein the application manager receives the information and processes the information as input to the resource manager such that the resource manager dynamically alters further distribution during the computing of the computation task.<br><br>4. The method according to claim 3, wherein the resource manager receives the information such that the resource manager dynamically alters assignment of the plurality of computation nodes and the plurality of booster nodes to each other during the computation of the computation task.<br><br>5. The method according to claim 1, wherein daemons operate in the plurality of computation nodes and the plurality of booster nodes to generate the information.<br><br>8. The method according to claim 3, wherein a daemon operating at a node generates a measure of a loading of the node during processing of a sub-task of the plurality of sub-tasks. |

(xxiv)    On information and belief, Becker contributed substantially to the conception of the invention(s) claimed in at least one claim of the '442 patent, but is not named an inventor on that patent.  Becker's inventorship is corroborated by, among other things, contemporaneous documents establishing Becker's participation in conception.  *See, e.g.*, ParTec_00000045, at -404–410.  On information and belief, Becker's conception of the claimed invention was communicated to the named inventors, Thomas Lippert and Bernhard Frohwitter.  *See, e.g.*, *id.*  Becker's contribution to the conception of a dynamic accelerator-cluster architecture is further independently corroborated by his co-authorship with Thomas Lippert on a

paper concerning those inventions. Further, the '442 patent purports to be a development of the system disclosed in the '156 and '883 patents, to which Becker should also be named an inventor. '442 Patent, 1:22-25. The '442 Patent is therefore invalid for improper inventorship and for claiming derived subject matter.

## Fourth Defense: Limitations On Damages And Other Relief

Plaintiffs' right to seek damages and other remedies from Microsoft is limited by 35 U.S.C. §§ 285, 286, 287, and/or 288, and may additionally be limited by 28 U.S.C. § 1498. Specifically, to the extent that ParTec, its predecessors-in-interest, or its licensees failed to properly mark any of its relevant products with its patents as required by 35 U.S.C. § 287 or otherwise give proper notice that Microsoft's actions allegedly infringed ParTec's patents, Microsoft is not liable for any of the allegedly infringing acts performed before it received actual notice of the alleged infringement.

## Fifth Defense: Prosecution History Estoppel

Plaintiffs are estopped based on amendments, statements, representations, and admissions made during prosecution of the applications that led to the Asserted Patents from asserting any interpretation of the claims of the Asserted Patents that would be broad enough to cover any of Microsoft's products or methods alleged to infringe the Asserted Patents.

## Sixth Defense: License and Release

Microsoft is expressly licensed to one or more Asserted Patents with priority dates before August 1, 2017, pursuant to an April 9, 2018 agreement with Bernhard Frohwitter, and Plaintiffs' claims under any such patents are released. Plaintiffs are not entitled to any recovery on any such patents. The license has been produced in this case at MSFT_PARTEC_000710185.

**Seventh Defense: Implied License**

Microsoft is impliedly licensed to the '442 Patent to the extent it is broader in scope than the asserted claims of the expressly licensed '156 Patent and '883 Patent.  Plaintiffs contend that all three Asserted Patents are practiced by Parastation, and Plaintiffs point to identical features within Parastation as practicing the limitations of all three patents.  *See, e.g.*, Plaintiffs' Response to Interrogatory No. 18.  Further, Plaintiffs' infringement allegations assert all three patents against the same Microsoft accused product, and points to the same features within Microsoft's products for its allegations under all three Asserted Patents.  To the extent that Plaintiffs' apparent application of the '442 Patent's claim scope is accepted, that patent would be necessary for a licensee (such as a Parastation user, or other licensee) to practice the claims of the '156 and '883 Patents.  Therefore, to the extent Plaintiffs' apparent application of the claim scope for the '442 Patent is accepted, the April 9, 2018 express license (MSFT_PARTEC_000710185) results in an implied license with respect to the '442 Patent.

**Eighth Defense: Reverse Doctrine of Equivalents**

Irrespective of literal claim scope, no relief is available to Plaintiffs because, among other things, the accused technology is antithetical in function, way, and result from the alleged inventions disclosed in the Asserted Patents, and Plaintiff cannot sustain its burden of proving otherwise, under the reverse doctrine of equivalents.  Further, the use of the accused technology is substantially and materially different in principle from the purported inventions described in the Asserted Patents, such that even if the accused technology performs a similar general function as the Asserted Patents, it does so in a substantially and materially different way, and Plaintiff cannot sustain its burden of proving otherwise, under the reverse doctrine of equivalents.  Microsoft incorporates by reference its response to Counterclaim-Defendants' Interrogatory No. 6

### Ninth Defense: Inequitable Conduct

No recovery is available to Plaintiffs under because each Asserted Patent is unenforceable for reason of the inequitable conduct committed by Bernhard Frohwitter, Thomas Lippert, and Jan Gigerich during USPTO prosecution of each Asserted Patents, as demonstrated by at least the following facts:

### Individuals Owing A Duty Of Disclosure And Candor To The USPTO

#### *Bernhard Frohwitter*

(i) Bernhard Frohwitter is a German lawyer who "is best known as a shareholder of a small empire of non-practising entities (NPEs)."[11] "Frohwitter always led a dual existence as a lawyer and entrepreneur."[12] Frohwitter's most infamous exploit was the "dispute between IPCom and Nokia, in which the NPE allegedly demanded €12 billion and in which Frohwitter still acted as lawyer and CEO of IPCom." A December 2024 article reports that "Frohwitter still acted as lawyer and CEO of IPCom" during the IPCom/Nokia dispute, but "later restricted himself entirely to the role of IPCom manager." Microsoft later acquired certain business units from Nokia and negotiated a license to Frohwitter's patents. *See* MSFT_PARTEC_000710185.

(ii) The article from December 2024 describes this litigation against Microsoft and explains that "Frohwitter's law firm filed most of the patents for ParTec."[13] The article further explains that "[named inventor Thomas] Lippert applied for patents

---

[11] https://www.ipcom-munich.com/post/how-ipcom-kept-the-mobile-phone-industry-on-tenterhooks-for-13-years
[12] https://www.juve-patent.com/people-and-business/bernhard-frohwitters-foray-into-supercomputers-and-suit-against-nvidia/
[13] https://www.juve-patent.com/people-and-business/bernhard-frohwitters-foray-into-supercomputers-and-suit-against-nvidia/

14 years ago and is listed as the inventor on many patents that now belong to ParTec" and "Frohwitter is co-inventor of [certain patents] together with Lippert."[14] For example, Frohwitter is also named an inventor on the '442 Patent.  The article notes that this litigation against Microsoft is based on those patent families.

(iii)    On information and belief, in or around 2003, Frohwitter and Lippert arrived at secret handshake agreement whereby Frohwitter would receive unrestricted personal ownership of Lippert's patents, in exchange for Lippert allowing Frohwitter to handle and execute patent applications in Lippert's name. ParTec_00001955.  This backroom deal resulted in patent applications being filed worldwide, including the Asserted Patents.  *Id.*  On information and belief, Frohwitter also promised Lippert money for the exploitation of his inventions.  *Id.* On information and belief, by 2004, Frohwitter became the majority shareholder and CEO of ParTec.[15]

(iv)    Frohwitter also signed the power of attorney for the '156 and '883 Patent families. ParTec_00000045, at -238.

---

[14] https://www.juve-patent.com/people-and-business/bernhard-frohwitters-foray-into-supercomputers-and-suit-against-nvidia/
[15] https://par-tec.com/bernhard-frohwitter-bio/

## ParTec Cluster Competence Center GMBH

☐ Inventor or Joint Inventor (title not required below)

☐ Legal Representative of a Deceased or Legally Incapacitated Inventor (title not required below)

☑ Assignee or Person to Whom the Inventor is Under an Obligation to Assign (provide signer's title if applicant is a juristic entity)

☐ Person Who Otherwise Shows Sufficient Proprietary Interest (e.g., a petition under 37 CFR 1.46(b)(2) was granted in the application or is concurrently being filed with this document) (provide signer's title if applicant is a juristic entity)

**SIGNATURE of Applicant for Patent**

The undersigned (whose title is supplied below) is authorized to act on behalf of the applicant (e.g., where the applicant is a juristic entity).

| Signature | | Date (Optional) | 27/10/2016 |
|---|---|---|---|
| Name | Bernhard Frohwitter | | |
| Title | Managing Director | | |

**NOTE**: Signature – This form must be signed by the applicant in accordance with 37 CFR 1.33. See 37 CFR 1.4 for signature requirements and certifications. If more than one applicant, use multiple forms.

☑ Total of     1          forms are submitted.

This collection of information is required by 37 CFR 1.131, 1.32, and 1.33. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.11 and 1.14. This collection is estimated to take 3 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.

*If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.*

(v)     On information and belief, prior to or during prosecution of each Asserted Patent, Frohwitter was intimately familiar with Parastation V5 and understood its materiality to the prosecution of the Asserted Patents.  For example, an August 2011 user guide identifies Frohwitter as the contact for worldwide licensing of Parastation V5, including for potential licensees in the United States.  *See, e.g.*, MSFT_PARTEC_000710259, -351–56.

# Appendix B. *ParaStation* license

The *ParaStation* software may be used under the following terms and conditions only.

Software and Know-how License Agreement

Version 1.0

between ParTec Cluster Competence Center GmbH

place of business: Possartstr. 20, 81679 München

represented by: Bernhard Frohwitter

§ 2 Granted Rights

Subject to and conditioned upon Licensees full compliance with the terms and conditions of this license, ParTec grants Licensee of this contract a non-exclusive, worldwide and royaltyfree license for University Use and Commercial Use only to:

(vi)     On information and belief, prior to or during prosecution of each Asserted Patent, Frohwitter was intimately familiar with SLURM and understood its materiality to the prosecution of the Asserted Patents.  *See, e.g.*, ParTec_01359319.  For example, Frohwitter is listed as a contributor to a draft white paper dated August 25, 2018 explaining how SLURM is used for the dynamic resource allocations in Parastation.  *See, e.g.*, ParTec_01359319, at -329, -340.



(vii) Bernhard Frohwitter owed a duty of candor and disclosure to the USPTO with respect to the prosecution of the '156 Patent.  On information and belief, Frohwitter was substantively involved in the preparation and/or prosecution of that patent.  For example, a letter agreement dated August 2017 signed by Frohwitter explained that Frohwitter agreed to handle and execute patent applications, and that he arranged and carried out patent applications in Thomas Lippert's name.  ParTec_00001955.  The letter agreement identifies EP 10187436 dated October 13, 2010, and many other applications, such as WO 2012/049247, which applications ultimately led to the issuance of the '156 Patent.  ParTec_00001955.

(viii) Bernhard Frohwitter owed a duty of candor and disclosure to the USPTO with respect to the prosecution of the '883 Patent.  On information and belief, Frohwitter was substantively involved in the preparation and/or prosecution of that patent.  For example, a letter agreement dated August 2017 signed by Frohwitter explained that Frohwitter agreed to handle and execute patent applications, and that he arranged and carried out patent applications in Thomas Lippert's name.  ParTec_00001955.  The letter agreement identifies EP 10187436 dated October 13, 2010, and many other applications, such as WO 2012/049247, which applications ultimately led to the issuance of the '883 Patent.  ParTec_00001955

(ix) Bernhard Frohwitter owed a duty of candor and disclosure to the USPTO with respect to the prosecution of the '442 Patent.  On information and belief, Frohwitter was substantively involved in the preparation and/or prosecution of that patent.  For example, a letter agreement dated August 2017 signed by Frohwitter explained that Frohwitter agreed to handle and execute patent applications, and that he arranged

and carried out patent applications in Thomas Lippert's name.  ParTec_00001955. The letter mentions WO 2012/049247 as one such application, and the '442 Patent purports to be a development of that system.  *Id.*; '442 Patent, 1:22-25.  Frohwitter is named an inventor on the '442 Patent and therefore owed a duty of candor and disclosure in that capacity.

### *Thomas Lippert*

(x)     Thomas Lippert is a named inventor on all three Asserted Patents.  Lippert is reportedly a researcher at Julich Supercomputing Centre (JSC) in Germany. Lippert is an advisor to BF exaQC AG.

(xi)    An article from December 2024 describes this litigation against Microsoft and explains that "Lippert applied for patents 14 years ago and is listed as the inventor on many patents that now belong to ParTec" and "Frohwitter is co-inventor of [certain patents] together with Lippert."[16]  The article further explains that "Frohwitter's law firm filed most of the patents for ParTec."[17]  The article notes that this litigation against Microsoft is based on those patent families.

(xii)   On information and belief, in or around 2003, Lippert and Frohwitter arrived at secret handshake agreement whereby Frohwitter would receive unrestricted personal ownership of Lippert's patents, in exchange for Lippert allowing Frohwitter to handle and execute patent applications in Lippert's name. ParTec_00001955.  This backroom deal resulted in patent applications being filed

---

[16] https://www.juve-patent.com/people-and-business/bernhard-frohwitters-foray-into-supercomputers-and-suit-against-nvidia/

[17] https://www.juve-patent.com/people-and-business/bernhard-frohwitters-foray-into-supercomputers-and-suit-against-nvidia/

worldwide, including the Asserted Patents. ParTec_00001955. On information and belief, Frohwitter also promised Lippert money for the exploitation of his inventions. ParTec_00001955. On information and belief, by 2004, Frohwitter became the majority shareholder and CEO of ParTec.[18]

(xiii)     On information and belief, prior to or during prosecution of each Asserted Patent Lippert was intimately familiar with Parastation V5 and understood its materiality to the prosecution of the Asserted Patents. *See, e.g.*, ParTec_00000045, at -340– 431. For example, around September 24, 2010, Lippert provided documents to his attorneys indicating that Parastation was relevant to the invention being claimed and was prior art. ParTec_00000045, at -340–431 (July 2010 document describing "current open source ParaStation V5"). Around February 18, 2018, Lippert reviewed those same documents in connection with providing an affidavit to the USPTO for prosecution of the '156 Patent. ParTec_00000045, at -340–431.



**Document Lippert Provided to Gigerich (Sept. 2010) and Reviewed (Feb. 2018)**
ParTec_00000045, at -340–431

---

[18] https://par-tec.com/bernhard-frohwitter-bio/

(xiv)    On information and belief, prior to or during prosecution of each Asserted Patent, Lippert was intimately familiar with SLURM and understood its materiality to the prosecution of the Asserted Patents.  *See, e.g.*, ParTec_01359319.  For example, Lippert is listed as a contributor to a draft white paper dated August 25, 2018 explaining how SLURM is used for the dynamic resource allocations in Parastation. *See, e.g.*, ParTec_01359319, at -329, -340.



(xv)     Thomas Lippert owed a duty of candor and disclosure to the USPTO with respect to the prosecution of the '156 Patent.  On information and belief, Lippert was substantively involved in the preparation and/or prosecution of that patent.  For example, a letter agreement dated August 2017 signed by Lippert explained that Lippert agreed Frohwitter would handle and execute patent applications on behalf of Lippert.  ParTec_00001955.  The letter agreement identifies EP 10187436 dated October 13, 2010, and many other applications, such as WO 2012/049247, which applications ultimately led to the issuance of the '156 Patent.  ParTec_00001955. Further, Lippert submitted a sworn affidavit during prosecution of the '156 Patent to establish priority and obtain claim issuance over a rejection.  ParTec_00000045, at -340–431.  Lippert is the sole named inventor on the '156 Patent and therefore owed a duty of candor and disclosure in that capacity.

(xvi)    Thomas Lippert owed a duty of candor and disclosure to the USPTO with respect to the prosecution of the '883 Patent.  On information and belief, Lippert was substantively involved in the preparation and/or prosecution of that patent.  For example, a letter agreement dated August 2017 signed by Lippert explained that Lippert agreed Frohwitter would handle and execute patent applications on behalf of Lippert.  ParTec_00001955.  The letter agreement identifies EP 10187436 dated October 13, 2010, and many other applications, such as WO 2012/049247, which applications ultimately led to the issuance of the '883 Patent.  ParTec_00001955. Further, Lippert submitted a sworn affidavit during prosecution of a parent application (the '156 Patent) that established priority for the '883 Patent, but for which the '883 Patent would not have issued.  ParTec_00000045, at -340–431.

63

Lippert is the sole named inventor on the '883 Patent and therefore owed a duty of candor and disclosure in that capacity.

(xvii)    Thomas Lippert owed a duty of candor and disclosure to the USPTO with respect to the prosecution of the '442 Patent.  On information and belief, Lippert was substantively involved in the preparation and/or prosecution of that patent.  For example, a letter agreement dated August 2017 signed by Lippert explained that Lippert agreed that Frohwitter would handle and execute prosecution on behalf of Lippert.  ParTec_00001955.  The letter mentions WO 2012/049247 as one such application, and the '442 Patent purports to be a development of that system.  *Id.*; '442 Patent, 1:22-25.  Lippert is a named inventor on the '442 Patent and therefore owed a duty of candor and disclosure in that capacity.

### *Jan Gigerich*

(xviii)    On information and belief, Jan Gigerich is a German Patent Attorney (*Patentanwalt*) and European Patent Attorney whose place of business is in Munich, Germany. On information and belief, as the European Patent Attorney responsible for the Asserted Patents' original applications in Europe, Gigerich likely managed prosecution of the entire family, as indicated by the presence of his name as the responsible attorney on an International Search Report that was submitted to the USPTO.  ParTec_00000045, at -099.  As the European Patent Attorney responsible for patents originating in Europe, Gigerich would likely have corresponded with and advised USPTO prosecution counsel.  *See, e.g.*, ParTec_00000045, at -340–431 (affidavit indicating that documents possessed Gigerich were provided to USPTO counsel).

64

(xix)    Gigerich is also a member of the executive board of Counterclaim-Defendant BF exaQC AG, which purports to have full control over licensing of the Asserted Patents and preparation of applications, meaning Gigerich has a business interest in Plaintiffs' prosecution of this suit.[19]

(xx)    On information and belief, as a long-time confederate of Frohwitter, Gigerich owes Frohwitter personal loyalties.  For example, through at least 2016, Gigerich was employed at Frohwitter's law firm and, on information and belief, subject to the direction and control of Frohwitter as his employer.[20]  In that capacity, Gigerich was tasked with prosecution of the patent applications naming Lippert.  *See, e.g.*, ParTec_00000045, at -340–431 (affidavit indicating that Gigerich prepared the original application).

(xxi)    Additionally, on information and belief, Gigerich has represented Frohwitter and Lippert (and companies associated with the two) as an attorney.  In his capacity as an attorney, Gigerich held a relationship of trust and confidence with Frohwitter and with Lippert.  As a fiduciary to Frohwitter and Lippert, Gigerich owed a duty of loyalty that required Gigerich to prioritize the interests of Frohwitter and Lippert over Gigerich's own personal interests.  Gigerich was also an agent or representative of IPCom, a company controlled by Frohwitter, meaning Gigerich was subject to direction and control by IPCom and Frohwitter and owed loyalty in that capacity as well.

---

[19] https://www.bf-exa-qc.com/legal-notice
[20] https://web.archive.org/web/20160607195210/http://www.frohwitter.com/team.htm

(xxii)    Additionally, on information and belief, Gigerich also possesses personal pecuniary interests in the Asserted Patents and their enforcement.  On information and belief, Gigerich's participation in ParTec's patent enforcement is "exclusively on a contingency basis," meaning it is in Gigerich's personal financial interest for Counterclaim-Defendants to receive patents and enforce them.[21]

(xxiii)    An article from December 2024 describes this litigation against Microsoft and explains that "Frohwitter's law firm filed most of the patents for ParTec" and that "patent attorney Jan Giegerich [was] already present at Frohwitter's side during his time at IPCom."[22]  The article further explains that "Lippert applied for patents 14 years ago and is listed as the inventor on many patents that now belong to ParTec and "Frohwitter is co-inventor of [certain patents] together with Lippert."[23]  The article notes that this litigation against Microsoft is based on the same patent families.  The USPTO records likewise indicate that Gigerich was involved in prosecution.  *See, e.g.*, ParTec_00000045, at -340–431.

(xxiv)    On information and belief, prior to or during prosecution of each Asserted Patent, Gigerich was intimately familiar with Parastation V5 and understood its materiality to the prosecution of the Asserted Patents.  For example, around September 24, 2010, Gigerich received possession of documents indicating that Parastation was relevant to the invention being claimed and was prior art, as evidenced by Lippert's

---

[21] https://www.juve-patent.com/people-and-business/bernhard-frohwitters-foray-into-supercomputers-and-suit-against-nvidia/

[22] https://www.juve-patent.com/people-and-business/bernhard-frohwitters-foray-into-supercomputers-and-suit-against-nvidia/

[23] https://www.juve-patent.com/people-and-business/bernhard-frohwitters-foray-into-supercomputers-and-suit-against-nvidia/

affidavit.    ParTec_00000045, at -340–431 (including July 2010 document describing "current open source ParaStation V5" licensed to Intel).    Those documents were used to prepare the applications for the family.  *Id.*  The affidavit also indicates that the documents were again provided to Lippert around February 2018, when the affidavit was executed.  ParTec_00000045, at -340–431.

(xxv)    Gigerich was also involved in prosecution of the family while working at Frohwitter's firm, which operated from the same office as ParTec.    Thus, it is exceedingly unlikely that Gigerich was unaware of Parastation and its relevance.



**Shared Office Of Gigerich and ParTec AG[24]**

(xxvi)    Jan Gigerich owed a duty of candor and disclosure to the USPTO with respect to the prosecution of the '156 Patent.  On information and belief, Gigerich at the time was an attorney employed at the Frohwitter Firm, which is the law firm through which Frohwitter controlled prosecution of the patent.  On information and belief, Gigerich was substantively involved in the preparation and/or prosecution of that

---

[24] https://www.google.com/maps/@48.1436952,11.6066674,3a,15y,91.45h,84.74t/data=!3m7!1e1!3m5!1sZFltDohQ71qka-opaFIAAQ!2e0!6shttps:%2F%2Fstreetviewpixels-pa.googleapis.com%2Fv1%2Fthumbnail%3Fcb_client%3Dmaps_sv.tactile%26w%3D900%26h%3D600%26pitch%3D5.261307288834615%26panoid%3DZFltDohQ71qka-opaFIAAQ%26yaw%3D91.4462601906202!7i16384!8i8192?entry=ttu&g_ep=EgoyMDI1MDkyMy4wIKXMDSoASAFQAw%3D%3D

patent.  For example, a sworn affidavit submitted by Lippert during prosecution of the '156 Patent establishes that Gigerich, one of Lippert's patent attorneys, participated in the inventorship determination for the patent family. ParTec_00000045, at -340–431.  To establish the version of the events recited in Lippert's affidavit, the affidavit relies on certain conversations and documents exchanged between and among Lippert and Gigerich (thereby waiving any purported attorney-client privilege over the subject matter of the inventorship determination).  *Id.*  On information and belief, Gigerich facilitated Lippert's preparation and/or submission of the affidavit to the USPTO.  *Id.*  As Lippert's European patent attorney, on information and belief, Gigerich also likely corresponded with USPTO patent prosecution counsel, which would further establish Gigerich's substantive involvement in the preparation and/or prosecution of the USPTO application.

(xxvii)  Jan Gigerich owed a duty of candor and disclosure to the USPTO with respect to the prosecution of the '883 Patent.  On information and belief, Gigerich at the time was an attorney employed at the Frohwitter Firm, which is the law firm through which Frohwitter controlled prosecution of the patent.  On information and belief, Gigerich was substantively involved in the preparation and/or prosecution of that patent.  For example, a sworn affidavit submitted by Lippert during prosecution of the parent application (the '156 Patent) establishes that Gigerich, one of Lippert's patent attorneys, participated in the inventorship determination for the patent family.  ParTec_00000045, at -340–431.  On information and belief, Gigerich facilitated Lippert's preparation and/or submission of the affidavit to the USPTO

during prosecution of the parent application (the '156 Patent) that established priority for the '883 Patent, but for which the '883 Patent would not have issued. As Lippert's European patent attorney, Gigerich also likely corresponded with USPTO patent prosecution counsel, which would further establish Gigerich's substantive involvement in the preparation and/or prosecution of the USPTO application.

(xxviii)    Jan Gigerich owed a duty of candor and disclosure to the USPTO with respect to the prosecution of the '442 Patent. On information and belief, Gigerich was substantively involved in the preparation and/or prosecution of that patent. For example, the '442 Patent names Frohwitter and Lippert and claims alleged priority to a European application, and Gigerich was Frohwitter's and Lippert's patent attorney. Gigerich is also the patent attorney for other companies owned by Frohwitter, such as IPCom. Gigerich is also a board member of BF exaQC AG, which is responsible for prosecuting ParTec's patents since at least 2023. Gigerich likely was involved and/or consulted with respect to the inventorship determination for the '442 Patent family. The Lippert-Frohwitter letter agreement (ParTec_000-1955) mentions WO 2012/049247, and the '442 Patent purports to be a development of that system. '442 Patent, 1:22-25. As Lippert's and Frohwitter's European patent, Gigerich also likely corresponded with USPTO patent prosecution counsel, which would further establish Gigerich's substantive involvement in the preparation and/or prosecution of the USPTO application.

**The Scheme To Defraud**

### *2003: The Secret Deal Between Frohwitter and Lippert*

(xxix)    On information and belief, in or around 2003, Frohwitter and Lippert arrived at secret handshake agreement whereby Frohwitter would receive unrestricted personal ownership of Lippert's patents, in exchange for allowing Frohwitter to handle and execute patent applications in Lippert's name.  ParTec_00001955.  This backroom deal resulted in patent applications being filed worldwide.  *Id.*

(xxx)    On information and belief, Frohwitter also promised Lippert money for the exploitation of his inventions.  ParTec_00001955.  On information and belief, pursuant to that promise, which induced Lippert into the arrangement, Frohwitter invested many millions of euros to fund Lippert's pursuits and interests.  *Id.*

(xxxi)    On information and belief, rather than acquire Lippert's patent interests directly, Frohwitter acquired them indirectly by acquiring ParTec—a small software company—and assigning the patent rights to ParTec.  This had the effect of concealing or obscuring Frohwitter's involvement and ownership in the ParTec patent portfolio, while ascribing an air of legitimacy to their backroom deal.  On information and belief, by 2004, Frohwitter became the majority shareholder and CEO of ParTec.[25]

### *2005-2009: Academic Teams In Germany Try To Develop Computing Clusters; ParTec's Minimal Involvement Was Contributing Open-Source Software*

(xxxii)    On information and belief, around 2005, a collaboration was formed among several European universities attempting to develop accelerated computing cluster architectures.  Among the participants were the Julich Supercomputing Center ("JSC," also called "FZJ" for its German name, *Forschungszentrum Julich*) where

---

[25] https://par-tec.com/bernhard-frohwitter-bio/

Lippert was employed, and the German Research School for Simulation (GRS) at Aachen University (hereafter GRS/Aachen).  The collaboration was supported by certain United States companies, such as Intel Corporation and Sun Microsystems (now Oracle).  The collaboration resulted in efforts to develop heterogenous accelerated cluster architectures, such as QPACE (2009), JUROPA/HPC-FF (2009), DEEP (2013), and JURECA (2015-2017). Microsoft incorporates all relevant allegations supporting its inventorship defense, *supra* (hereafter "Inventorship Defense"), including ¶¶ (i)-(xxiv).

(xxxiii)    On information and belief, JSC's Norbert Eicker was the architect of the heterogeneous systems developed pursuant to the JSC/GRS efforts, including the cluster-booster systems.[26]  Eicker's role as the architect of the JSC/GRS cluster-booster systems is established by (among other evidence): Eicker's publications that are prior art to the Asserted Patents; contemporaneous documents showing Eicker's participation in conception of the claimed inventions; and subsequent publications describing the claimed inventions which list Eicker and Lippert as co-authors.[27] Among other contributions of Eicker, the Asserted Patents claim a cluster/booster architecture.  *See, e.g.*, Inventorship Defense ¶¶ (i)-(vii).

---

[26] https://www.fz-juelich.de/en/ias/jsc/news/news-items/news-flashes/2013/2013-10-eicker-prof
[27] *See, e.g.*, ParTec_00000045, at -374–380; U. Detert, A. Thomasch, N. Eicker & J. Broughton eds., JULI Project – Final Report (2007); H. Baier, H. Boettiger, M. Drochner, N. Eicker, U. Fischer, Z. Fodor, A. Frommer, C. Gomez, G. Goldrian, S. Heybrock, D. Hierl, M. Husken, T. Huth, B. Krill, J. Lauritsen, T. Lippert, T. Mauer, B. Mendi, N. Meyer, A. Nobile, I. Ouda, M. Pivanti, D. Pleiter, M. Ries, A. Schafer, H. Schick, F. Schifano, H. Simma, S. Solbrig, T. Streuer, K.-H. Sulanke, R. Tripiccione, J.-S. Vogt, T. Wettig & F. Winter, QPACE – A QCD Parallel Computer Based on Cell Processors (2009); N. Attig, F. Berberich, U. Detert, N. Eicker, T. Eickermann, P. Gibbon, W. Gurich, W. Homberg, A. Illich, S. Rinke, M Stephan, K. Wolkersdorfer & T. Lippert, Entering the Petaflop-Era: New Developments in Supercomputing

(xxxiv)    On information and belief, Sebastian Rinke contributed to and developed the accelerators/boosters to the JSC/GRS efforts.[28]  Rinke's role as the contributor of the accelerators/boosters is established by (among other evidence): Rinke's publications that are prior art to the Asserted Patents; contemporaneous documents showing Rinke's participation in conception of the claimed inventions; and subsequent publications describing the claimed inventions which list Rinke and Lippert as co-authors.[29]  Among other contributions of Rinke, the Asserted Patents claim a booster with booster nodes.  *See, e.g.*, Inventorship Defense ¶¶ (vii)-(xii).

(xxxv)    On information and belief, the GRS team, including Felix Wolf and Daniel Becker, contributed the dynamic resource assignment feature to the JSC/GRS efforts.  At GRS, Wolf's responsibilities included development of resource managers, dynamic resource assignment, and other performance tuning.  Further, Becker was Wolf's student, and Becker contributed the timestamp synchronization feature, as reflected in his Ph.D. dissertation (supervised by Wolf).  Wolf's and Becker's roles in contributing to the development of a dynamic assignment resource manager for the

---

(2010); D.A. Mallon, N. Eicker, M.E. Innocenti, G. Lapenta, T. Lippert & E. Suarez, On The Scalability of the Clusters-Booster Concept (2012);  N. Eicker, T. Lippert, T. Moschny, E. Suarez, The DEEP Project: Pursuing Cluster-Computing In The Many-Core Era (2013); N. Eicker, T. Lippert, E. Suarez, T. Moschny, The DEEP Project: Pursuing Cluster-Computing In The Many-Core Era – HUCAA'13 Slides (2013); N. Eicker & T. Lippert, An Accelerated Cluster-Architecture for the Exascale (2014).

[28] https://fim.htwk-leipzig.de/en/fakultaet/personen/professorinnen-und-professoren/sebastian-rinke

[29] *See, e.g.*, ParTec_00000045, at -404-410; S. Rinke, H Boettiger & B. Krill, QPACE: Energy-Efficient High Performance Computing (2010); N. Attig, F. Berberich, U. Detert, N. Eicker, T. Eickermann, P. Gibbon, W. Gurich, W. Homberg, A. Illich, S. Rinke, M Stephan, K. Wolkersdorfer & T. Lippert, Entering the Petaflop-Era: New Developments in Supercomputing (2010); S. Rinke, D. Becker, T. Lippert, S. Prabhakaran, L. Westphal & F. Wolf, A Dynamic Accelerator-Cluster Architecture (2012).

JSC/GRS efforts are documented in their publications that are prior art to the Asserted Patents and in contemporaneous documents showing their participation in conception.[30]  Among other contributions of Wolf and Becker, the Asserted Patents claim a resource manager with dynamic assignment based on information about computing processes, such as timestamp information.  *See, e.g.*, Inventorship Defense ¶¶ (xiii)-(xviii) (Wolf); Inventorship Defense ¶¶ (xix)-(xxiv) (Becker).

(xxxvi)   On information and belief, the collaboration between and among JSC and GRS—including the contributions of Eicker, Wolf, Rinke, and Becker—resulted in what ParTec refers to as the "dynamic Modular System Architecture" (dMSA).[31]  *See, e.g.*, Inventorship Defense ¶¶ (i)-(xxiv)

(xxxvii)  On information and belief, ParTec's contribution to the collaboration between and among JSC and GRS was limited to providing ParTec's open-source Parastation V5 software—which had been publicly used and/or on sale by or before October 12, 2010.  Microsoft incorporates all relevant allegations supporting its statutory bar defense, *supra* (hereafter Statutory Bar Defense), including ¶¶ (i)-(xii) and the charts designated Exhibits 156-12, 883-12, and 442-13 to Microsoft's invalidity contentions.

---

[30] *See, e.g.*, ParTec_00000045, at -376-386, 404-410; D. Becker, F. Wolf, W. Frings, M Geimer, B.J.N. Wylie & B. Mohr., Automatic Trace-Based Performance Analysis of Metacomputing Applications (2007); D. Becker, W. Frings & F. Wolf, Performance Evaluation and Optimization of Parallel Grid Computing Applications (2008); F. Wolf, D. Becker, M. Geimer, B.J.N. Wylie, Scalable Performance Analysis Methods for the Next Generation of Supercomputers (2008); D. Becker, Timestamp Synchronization of Concurrent Events (2009) (F. Wolf, advisor); F. Wolf, D. Bohme, M. Geimer, M.-A. Hermanns, B. Mohr, Z. Szebenyi & B.J.N. Wylie, Performance Tuning in the Petascale Era (2010); S. Rinke, D. Becker, T. Lippert, S. Prabhakaran, L. Westphal & F. Wolf, A Dynamic Accelerator-Cluster Architecture (2012).

[31] *See also* Plaintiffs' Resp. to Interrogatory No. 18; https://par-tec.com/milestone-projects/

(xxxviii)   Additionally, on information and belief, by May 27, 2009, Parastation V5 itself used SLURM (Simple Linux Utility for Resource Management), another open-source software tool. *See, e.g.*, Pickartz Dep. Ex. 6, at 19; MSFT_PARTEC_000711231 - MSFT_PARTEC_000711559 (source code). Microsoft incorporates all relevant allegations concerning SLURM, including the charts designated Exhibits 156-11, 883-11, and 442-6 to Microsoft's invalidity contentions.

```
907     2009-05-27  Jens Hauke  <hauke@par-tec.com> -   5.0.15-1
908
909         * Replace PMI_Get_id() by PMI_KVS_Get_my_name() to be compatible
910         with slurm.
911
```

**Change Log Indicating Parastation V5's SLURM Compatibility In May 2009**
(Pickartz Dep. Ex. 6, at 19)

### 2010-2013: Frohwitter and Lippert Reaffirm The Secret Deal And File Patents In Lippert's Name Without Naming Lippert's Collaborators

(xxxix)   On information and belief, in or around 2010, Frohwitter and Lippert reaffirmed their previous oral arrangement—to file patents in Lippert's name, thereby resulting in unrestricted ownership by Frohwitter.  ParTec_00001955.

(xl)   On information and belief, by 2010, Frohwitter was the CEO, chairman, and majority shareholder of ParTec and thereby had achieved unrestricted control and ownership of ParTec's patents and patent applications.[32]

(xli)   On information and belief, in or around September 2010, Lippert provided documents concerning the alleged "dMSA" to his and Frohwitter's European patent

---

[32] https://par-tec.com/bernhard-frohwitter-bio/

attorney, Jan Gigerich, to file a patent application pursuant to the oral agreement. ParTec_00000045, at -342 (¶ 8). Gigerich was an employee of Frohwitter's law firm and handled other patent prosecution matters for Frohwitter. *See, e.g.*, ParTec_00000045, at -099. On information and belief, the documents were also provided to Frohwitter, who controlled all patent prosecution pursuant to the oral arrangement. *See, e.g.*, ParTec_00001955.

(xlii)    The documents provided by Lippert in September 2010 established that Eicker, Wolf, Rinke, and Becker made significant contributions to the purported inventions. ParTec_00000045, at -344–410. The application did not name Eicker, Wolf, Rinke, or Becker as inventors.

(xliii)   On information and belief, prior to or during prosecution of each Asserted Patent, each of Lippert, Frohwitter, and Gigerich knew and understood that Eicker, Wolf, Rinke, and Becker would have to be named inventors on the applications. Each of Lippert, Frohwitter, and Gigerich were involved in the inventorship determinations for the Asserted Patents, and the relevant documents showing the material contributions of Eicker, Wolf, Rinke, and Becker were discussed at least (a) around September 24, 2010 and (b) again in or around February 2018. *See, e.g.*, Inventorship Defense ¶¶ (i)-(xxiv); ParTec_00001955; ParTec_00000045, at -344–410.

(xliv)    On information and belief, prior to or during prosecution of each Asserted Patent, each of Lippert, Frohwitter, and Gigerich understood and believed that naming any of Eicker, Wolf, Rinke, or Becker as inventors would deprive Frohwitter of unrestricted ownership—the subject of the secret deal—because those inventors did

not themselves have similar arrangements to assign their inventions to Frohwitter. ParTec_00001955; ParTec_00000045, at -344–410.

(xlv)    On information and belief, prior to or during prosecution of each Asserted Patent, each of Lippert, Frohwitter, and Gigerich understood and believed that naming any of Eicker, Wolf, Rinke, or Becker as inventors would have caused a patent examiner to discover additional prior art, including the use of Parastation V5 for their research.  *See, e.g.*, Inventorship Defense ¶¶ (i)-(xxiv).

(xlvi)    On information and belief, on or around October 13, 2010, Frohwitter and Gigerich caused the filing of a European patent application in Lippert's name, with ParTec as the assignee.  That application did not name Eicker, Wolf, Rinke, or Becker. ParTec_00000045, at -411–431.



(xlvii)    On information and belief, Gigerich and Frohwitter managed prosecution of the entire patent family, as indicated by their firm's receipt of an International Search Report that was submitted to the USPTO.  ParTec_00000045, at -099.

PATENT COOPERATION TREATY



(xlviii)  On information and belief, on or around April 12, 2013, Frohwitter and Gigerich caused the filing of the application for the '156 Patent in Lippert's name, with ParTec as the assignee.  That application did not name Eicker, Wolf, Rinke, or Becker.  ParTec_00000045, at -080–095.

(xlix)  Additionally, on information and belief, prior to or during prosecution of each Asserted Patent, each of Lippert, Frohwitter, and Gigerich were aware of Parastation V5 and understood its materiality to the inventions being claimed.  For example, by September 24, 2010, each knew that Parastation V5 was "open source" and had been commercially offered in the United States—such as via a license to Intel Corporation—by at least July 7, 2010.  ParTec_00000045, at -349.  Those documents were discussed again in or around February 2018, during prosecution of the '156 Patent (the earliest Asserted Patent, and a parent of the '883 Patent), and shortly after filing the priority application for the '442 Patent.  Frohwitter and Lippert are also named on other documents discussing Parastation V5, indicating their awareness and familiarity with the reference.  *See, e.g.*, ParTec_01359319, at -329, -340 (August 2018).



**Document Lippert Provided to Gigerich (Sept. 2010) and Reviewed (Feb. 2018)**
ParTec_00000045, at -340–431

(l)    Parastation V5 was not disclosed during the prosecution of the '156 Patent.

(li)    Additionally, on information and belief, prior to or during prosecution of each

Asserted Patent, at least Lippert and Frohwitter were aware of SLURM and

understood its materiality to the inventions being claimed.  The role of SLURM in

Parastation software was discussed in an August 25, 2018 document naming

Lippert and Frohwitter.  ParTec_01359319, at -329, -340.

(lii)     SLURM was not disclosed during the prosecution of the '156 Patent.

**2017-2018: Lippert Submits A Demonstrably False Affidavit To The USPTO During Prosecution Of The '156 Patent**

(liii)    During prosecution of the '156 patent, the USPTO examiner had issued rejections based on the Kirshnamurthy reference (US 2012/0054770) in August 2015, June 2016, and January 2017.  ParTec_00000045, at -161–170, -221–321, -277–286.  Each time, the examiner disagreed with ParTec's arguments for patentability and rejected ParTec's amendments to distinguish Krishnamurthy.  *Id.*

(liv)     Under the governing law at the time—before the United States Congress passed the America Invents Act—Frohwitter and Lippert could not rely on their European application as a source of priority without submitting proof of conception and reduction to practice of the invention.  *See, e.g.*, ParTec_00000045, at -279-80.  On information and belief, by June 28, 2017, each of Frohwitter, Lippert, and Gigerich knew, understood, and believed that that the '156 Patent would not issue over the prior art unless they submitted proof of conception and reduction to practice of the invention, which would allow them to antedate Krishnamurthy and obtain patent issuance.

| | |
|---|---|
| Application/Control Number: 13/861,429 | Page 2 |
| Art Unit: 2441 | |

**DETAILED ACTION**

The present application is being examined under the pre-AIA first to invent provisions.

…

Application/Control Number: 13/861,429                                Page 3
Art Unit: 2441

3.    Claims 1-12, 14 and 16-19 is/are rejected under pre-AIA 35 U.S.C. 103(a) as

being unpatentable over Krishnamurthy et al (hereafter, "Krishnamurthy"), US

2012/0054770 A1 (hereafter, "Krishnamurthy '770"), in view of  Krishnamurthy et al, US

2009/0213127A1 (hereafter, "Krishnamurthy '127").

**January 11, 2017 Rejection**
**(ParTec_00000045, at -279-80)**

(lv)    On or around June 28, 2017, ParTec initiated an Examiner Interview to discuss the

Krishnamurthy reference, but the Examiner would not agree to allow the claims.

ParTec_00000045, at -321–332

All participants (applicant, applicant's representative, PTO personnel):

(1) *OANH DUONG*.                                        (3)_____.

(2) *Shawn M. Buchaman, Reg. No. 65,064*.              (4)_____.

Date of Interview: *28 June 2017*.

Type:    ☒ Telephonic    ☐ Video Conference
         ☐ Personal [copy given to: ☐ applicant    ☐ applicant's representative]

Exhibit shown or demonstration conducted: ☐ Yes    ☒ No.
    If Yes, brief description: _____.

Issues Discussed   ☐101 ☐112 ☐102 ☐103 ☒Others
(For each of the checked box(es) above, please describe below the issue and detailed description of the discussion)

Claim(s) discussed: *1*.

Identification of prior art discussed: *Krishnamurthy et al, US 2012/0054770 A1.*

Substance of Interview
(For each issue discussed, provide a detailed description and indicate if agreement was reached. Some topics may include: identification or clarification of a reference or a portion thereof, claim interpretation, proposed amendments, arguments of any applied references etc...)

*A proposed amendment as attached was discussed; however, no agreement on allowability of the claim(s) has been reached. Such amendment(s) will be further considered when officially filed .*

**June 28, 2017 Interview**
**(ParTec_00000045, at -321–332)**

(lvi)    On information and belief, by June 28, 2017, it was clear that the application for

the '156 Patent would not issue in view of Krishnamurthy. ParTec_00000045, at -

321–332. On information and belief, Frohwitter, Lippert, and Gigerich knew,

understood, and believed that the '156 Patent would not issue unless they were able to antedate the reference. *See, e.g.*, ParTec_00000045, at -340–343.

(lvii)     On information and belief, each of Frohwitter, Lippert, and Gigerich knew, understood, and believed that the relevant documents establishing prior conception would reveal the inventive contributions of Eicker, Wolf, Rinke, and Becker, and would cause the USPTO to question why they had not been named. *See, e.g.*, ParTec_00000045, at -344–410; Inventorship Defense ¶¶ (i)-(vii) (Eicker), ¶¶ (vii)-(xii) (Rinke), ¶¶ (xiii)-(xviii) (Wolf), ¶¶ (xix)-(xxiv) (Becker).  On information and belief, each of Frohwitter, Lippert, and Gigerich knew, understood, and believed that naming any of Eicker, Wolf, Rinke, or Becker as inventors would deprive Frohwitter of unrestricted ownership—the subject of the secret deal—because those inventors did not themselves have similar arrangements to assign their inventions to Frohwitter.  *See, e.g.*, ParTec_00001955.

(lviii)    On information and belief, in or around August 2017—just a few weeks after the Examiner Interview where the Krishnamurthy rejection was maintained—Frohwitter and Lippert executed a letter agreement that memorialized Lippert's promise to give Frohwitter unrestricted ownership and control over patent applications and prosecution, in exchange for written acknowledgement of Frohwitter's past investment of "millions of euros" for Lippert's benefit, and written promises of future monies to Lippert. ParTec_00001955.

(lix)      Subsequently, on information and belief, on or around February 18, 2018, Lippert signed a demonstrably false affidavit that was submitted to the USPTO. ParTec_00000045, at -340–343.   Lippert's affidavit attached the conception

documents but falsely attested that he is the sole inventor of the subject matters described in those documents. *Id.* The affidavit is demonstrably false because the attached documents were clearly authored or co-authored by others. ParTec_00000045, at -340–343. On information and belief, Lippert falsely attested that the subject matters described in the attachments reflect his diligent reduction to practice, as opposed to conception efforts by Eicker, Wolf, Rinke, and Becker. ParTec_00000045, at -340–343. Lippert knew his sworn statements were material to patentability.

I, Thomas Lippert, state as follows:

1. I am the sole inventor of the above-referenced patent application.

...

9. Thus, Exhibit A demonstrates the conception of the claimed invention prior to August 31, 2010, and Exhibit G demonstrates the successful reduction to practice of the invention recited in the claims of the above-identified patent application at least upon filing of European Patent Application No. 10187436.0 on October 13, 2010. Finally, Exhibits B-F demonstrate diligence between the conception of the claimed invention (at least as early as July 12, 2010) and the constructive reduction to practice (at least as early as October 13, 2010).

10. Therefore, Exhibits A-G together demonstrate that the effective filing date of the claimed invention antedates the August 31, 2010 filing date of U.S. Patent Application No. 2012/0054770 of Krishnamurthy.

11. I hereby declare that all statements made herein of my own knowledge are true and that all statements made on information and belief are believed to be true, and further that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under Section 1001 of Title 18 of the United States Code, and that such willful false statements may jeopardize the validity of the application or any patent issued thereon.

Dated: _13.2.2018_          By: _____
                                    Signature

**Lippert Affidavit** (ParTec_00000045, at -340–343)

---

Exhibit C

Concept Paper, Thomas Lippert, Norbert Eicker, V0.2, 19.7.2010,

Exhibit D

Concept Paper, Thomas Lippert, Norbert Eicker, V0.3, 16.9.2010,

*Exhibits C-D to Lippert Affidavit* (ParTec_00000045, at -374–386)



*Exhibit F to Lippert Affidavit* (ParTec_00000045, at -404–410)

(lx)    On information and belief, Frohwitter and Gigerich corruptly caused, facilitated, induced, solicited, and/or aided and abetted Lippert's submission of the demonstrably false affidavit.  ParTec_00000045, at -340–343.  On information and belief, Lippert's signature on the affidavit was induced and procured in view of past money, and with the promise of future money, from Frohwitter. ParTec_00001955.

(lxi)    That affidavit had the effect of causing the USPTO examiner not to question the absence of Eicker, Wolf, Rinke, and Becker as inventors of the application, and to grant the '156 Patent solely in Lippert's name.  *See, e.g.*, Inventorship Defense ¶¶ (i)-(vii) (Eicker), ¶¶ (vii)-(xii) (Rinke), ¶¶ (xiii)-(xviii) (Wolf), ¶¶ (xix)-(xxiv) (Becker).  Krishnamurthy was not raised again and the patent issued in November 2018.  ParTec_00000045, -516.



UNITED STATES PATENT AND TRADEMARK OFFICE

| APPLICATION NO. | ISSUE DATE | PATENT NO. |
|---|---|---|
| 13/861,429 | 11/27/2018 | 10142156 |

(lxii)    The fraud worked.  Had Frohwitter, Lippert, and Gigerich not concealed and/or misrepresented the truth about the contributions of Eicker, Wolf, Rinke, and Becker, the USPTO examiner would have either: (i) issued a final rejection based on Krishnamurthy, (ii) rejected the '156 Patent for improper inventorship, or (iii) required an amendment to name Eicker, Rinke, Wolf, and Becker, which would deprive Frohwitter of unrestricted ownership.  *See, e.g.*, Inventorship Defense ¶¶ (i)-(vii) (Eicker), ¶¶ (vii)-(xii) (Rinke), ¶¶ (xiii)-(xviii) (Wolf), ¶¶ (xix)-(xxiv) (Becker); ParTec_00001955.  But for the concealment and/or misrepresentation of the contributions of Eicker, Wolf, Rinke, and Becker—which occurred at least upon the filing of the '156 Patent application in 2013, and again in 2018 upon the submission of Lippert's false affidavit, and during all times prior to issuance—Frohwitter and ParTec would not have received a valid patent while retaining ownership of it.

(lxiii)    Additionally, Lippert would not have been able to antedate either of Parastation V5 or SLURM (both being 102(b) references) via an affidavit.  *See, e.g.*, Invalidity Contentions Exs. 156-11, 883-11, 442-6 (SLURM); Exs. 156-12, 883-12, 442-13 (Parastation V5); Statutory Bar Defense ¶¶ (i)-(iv) ('156 Patent), ¶¶ (v)-(viii) ('883 Patent), ¶¶ (ix)-(xii) ('442 Patent).  Had Parastation V5 or SLURM been disclosed

during prosecution, the USPTO would have rejected the asserted claims and the patent would not have issued.

***2018-2019: The Fraud Is Repeated For The '442 Patent After A Change In U.S. Law***

(lxiv)    On January 23, 2018—shortly before filing Lippert's affidavit on February 18, 2018, Frohwitter and Lippert filed a European patent application with six columns of disclosures and a single figure.  ParTec_00001037.  That application was used as the priority claim for the '442 Patent.  *Id.*  On information and belief, Frohwitter, Lippert, and Gigerich caused the filing of this application.

| III-2 | Applicant and/or inventor | |
|---|---|---|
| III-2-1 | This person is | Inventor only |
| III-2-2 | Inventor for | All designated States |
| III-2-4 | Name (LAST, First) | FROHWITTER, Bernhard |
| III-2-5 | Address | c/o Frohwitter Patent- und Rechtsanwälte Possartstrasse 20 81679 München Germany |
| IV-1 | Agent or common representative; or address for correspondence | Agent |
| | The person identified below is hereby/ has been appointed to act on behalf of the applicant(s) before the competent International Authorities as: | |
| IV-1-1 | Name (LAST, First) | TOMLINSON, Edward James |
| IV-1-2 | Address | Frohwitter Patent- und Rechtsanwälte Possartstrasse 20 81679 München Germany |
| IV-1-3 | Telephone No. | +4989998090 |
| IV-1-4 | Facsimile No. | +498999809555 |
| IV-1-5 | e-mail | info@frohwitter.com |
| IV-1-6 | Agent's registration No. | 100043299 |
| V | DESIGNATIONS | |
| V-1 | The filing of this request constitutes under Rule 4.9(a), the designation of all Contracting States bound by the PCT on the international filing date, for the grant of every kind of protection available and, where applicable, for the grant of both regional and national patents. | |
| VI-1 | Priority claim of earlier regional application | |
| VI-1-1 | Filing date | 23 January 2018 (23.01.2018) |
| VI-1-2 | Number | 18152903.3 |
| VI-1-3 | Regional Office | EP |

(lxv)    The '442 Patent was filed on January 23, 2019 naming Bernhard Frohwitter and Thomas Lippert as inventors and claiming priority to the January 2018 EP application.

(lxvi)  The '442 Patent claims to be a development of the system disclosed in the '156 Patent.  '442 Patent, 1:22-25.  Likewise, the claims ultimately issued on the '442 Patent are obvious in view of the '156 Patent.[33]  Plaintiffs now are asserting the '442 Patent claims to cover the same purported inventions disclosed in the '156 Patent.  *See, e.g.* Plaintiffs' Response to Interrogatory No. 18.  Notwithstanding this apparent overlap, the '442 Patent does not name Eicker, Wolf, Rinke, or Becker as inventors.  *See, e.g.*, Inventorship Defense ¶¶ (i)-(vii) (Eicker), ¶¶ (vii)-(xii) (Rinke), ¶¶ (xiii)-(xviii) (Wolf), ¶¶ (xix)-(xxiv) (Becker).

(lxvii)  On information and belief, prior to or around January 22, 2018, each of Frohwitter, Lippert, and Gigerich knew, understood, and believed that naming any of Eicker, Wolf, Rinke, or Becker as inventors would deprive Frohwitter of unrestricted ownership—the subject of the secret deal—because those inventors did not themselves have similar arrangements to assign their inventions to Frohwitter.  *See, e.g.*, ParTec_00001955.

(lxviii)  Additionally, by January 23, 2018, the law in the United States had changed—under the America Invents Act—such that a foreign patent applicant could rely on the filing date of a foreign application without submitting proof of invention.  *See, e.g.*, ParTec_00001037, -1161.  On information and belief, Frohwitter, Lippert, and Gigerich knew and understood that the law had changed such that proof of conception would not be required to claim priority to a European application.

---

[33] Microsoft incorporates by reference all papers, exhibits, and decisions to the '442 Patent IPR.

| |
|---|
| ***Notice of Pre-AIA or AIA Status*** |
| 1.    The present application, filed on or after March 16, 2013, is being examined under the first inventor to file provisions of the AIA. |

**October 28, 2021 Rejection**
**(ParTec_00001037, -1161)**

(lxix)    The filing of the '442 Patent after the America Invents Act had the effect of removing the need for Frohwitter and Lippert to submit actual proof of inventorship, such as an affidavit.  ParTec_00001037, -1161.  This allowed Frohwitter and Lippert to obtain another patent, on the same invention claimed in the '156 Patent, without revealing the underlying facts that would cause the examiner to question inventorship and jeopardize Frohwitter's ownership or Lippert's remuneration.  ParTec_00001955.

(lxx)    Additionally, on information and belief, by January 23, 2018, it was a matter of public record that Eicker, Wolf, Rinke, and Becker had contributed to the conception of the JSC/GRS cluster-booster architectures and their method of operation, as evidenced by publications on which they are co-authors of Lippert's.[34]

---

[34] *See, e.g.*, H. Baier, H. Boettiger, M. Drochner, N. Eicker, U. Fischer, Z. Fodor, A. Frommer, C. Gomez, G. Goldrian, S. Heybrock, D. Hierl, M. Husken, T. Huth, B. Krill, J. Lauritsen, T. Lippert, T. Mauer, B. Mendi, N. Meyer, A. Nobile, I. Ouda, M. Pivanti, D. Pleiter, M. Ries, A. Schafer, H. Schick, F. Schifano, H. Simma, S. Solbrig, T. Streuer, K.-H. Sulanke, R. Tripiccione, J.-S. Vogt, T. Wettig & F. Winter, *QPACE – A QCD Parallel Computer Based on Cell Processors* (2009); N. Attig, F. Berberich, U. Detert, N. Eicker, T. Eickermann, P. Gibbon, W. Gurich, W. Homberg, A. Illich, S. Rinke, M Stephan, K. Wolkersdorfer & T. Lippert, *Entering the Petaflop-Era: New Developments in Supercomputing* (2010); D.A. Mallon, N. Eicker, M.E. Innocenti, G. Lapenta, T. Lippert & E. Suarez, *On The Scalability of the Clusters-Booster Concept* (2012); S. Rinke, D. Becker, T. Lippert, S. Prabhakaran, L. Westphal & F. Wolf, A Dynamic Accelerator-Cluster Architecture (2012); N. Eicker, T. Lippert, T. Moschny, E. Suarez, *The DEEP Project: Pursuing Cluster-Computing In The Many-Core Era* (2013); N. Eicker, T. Lippert, E. Suarez, T. Moschny, *The DEEP Project: Pursuing Cluster-Computing In The Many-Core Era – HUCAA'13 Slides* (2013); N. Eicker & T. Lippert, *An Accelerated Cluster-Architecture for the Exascale* (2014); ParTec_00000045, at -344–410 (prior-art documents published in '156 Patent file history).

(lxxi)     The '442 Patent issued on December 27, 2022 naming Frohwitter and Lippert, but not any of Eicker, Wolf, Rinke, or Becker.

(lxxii)    Additionally, on information and belief, by January 23, 2018, the collaboration between JSC and GRS had produced several additional accelerated cluster architectures, including DEEP and JURECA.  On information and belief, as recent as the end of 2017, the method of operating these cluster-booster architectures was based on Parastation V5, which had been in public use and/or on sale.  *See, e.g.*, Statutory Bar Defense ¶¶ (i)-(iv) ('156 Patent), ¶¶ (v)-(viii) ('883 Patent), ¶¶ (ix)-(xii) ('442 Patent); Invalidity Contentions Exs. 156-12, 883-12, 442-13. Frohwitter, Lippert, and Gigerich did not disclose Parastation V5 during prosecution of the '442 Patent.

(lxxiii)   On information and belief, SLURM continued to be used with Parastation V5, such as around 2014.  *See, e.g.*, Invalidity Contentions Exs. 156-11, 883-11, 442-6; ParTec_00088291; ParTec_01580311.  Frohwitter and Lippert did not disclose SLURM during prosecution of the '442 Patent.

(lxxiv)    Had Parastation V5 or SLURM been disclosed during prosecution, the USPTO would have rejected the asserted claims and the patent would not have issued.  *See, e.g.*, Invalidity Contentions Exs. 156-11, 156-12,  883-11, 883-12, 442-6, 442-13.

### *2021-2024: The '883 Patent Is Obtained After The Successful Fraud For The '156 Patent*

(lxxv)     By November 2018, the USPTO examiner had issued the '156 Patent—accepting Lippert's affidavit despite its falsity—meaning the scheme to defraud succeeded.

(lxxvi)    On March 9, 2021, the '883 Patent was filed as a continuation of the '156 Patent, relying on the priority established for the '156 Patent.  ParTec_0000517, at -520.

That priority was established through the aforementioned acts of deceit. The '883 Patent names Lippert as the sole inventor and does not name Eicker, Wolf, Rinke, or Becker as inventors. *See, e.g.*, Inventorship Defense ¶¶ (i)-(vii) (Eicker), ¶¶ (vii)-(xii) (Rinke), ¶¶ (xiii)-(xviii) (Wolf), ¶¶ (xix)-(xxiv) (Becker)

**Domestic Priority Information**

| Application:: | Continuity Type:: | Parent Application:: | Parent Filing Date:: | Prior Appl Status:: |
|---|---|---|---|---|
| This Application | Continuation of | 16/191,973 | 11/15/18 | Pending |
| 16/191,973 | Continuation of | 13/861,429 | 04/12/13 | Patented |
| 13/861,429 | Continuation of | PCT/EP2011/067888 | 10/13/11 | |

*See, e.g.*, ParTec_0000517, at -528.

(lxxvii)  The '883 Patent issued on March 19, 2024, listing Lippert as the sole named inventor.

(lxxviii)  Relying on the priority established through the '156 Patent allowed the '883 Patent to issue without question as to its inventorship and without jeopardizing Frohwitter's efforts to maintain unrestricted ownership or Lippert's remuneration.

(lxxix)  Parastation V5 was not disclosed during the prosecution of the '883 Patent. Likewise, SLURM was not disclosed during the prosecution of the '883 Patent. *See, e.g.*, ParTec_0000517, at -528; *see, e.g.*, Statutory Bar Defense ¶¶ (i)-(iv) ('156 Patent), ¶¶ (v)-(viii) ('883 Patent), ¶¶ (ix)-(xii) ('442 Patent); Invalidity Contentions Exs. 156-12, 883-12, 442-13.

## Inequitable Conduct During Prosecution Of The '156 Patent

### *Frohwitter's Misrepresentation or Concealment of Inventorship*

(lxxx)    **Duty of Candor and Disclosure:** Frohwitter was substantively involved in the preparation and/or prosecution of the '156 Patent and therefore owed a duty of candor and disclosure to the USPTO.

(lxxxi)    **But-For Material Information:** Norbert Eicker, Felix Wolf, Sebastian Rinke, and Daniel Becker contributed significantly to the conception of the claimed inventions and should be named inventors on that patent.    *See, e.g.*, Inventorship Defense ¶¶ (i)-(vii) (Eicker), ¶¶ (vii)-(xii) (Rinke), ¶¶ (xiii)-(xviii) (Wolf), ¶¶ (xix)-(xxiv) (Becker).  The inventorship of the '156 Patent was material to patentability.  Had the USPTO examiner understood that the correct inventors were not named, the application would have been rejected for improper inventorship.

(lxxxii)    **Awareness of the Information and Appreciation of its Materiality:** Prior to or during prosecution of the '156 Patent, Frohwitter knew and understood that Eicker, Wolf, Rinke, and Becker made inventive contributions.    *See, e.g.*, ParTec_00000045, at -340–431; ParTec_00001955.  Frohwitter knew, believed, and understood that identifying Eicker, Wolf, Rinke, and Becker as inventors would have caused a rejection of the application. Frohwitter knew, believed, and understood that amending the application to name Eicker, Wolf, Rinke, and Becker as inventors would jeopardize Frohwitter's ownership of the patent.

(lxxxiii)    **Deliberate Concealment:** Despite knowing of the inventive contributions of Eicker, Wolf, Rinke, and Becker and appreciating their materiality to patentability, Frohwitter failed to identify them as inventors on the '156 Patent.  In view of additional evidence independently showing or establishing a scheme to defraud, the only reasonable inference that can be drawn from Frohwitter's failure to disclose

the inventive contributions of Eicker, Wolf, Rinke, and Becker is that Frohwitter deliberately concealed those facts, specifically intending to deceive or to mislead the USPTO into issuing an invalid patent.

(lxxxiv) **Egregious Affirmative Misconduct:** Frohwitter corruptly caused, facilitated, induced, solicited, and/or aided and abetted Lippert's submission of the demonstrably false affidavit, which had the effect of affirmatively misrepresenting the inventorship of the '156 Patent. *See, e.g.*, ParTec_00000045, at -340–431; ParTec_00001955. In view of additional evidence independently showing or establishing a scheme to defraud, the only reasonable inference that can be drawn from Frohwitter's egregious affirmative misconduct is that Frohwitter deliberately caused a misrepresentation, specifically intending to deceive or to mislead the USPTO into issuing an invalid patent.

(lxxxv) The '156 Patent is therefore unenforceable owing to Frohwitter's inequitable conduct before the USPTO.

### *Lippert's Misrepresentation or Concealment of Inventorship*

(lxxxvi) **Duty of Candor and Disclosure:** Lippert was substantively involved in the preparation and/or prosecution of the '156 Patent and therefore owed a duty of candor and disclosure to the USPTO.

(lxxxvii) **But-For Material Information:** Norbert Eicker, Felix Wolf, Sebastian Rinke, and Daniel Becker contributed significantly to the conception of the claimed inventions and should be named inventors on that patent. *See, e.g.*, Inventorship Defense ¶¶ (i)-(vii) (Eicker), ¶¶ (vii)-(xii) (Rinke), ¶¶ (xiii)-(xviii) (Wolf), ¶¶ (xix)-(xxiv) (Becker). The inventorship of the '156 Patent was material to patentability. Had

the USPTO examiner understood that the correct inventors were not named, the application would have been rejected for improper inventorship.

(lxxxviii) **Awareness of the Information and Appreciation of its Materiality:** Prior to or during prosecution of the '156 Patent, Lippert knew and understood that Eicker, Wolf, Rinke, and Becker made inventive contributions. *See, e.g.*, ParTec_00000045, at -340–431; ParTec_00001955; Inventorship Defense ¶¶ (i)-(vii) (Eicker), ¶¶ (vii)-(xii) (Rinke), ¶¶ (xiii)-(xviii) (Wolf), ¶¶ (xix)-(xxiv) (Becker).  Lippert knew, believed, and understood that identifying Eicker, Wolf, Rinke, and Becker as inventors would have caused a rejection of the application.  Lippert knew, believed, and understood that amending the application to name Eicker, Wolf, Rinke, and Becker as inventors would jeopardize Frohwitter's ownership of the patent (which Lippert had promised in exchange for money).

(lxxxix) **Deliberate Concealment:** Despite knowing of the inventive contributions of Eicker, Wolf, Rinke, and Becker and appreciating their materiality to patentability, Lippert failed to identify them as inventors on the '156 Patent.  In view of additional evidence independently showing or establishing a scheme to defraud, the only reasonable inference that can be drawn from Lippert's failure to disclose the inventive contributions of Eicker, Wolf, Rinke, and Becker is that Lippert deliberately concealed those facts, specifically intending to deceive or to mislead the USPTO into issuing an invalid patent.

(xc) **Egregious Affirmative Misconduct:** Lippert signed and submitted a demonstrably false affidavit, which had the effect of affirmatively misrepresenting the inventorship of the '156 Patent.  *See, e.g.*, ParTec_00000045, at -340–431;

ParTec_00001955;    Inventorship Defense ¶¶ (i)-(vii) (Eicker), ¶¶ (vii)-(xii) (Rinke), ¶¶ (xiii)-(xviii) (Wolf), ¶¶ (xix)-(xxiv) (Becker).   In view of additional evidence independently showing or establishing a scheme to defraud, the only reasonable inference that can be drawn from Lippert's egregious affirmative misconduct is that Lippert deliberately caused a misrepresentation, specifically intending to deceive or to mislead the USPTO into issuing an invalid patent.

(xci)    The '156 Patent is therefore unenforceable owing to Lippert's inequitable conduct before the USPTO.

### *Gigerich's Misrepresentation or Concealment of Inventorship*

(xcii)    **Duty of Candor and Disclosure:** Gigerich was substantively involved in the preparation and/or prosecution of the '156 Patent and therefore owed a duty of candor and disclosure to the USPTO.

(xciii)    **But-For Material Information:** Norbert Eicker, Felix Wolf, Sebastian Rinke, and Daniel Becker contributed significantly to the conception of the claimed inventions and should be named inventors on that patent.  *See, e.g.*, Inventorship Defense ¶¶ (i)-(vii) (Eicker), ¶¶ (vii)-(xii) (Rinke), ¶¶ (xiii)-(xviii) (Wolf), ¶¶ (xix)-(xxiv) (Becker).  The inventorship of the '156 Patent was material to patentability.  Had the USPTO examiner understood that the correct inventors were not named, the application would have been rejected for improper inventorship.

(xciv)    **Awareness of the Information and Appreciation of its Materiality:** Prior to or during prosecution of the '156 Patent, Gigerich knew and understood that Eicker, Wolf, Rinke, and Becker made inventive contributions.  *See, e.g.*, ParTec_00000045, at -340–431; ParTec_00001955.  Gigerich knew, believed, and

understood that identifying Eicker, Wolf, Rinke, and Becker as inventors would have caused a rejection of the application. Gigerich knew, believed, and understood that amending the application to name Eicker, Wolf, Rinke, and Becker as inventors would jeopardize Frohwitter's ownership of the patent.

(xcv) **Deliberate Concealment:** Despite knowing of the inventive contributions of Eicker, Wolf, Rinke, and Becker and appreciating their materiality to patentability, Gigerich failed to identify them as inventors on the '156 Patent. In view of additional evidence independently showing or establishing a scheme to defraud, the only reasonable inference that can be drawn from Gigerich's failure to disclose the inventive contributions of Eicker, Wolf, Rinke, and Becker is that Gigerich deliberately concealed those facts, specifically intending to deceive or to mislead the USPTO into issuing an invalid patent.

(xcvi) **Egregious Affirmative Misconduct:** Gigerich corruptly caused, facilitated, induced, solicited, and/or aided and abetted Lippert's submission of the demonstrably false affidavit, which had the effect of affirmatively misrepresenting the inventorship of the '156 Patent. *See, e.g.*, ParTec_00000045, at -340–431; ParTec_00001955; Inventorship Defense ¶¶ (i)-(vii) (Eicker), ¶¶ (vii)-(xii) (Rinke), ¶¶ (xiii)-(xviii) (Wolf), ¶¶ (xix)-(xxiv) (Becker). In view of additional evidence independently showing or establishing a scheme to defraud, the only reasonable inference that can be drawn from Gigerich's egregious affirmative misconduct is that Gigerich deliberately caused a misrepresentation, specifically intending to deceive or to mislead the USPTO into issuing an invalid patent.

(xcvii)    The '156 Patent is therefore unenforceable owing to Gigerich's inequitable conduct before the USPTO.

### *Frohwitter's Intentional Concealment of Parastation V5*

(xcviii)    **Duty of Candor and Disclosure:** Frohwitter was substantively involved in the preparation and/or prosecution of the '156 Patent and therefore owed a duty of candor and disclosure to the USPTO.

(xcix)    **But-For Material Information:** Parastation V5 was prior art to the '156 Patent and discloses or renders obvious each element of the asserted claims. *See, e.g.*, Statutory Bar Defense ¶¶ (i)-(iv) ('156 Patent); Invalidity Contentions Exs. 156-12. Had the USPTO examiner been apprised of Parastation V5 and its status as prior art, the claims of the '156 Patent would have been rejected.

(c)    **Awareness of the Information and Appreciation of its Materiality:** Prior to or during prosecution of the '156 Patent, Frohwitter knew and understood that Parastation V5 was prior art. *See, e.g.*, ParTec_00000045, at -349; ParTec_01359319, at -329, -340; MSFT_PARTEC_000710259, -351–56. Frohwitter knew, believed, and understood that identifying Parastation V5 to the USPTO would have caused a rejection of the application.

(ci)    **Deliberate Concealment:** Despite knowing that Parastation V5 was prior art and appreciating that Parastation V5 was but-for material to patentability, Frohwitter failed to disclose Parastation V5 to the USPTO examiner during prosecution.  In view of additional evidence independently showing or establishing a scheme to defraud, the only reasonable inference that can be drawn from Frohwitter's failure

to disclose Parastation V5 is that Frohwitter deliberately concealed it, specifically intending to deceive or to mislead the USPTO into issuing an invalid patent.

(cii)　　The '156 Patent is therefore unenforceable owing to Frohwitter's inequitable conduct before the USPTO.

### *Lippert's Intentional Concealment of Parastation V5*

(ciii)　　**Duty of Candor and Disclosure:** Lippert was substantively involved in the preparation and/or prosecution of the '156 Patent and therefore owed a duty of candor and disclosure to the USPTO.

(civ)　　**But-For Material Information:** Parastation V5 was prior art to the '156 Patent and discloses or renders obvious each element of the asserted claims.  *See, e.g.*, Statutory Bar Defense ¶¶ (i)-(iv) ('156 Patent); Invalidity Contentions Exs. 156-12. Had the USPTO examiner been apprised of Parastation V5 and its status as prior art, the claims of the '156 Patent would have been rejected.

(cv)　　**Awareness of the Information and Appreciation of its Materiality:** Prior to or during prosecution of the '156 Patent, Lippert knew and understood that Parastation V5 was prior art.  *See, e.g.*, ParTec_00000045, at -349; ParTec_01359319, at -329, -340.  Lippert knew, believed, and understood that identifying Parastation V5 to the USPTO would have caused a rejection of the application.

(cvi)　　**Deliberate Concealment:** Despite knowing that Parastation V5 was prior art and appreciating that Parastation V5 was but-for material to patentability, Lippert failed to disclose Parastation V5 to the USPTO examiner during prosecution.  In view of additional evidence independently showing or establishing a scheme to defraud, the only reasonable inference that can be drawn from Lippert's failure to disclose

Parastation V5 is that Lippert deliberately concealed it, specifically intending to deceive or to mislead the USPTO into issuing an invalid patent.

(cvii)    The '156 Patent is therefore unenforceable owing to Lippert's inequitable conduct before the USPTO.

### *Gigerich's Intentional Concealment of Parastation V5*

(cviii)    **Duty of Candor and Disclosure:** Gigerich was substantively involved in the preparation and/or prosecution of the '156 Patent and therefore owed a duty of candor and disclosure to the USPTO.

(cix)    **But-For Material Information:** Parastation V5 was prior art to the '156 Patent and discloses or renders obvious each element of the asserted claims.  *See, e.g.*, Statutory Bar Defense ¶¶ (i)-(iv) ('156 Patent); Invalidity Contentions Exs. 156-12. Had the USPTO examiner been apprised of Parastation V5 and its status as prior art, the claims of the '156 Patent would have been rejected.

(cx)    **Awareness of the Information and Appreciation of its Materiality:** Prior to or during prosecution of the '156 Patent, Gigerich knew and understood that Parastation V5 was prior art.  *See, e.g.*, ParTec_00000045, at -340-431.  Gigerich knew, believed, and understood that identifying Parastation V5 to the USPTO would have caused a rejection of the application.

(cxi)    **Deliberate Concealment:** Despite knowing that Parastation V5 was prior art and appreciating that Parastation V5 was but-for material to patentability, Gigerich failed to disclose Parastation V5 to the USPTO examiner during prosecution.  In view of additional evidence independently showing or establishing a scheme to defraud, the only reasonable inference that can be drawn from Gigerich's failure to

disclose Parastation V5 is that Gigerich deliberately concealed it, specifically intending to deceive or to mislead the USPTO into issuing an invalid patent.

(cxii)    The '156 Patent is therefore unenforceable owing to Gigerich's inequitable conduct before the USPTO.

### *Frohwitter's Intentional Concealment of SLURM*

(cxiii)    **Duty of Candor and Disclosure:** Frohwitter was substantively involved in the preparation and/or prosecution of the '156 Patent and therefore owed a duty of candor and disclosure to the USPTO.

(cxiv)    **But-For Material Information:** SLURM was prior art to the '156 Patent and discloses or renders obvious each element of the asserted claims.  *See, e.g.*, Invalidity Contentions Exs. 156-11.  Had the USPTO examiner been apprised of SLURM and its status as prior art, the claims of the '156 Patent would have been rejected.

(cxv)    **Awareness of the Information and Appreciation of its Materiality:** Prior to or during prosecution of the '156 Patent, Frohwitter knew and understood that SLURM was prior art.  *See, e.g.*, ParTec_01359319, at -329, -340.  Frohwitter knew, believed, and understood that identifying SLURM to the USPTO would have caused a rejection of the application.

(cxvi)    **Deliberate Concealment:** Despite knowing that SLURM was prior art and appreciating that SLURM was but-for material to patentability, Frohwitter failed to disclose SLURM to the USPTO examiner during prosecution.  In view of additional evidence independently showing or establishing a scheme to defraud, the only reasonable inference that can be drawn from Frohwitter's failure to disclose

SLURM is that Frohwitter deliberately concealed it, specifically intending to deceive or to mislead the USPTO into issuing an invalid patent.

(cxvii)    The '156 Patent is therefore unenforceable owing to Frohwitter's inequitable conduct before the USPTO.

### *Lippert's Intentional Concealment of SLURM*

(cxviii)    **Duty of Candor and Disclosure:** Lippert was substantively involved in the preparation and/or prosecution of the '156 Patent and therefore owed a duty of candor and disclosure to the USPTO.

(cxix)    **But-For Material Information:** SLURM was prior art to the '156 Patent and discloses or renders obvious each element of the asserted claims.  *See, e.g.*, Invalidity Contentions Exs. 156-11.  Had the USPTO examiner been apprised of SLURM and its status as prior art, the claims of the '156 Patent would have been rejected.

(cxx)    **Awareness of the Information and Appreciation of its Materiality:** Prior to or during prosecution of the '156 Patent, Lippert knew and understood that SLURM was prior art.  *See, e.g.*, ParTec_01359319, at -329, -340.  Lippert knew, believed, and understood that identifying SLURM to the USPTO would have caused a rejection of the application.

(cxxi)    **Deliberate Concealment:** Despite knowing that SLURM was prior art and appreciating that SLURM was but-for material to patentability, Lippert failed to disclose SLURM to the USPTO examiner during prosecution.  In view of additional evidence independently showing or establishing a scheme to defraud, the only reasonable inference that can be drawn from Lippert's failure to disclose SLURM

is that Lippert deliberately concealed it, specifically intending to deceive or to mislead the USPTO into issuing an invalid patent.

(cxxii)    The '156 Patent is therefore unenforceable owing to Lippert's inequitable conduct before the USPTO.

## Inequitable Conduct During Prosecution Of The '883 Patent

### *Frohwitter's Misrepresentation or Concealment of Inventorship*

(cxxiii)   **Duty of Candor and Disclosure:** Frohwitter was substantively involved in the preparation and/or prosecution of the '883 Patent and therefore owed a duty of candor and disclosure to the USPTO.

(cxxiv)   **But-For Material Information:**  Norbert Eicker, Felix Wolf, Sebastian Rinke, and Daniel Becker contributed significantly to the conception of the claimed inventions and should be named inventors on that patent.  *See, e.g.*, Inventorship Defense ¶¶ (i)-(vii) (Eicker), ¶¶ (vii)-(xii) (Rinke), ¶¶ (xiii)-(xviii) (Wolf), ¶¶ (xix)-(xxiv) (Becker).  The inventorship of the '883 Patent was material to patentability.  Had the USPTO examiner understood that the correct inventors were not named, the application would have been rejected for improper inventorship.

(cxxv)    **Awareness of the Information and Appreciation of its Materiality:** Prior to or during prosecution of the '883 Patent, Frohwitter knew and understood that Eicker, Wolf, Rinke, and Becker made inventive contributions.  *See, e.g.*, ParTec_00000045, at -340–431; ParTec_00001955.  Frohwitter knew, believed, and understood that identifying Eicker, Wolf, Rinke, and Becker as inventors would have caused a rejection of the application. Frohwitter knew, believed, and

understood that amending the application to name Eicker, Wolf, Rinke, and Becker as inventors would jeopardize Frohwitter's ownership of the patent.

(cxxvi)   **Deliberate Concealment:** Despite knowing of the inventive contributions of Eicker, Wolf, Rinke, and Becker and appreciating their materiality to patentability, Frohwitter failed to identify them as inventors on the '883 Patent.  In view of additional evidence independently showing or establishing a scheme to defraud, the only reasonable inference that can be drawn from Frohwitter's failure to disclose the inventive contributions of Eicker, Wolf, Rinke, and Becker is that Frohwitter deliberately concealed those facts, specifically intending to deceive or to mislead the USPTO into issuing an invalid patent.

(cxxvii)  **Egregious Affirmative Misconduct:** Frohwitter corruptly caused, facilitated, induced, solicited, and/or aided and abetted Lippert's submission of the demonstrably false affidavit, which had the effect of affirmatively misrepresenting the inventorship of the '883 Patent's parent application (the '156 Patent).  *See, e.g.*, ParTec_00000045, at -340–431; ParTec_00001955.  The '883 Patent was issued relying on the priority and inventorship established for the '156 Patent.  In view of additional evidence independently showing or establishing a scheme to defraud, the only reasonable inference that can be drawn from Frohwitter's egregious affirmative misconduct is that Frohwitter deliberately caused a misrepresentation, specifically intending to deceive or to mislead the USPTO into issuing an invalid patent.

(cxxviii) The '883 Patent is therefore unenforceable owing to Frohwitter's inequitable conduct before the USPTO.

*Lippert's Misrepresentation or Concealment of Inventorship*

(cxxix)   **Duty of Candor and Disclosure:** Lippert was substantively involved in the preparation and/or prosecution of the '883 Patent and therefore owed a duty of candor and disclosure to the USPTO.

(cxxx)   **But-For Material Information:** Norbert Eicker, Felix Wolf, Sebastian Rinke, and Daniel Becker contributed significantly to the conception of the claimed inventions and should be named inventors on that patent. *See, e.g.*, Inventorship Defense ¶¶ (i)-(vii) (Eicker), ¶¶ (vii)-(xii) (Rinke), ¶¶ (xiii)-(xviii) (Wolf), ¶¶ (xix)-(xxiv) (Becker). The inventorship of the '883 Patent was material to patentability. Had the USPTO examiner understood that the correct inventors were not named, the application would have been rejected for improper inventorship.

(cxxxi)   **Awareness of the Information and Appreciation of its Materiality:** Prior to or during prosecution of the '883 Patent, Lippert knew and understood that Eicker, Wolf, Rinke, and Becker made inventive contributions. *See, e.g.*, ParTec_00000045, at -340–431; ParTec_00001955; Inventorship Defense ¶¶ (i)-(vii) (Eicker), ¶¶ (vii)-(xii) (Rinke), ¶¶ (xiii)-(xviii) (Wolf), ¶¶ (xix)-(xxiv) (Becker). Lippert knew, believed, and understood that identifying Eicker, Wolf, Rinke, and Becker as inventors would have caused a rejection of the application. Lippert knew, believed, and understood that amending the application to name Eicker, Wolf, Rinke, and Becker as inventors would jeopardize Frohwitter's ownership of the patent (which Lippert had promised in exchange for money).

(cxxxii)   **Deliberate Concealment:** Despite knowing of the inventive contributions of Eicker, Wolf, Rinke, and Becker and appreciating their materiality to patentability,

Lippert failed to identify them as inventors on the '883 Patent.  In view of additional evidence independently showing or establishing a scheme to defraud, the only reasonable inference that can be drawn from Lippert's failure to disclose the inventive contributions of Eicker, Wolf, Rinke, and Becker is that Lippert deliberately concealed those facts, specifically intending to deceive or to mislead the USPTO into issuing an invalid patent.

(cxxxiii)  **Egregious Affirmative Misconduct:** Lippert signed and submitted a demonstrably false affidavit, which had the effect of affirmatively misrepresenting the inventorship of the '883 Patent's parent application (the '156 Patent).  *See, e.g.*, ParTec_00000045, at -340–431; ParTec_00001955.  In view of additional evidence independently showing or establishing a scheme to defraud, the only reasonable inference that can be drawn from Lippert's egregious affirmative misconduct is that Lippert deliberately caused a misrepresentation, specifically intending to deceive or to mislead the USPTO into issuing an invalid patent.

(cxxxiv)  The '883 Patent is therefore unenforceable owing to Lippert's inequitable conduct before the USPTO.

### *Gigerich's Misrepresentation or Concealment of Inventorship*

(cxxxv)  **Duty of Candor and Disclosure:** Gigerich was substantively involved in the preparation and/or prosecution of the '883 Patent and therefore owed a duty of candor and disclosure to the USPTO.

(cxxxvi)  **But-For Material Information:** Norbert Eicker, Felix Wolf, Sebastian Rinke, and Daniel Becker contributed significantly to the conception of the claimed inventions and should be named inventors on that patent.  *See, e.g.*, Inventorship Defense

¶¶ (i)-(vii) (Eicker), ¶¶ (vii)-(xii) (Rinke), ¶¶ (xiii)-(xviii) (Wolf), ¶¶ (xix)-(xxiv) (Becker).  The inventorship of the '883 Patent was material to patentability.  Had the USPTO examiner understood that the correct inventors were not named, the application would have been rejected for improper inventorship.

(cxxxvii) **Awareness of the Information and Appreciation of its Materiality:** Prior to or during prosecution of the '883 Patent, Gigerich knew and understood that Eicker, Wolf, Rinke, and Becker made inventive contributions.  *See, e.g.*, ParTec_00000045, at -340–431.  Gigerich knew, believed, and understood that identifying Eicker, Wolf, Rinke, and Becker as inventors would have caused a rejection of the application. Gigerich knew, believed, and understood that amending the application to name Eicker, Wolf, Rinke, and Becker as inventors would jeopardize Frohwitter's ownership of the patent.

(cxxxviii) **Deliberate Concealment:** Despite knowing of the inventive contributions of Eicker, Wolf, Rinke, and Becker and appreciating their materiality to patentability, Gigerich failed to identify them as inventors on the '883 Patent.  In view of additional evidence independently showing or establishing a scheme to defraud, the only reasonable inference that can be drawn from Gigerich's failure to disclose the inventive contributions of Eicker, Wolf, Rinke, and Becker is that Gigerich deliberately concealed those facts, specifically intending to deceive or to mislead the USPTO into issuing an invalid patent.

(cxxxix) **Egregious Affirmative Misconduct:** Gigerich corruptly caused, facilitated, induced, solicited, and/or aided and abetted Lippert's submission of the demonstrably false affidavit, which had the effect of affirmatively misrepresenting

105

the inventorship of the '883 Patent's parent application (the '156 Patent). *See, e.g.*, ParTec_00000045, at -340–431. The '883 Patent was issued relying on the priority and inventorship established for the '156 Patent. In view of additional evidence independently showing or establishing a scheme to defraud, the only reasonable inference that can be drawn from Gigerich's egregious affirmative misconduct is that Gigerich deliberately caused a misrepresentation, specifically intending to deceive or to mislead the USPTO into issuing an invalid patent.

(cxl)    The '883 Patent is therefore unenforceable owing to Gigerich's inequitable conduct before the USPTO.

### *Frohwitter's Intentional Concealment of Parastation V5*

(cxli)    **Duty of Candor and Disclosure:** Frohwitter was substantively involved in the preparation and/or prosecution of the '883 Patent and therefore owed a duty of candor and disclosure to the USPTO.

(cxlii)    **But-For Material Information:** Parastation V5 was prior art to the '883 Patent and discloses or renders obvious each element of the asserted claims. *See, e.g.*, Statutory Bar Defense ¶¶ (v)-(viii) ('883 Patent), Invalidity Contentions Ex. 883-12. Had the USPTO examiner been apprised of Parastation V5 and its status as prior art, the claims of the '883 Patent would have been rejected.

(cxliii)    **Awareness of the Information and Appreciation of its Materiality:** Prior to or during prosecution of the '883 Patent, Frohwitter knew and understood that Parastation V5 was prior art. *See, e.g.*, ParTec_00000045, at -349; ParTec_01359319, at -329, -340; MSFT_PARTEC_000710259, -351–56.

Frohwitter knew, believed, and understood that identifying Parastation V5 to the USPTO would have caused a rejection of the application.

(cxliv)    **Deliberate Concealment:** Despite knowing that Parastation V5 was prior art and appreciating that Parastation V5 was but-for material to patentability, Frohwitter failed to disclose Parastation V5 to the USPTO examiner during prosecution. In view of additional evidence independently showing or establishing a scheme to defraud, the only reasonable inference that can be drawn from Frohwitter's failure to disclose Parastation V5 is that Frohwitter deliberately concealed it, specifically intending to deceive or to mislead the USPTO into issuing an invalid patent.

(cxlv)    The '883 Patent is therefore unenforceable owing to Frohwitter's inequitable conduct before the USPTO.

### *Lippert's Intentional Concealment of Parastation V5*

(cxlvi)    **Duty of Candor and Disclosure:** Lippert was substantively involved in the preparation and/or prosecution of the '883 Patent and therefore owed a duty of candor and disclosure to the USPTO.

(cxlvii)    **But-For Material Information:** Parastation V5 was prior art to the '883 Patent and discloses or renders obvious each element of the asserted claims. *See, e.g.*, Statutory Bar Defense ¶¶ (v)-(viii) ('883 Patent), Invalidity Contentions Ex. 883-12. Had the USPTO examiner been apprised of Parastation V5 and its status as prior art, the claims of the '883 Patent would have been rejected.

(cxlviii)    **Awareness of the Information and Appreciation of its Materiality:** Prior to or during prosecution of the '883 Patent, Lippert knew and understood that Parastation V5 was prior art. *See, e.g.*, ParTec_00000045, at -349; ParTec_01359319, at -329,

-340; MSFT_PARTEC_000710259, -351–56.   Lippert knew, believed, and understood that identifying Parastation V5 to the USPTO would have caused a rejection of the application.

(cxlix)   **Deliberate Concealment:** Despite knowing that Parastation V5 was prior art and appreciating that Parastation V5 was but-for material to patentability, Lippert failed to disclose Parastation V5 to the USPTO examiner during prosecution.  In view of additional evidence independently showing or establishing a scheme to defraud, the only reasonable inference that can be drawn from Lippert's failure to disclose Parastation V5 is that Lippert deliberately concealed it, specifically intending to deceive or to mislead the USPTO into issuing an invalid patent.

(cl)   The '883 Patent is therefore unenforceable owing to Lippert's inequitable conduct before the USPTO.

### Gigerich's Intentional Concealment of Parastation V5

(cli)   **Duty of Candor and Disclosure:** Gigerich was substantively involved in the preparation and/or prosecution of the '883 Patent and therefore owed a duty of candor and disclosure to the USPTO.

(clii)   **But-For Material Information:** Parastation V5 was prior art to the '883 Patent and discloses or renders obvious each element of the asserted claims.  *See, e.g.*, Statutory Bar Defense ¶¶ (v)-(viii) ('883 Patent), Invalidity Contentions Ex. 883-12.  Had the USPTO examiner been apprised of Parastation V5 and its status as prior art, the claims of the '883 Patent would have been rejected.

(cliii)   **Awareness of the Information and Appreciation of its Materiality:** Prior to or during prosecution of the '883 Patent, Gigerich knew and understood that

Parastation V5 was prior art.  *See, e.g.*, ParTec_00000045, at -340-431.  Gigerich knew, believed, and understood that identifying Parastation V5 to the USPTO would have caused a rejection of the application.

(cliv)   **Deliberate Concealment:** Despite knowing that Parastation V5 was prior art and appreciating that Parastation V5 was but-for material to patentability, Gigerich failed to disclose Parastation V5 to the USPTO examiner during prosecution.  In view of additional evidence independently showing or establishing a scheme to defraud, the only reasonable inference that can be drawn from Gigerich's failure to disclose Parastation V5 is that Gigerich deliberately concealed it, specifically intending to deceive or to mislead the USPTO into issuing an invalid patent.

(clv)   The '883 Patent is therefore unenforceable owing to Gigerich's inequitable conduct before the USPTO.

### *Frohwitter's Intentional Concealment of SLURM*

(clvi)   **Duty of Candor and Disclosure:** Frohwitter was substantively involved in the preparation and/or prosecution of the '883 Patent and therefore owed a duty of candor and disclosure to the USPTO.

(clvii)   **But-For Material Information:** SLURM was prior art to the '883 Patent and discloses or renders obvious each element of the asserted claims.  *See, e.g.*, Invalidity Contentions Ex. 883-11.  Had the USPTO examiner been apprised of SLURM and its status as prior art, the claims of the '883 Patent would have been rejected.

(clviii)   **Awareness of the Information and Appreciation of its Materiality:** Prior to or during prosecution of the '883 Patent, Frohwitter knew and understood that

SLURM was prior art.  *See, e.g.*, ParTec_01359319, at -329, -340.  Frohwitter knew, believed, and understood that identifying SLURM to the USPTO would have caused a rejection of the application.

(clix)  **Deliberate Concealment:** Despite knowing that SLURM was prior art and appreciating that SLURM was but-for material to patentability, Frohwitter failed to disclose SLURM to the USPTO examiner during prosecution.  In view of additional evidence independently showing or establishing a scheme to defraud, the only reasonable inference that can be drawn from Frohwitter's failure to disclose SLURM is that Frohwitter deliberately concealed it, specifically intending to deceive or to mislead the USPTO into issuing an invalid patent.

(clx)  The '883 Patent is therefore unenforceable owing to Frohwitter's inequitable conduct before the USPTO.

### *Lippert's Intentional Concealment of SLURM*

(clxi)  **Duty of Candor and Disclosure:** Lippert was substantively involved in the preparation and/or prosecution of the '883 Patent and therefore owed a duty of candor and disclosure to the USPTO.

(clxii)  **But-For Material Information:** SLURM was prior art to the '883 Patent and discloses or renders obvious each element of the asserted claims.  *See, e.g.*, Invalidity Contentions Ex. 883-11.  Had the USPTO examiner been apprised of SLURM and its status as prior art, the claims of the '883 Patent would have been rejected.

(clxiii)  **Awareness of the Information and Appreciation of its Materiality:** Prior to or during prosecution of the '883 Patent, Lippert knew and understood that SLURM

was prior art. *See, e.g.*, ParTec_01359319, at -329, -340. Lippert knew, believed, and understood that identifying SLURM to the USPTO would have caused a rejection of the application.

(clxiv) **Deliberate Concealment:** Despite knowing that SLURM was prior art and appreciating that SLURM was but-for material to patentability, Lippert failed to disclose SLURM to the USPTO examiner during prosecution. In view of additional evidence independently showing or establishing a scheme to defraud, the only reasonable inference that can be drawn from Lippert's failure to disclose SLURM is that Lippert deliberately concealed it, specifically intending to deceive or to mislead the USPTO into issuing an invalid patent.

(clxv) The '883 Patent is therefore unenforceable owing to Lippert's inequitable conduct before the USPTO.

## Inequitable Conduct During Prosecution Of The '442 Patent

### *Frohwitter's Misrepresentation or Concealment of Inventorship*

(clxvi) **Duty of Candor and Disclosure:** Frohwitter was substantively involved in the preparation and/or prosecution of the '442 Patent and therefore owed a duty of candor and disclosure to the USPTO.

(clxvii) **But-For Material Information:** Norbert Eicker, Felix Wolf, Sebastian Rinke, and Daniel Becker contributed significantly to the conception of the claimed inventions and should be named inventors on that patent. *See, e.g.*, Inventorship Defense ¶¶ (i)-(vii) (Eicker), ¶¶ (vii)-(xii) (Rinke), ¶¶ (xiii)-(xviii) (Wolf), ¶¶ (xix)-(xxiv) (Becker). The inventorship of the '442 Patent was material to patentability. Had

111

the USPTO examiner understood that the correct inventors were not named, the application would have been rejected for improper inventorship.

(clxviii)    **Awareness of the Information and Appreciation of its Materiality:** Prior to or during prosecution of the '442 Patent, Frohwitter knew and understood that Eicker, Wolf, Rinke, and Becker made inventive contributions. *See, e.g.*, ParTec_00000045, at -340–431; ParTec_00001955; Inventorship Defense ¶¶ (i)-(vii) (Eicker), ¶¶ (vii)-(xii) (Rinke), ¶¶ (xiii)-(xviii) (Wolf), ¶¶ (xix)-(xxiv) (Becker). Frohwitter knew, believed, and understood that identifying Eicker, Wolf, Rinke, and Becker as inventors would have caused a rejection of the application. Frohwitter knew, believed, and understood that amending the application to name Eicker, Wolf, Rinke, and Becker as inventors would jeopardize Frohwitter's ownership of the patent.

(clxix)    **Deliberate Concealment:** Despite knowing of the inventive contributions of Eicker, Wolf, Rinke, and Becker and appreciating their materiality to patentability, Frohwitter failed to identify them as inventors on the '442 Patent. In view of additional evidence independently showing or establishing a scheme to defraud, the only reasonable inference that can be drawn from Frohwitter's failure to disclose the inventive contributions of Eicker, Wolf, Rinke, and Becker is that Frohwitter deliberately concealed those facts, specifically intending to deceive or to mislead the USPTO into issuing an invalid patent.

(clxx)    The '442 Patent is therefore unenforceable owing to Frohwitter's inequitable conduct before the USPTO.

### *Lippert's Misrepresentation or Concealment of Inventorship*

(clxxi)    **Duty of Candor and Disclosure:** Lippert was substantively involved in the preparation and/or prosecution of the '442 Patent and therefore owed a duty of candor and disclosure to the USPTO.

(clxxii)   **But-For Material Information:** Norbert Eicker, Felix Wolf, Sebastian Rinke, and Daniel Becker contributed significantly to the conception of the claimed inventions and should be named inventors on that patent. *See, e.g.*, Inventorship Defense ¶¶ (i)-(vii) (Eicker), ¶¶ (vii)-(xii) (Rinke), ¶¶ (xiii)-(xviii) (Wolf), ¶¶ (xix)-(xxiv) (Becker). The inventorship of the '442 Patent was material to patentability. Had the USPTO examiner understood that the correct inventors were not named, the application would have been rejected for improper inventorship.

(clxxiii)  **Awareness of the Information and Appreciation of its Materiality:** Prior to or during prosecution of the '442 Patent, Lippert knew and understood that Eicker, Wolf, Rinke, and Becker made inventive contributions. *See, e.g.*, ParTec_00000045, at -340–431; ParTec_00001955; Inventorship Defense ¶¶ (i)-(vii) (Eicker), ¶¶ (vii)-(xii) (Rinke), ¶¶ (xiii)-(xviii) (Wolf), ¶¶ (xix)-(xxiv) (Becker). Lippert knew, believed, and understood that identifying Eicker, Wolf, Rinke, and Becker as inventors would have caused a rejection of the application. Lippert knew, believed, and understood that amending the application to name Eicker, Wolf, Rinke, and Becker as inventors would jeopardize Frohwitter's ownership of the patent (which Lippert had promised in exchange for money).

(clxxiv)   **Deliberate Concealment:** Despite knowing of the inventive contributions of Eicker, Wolf, Rinke, and Becker and appreciating their materiality to patentability, Lippert failed to identify them as inventors on the '442 Patent. In view of additional

evidence independently showing or establishing a scheme to defraud, the only reasonable inference that can be drawn from Lippert's failure to disclose the inventive contributions of Eicker, Wolf, Rinke, and Becker is that Lippert deliberately concealed those facts, specifically intending to deceive or to mislead the USPTO into issuing an invalid patent.

(clxxv)  The '442 Patent is therefore unenforceable owing to Lippert's inequitable conduct before the USPTO.

### *Gigerich's Misrepresentation or Concealment of Inventorship*

(clxxvi)  **Duty of Candor and Disclosure:** Gigerich was substantively involved in the preparation and/or prosecution of the '442 Patent and therefore owed a duty of candor and disclosure to the USPTO.

(clxxvii)  **But-For Material Information:** Norbert Eicker, Felix Wolf, Sebastian Rinke, and Daniel Becker contributed significantly to the conception of the claimed inventions and should be named inventors on that patent.  *See, e.g.*, Inventorship Defense ¶¶ (i)-(vii) (Eicker), ¶¶ (vii)-(xii) (Rinke), ¶¶ (xiii)-(xviii) (Wolf), ¶¶ (xix)-(xxiv) (Becker).  The inventorship of the '442 Patent was material to patentability.  Had the USPTO examiner understood that the correct inventors were not named, the application would have been rejected for improper inventorship.

(clxxviii)  **Awareness of the Information and Appreciation of its Materiality:** Prior to or during prosecution of the '442 Patent, Gigerich knew and understood that Eicker, Wolf, Rinke, and Becker made inventive contributions.  *See, e.g.*, ParTec_00000045, at -340–431; Inventorship Defense ¶¶ (i)-(vii) (Eicker), ¶¶ (vii)-(xii) (Rinke), ¶¶ (xiii)-(xviii) (Wolf), ¶¶ (xix)-(xxiv) (Becker).  Gigerich knew,

believed, and understood that identifying Eicker, Wolf, Rinke, and Becker as inventors would have caused a rejection of the application. Gigerich knew, believed, and understood that amending the application to name Eicker, Wolf, Rinke, and Becker as inventors would jeopardize Frohwitter's ownership of the patent.

(clxxix)   **Deliberate Concealment:** Despite knowing of the inventive contributions of Eicker, Wolf, Rinke, and Becker and appreciating their materiality to patentability, Gigerich failed to identify them as inventors on the '442 Patent.  In view of additional evidence independently showing or establishing a scheme to defraud, the only reasonable inference that can be drawn from Gigerich's failure to disclose the inventive contributions of Eicker, Wolf, Rinke, and Becker is that Gigerich deliberately concealed those facts, specifically intending to deceive or to mislead the USPTO into issuing an invalid patent.

(clxxx)   The '442 Patent is therefore unenforceable owing to Gigerich's inequitable conduct before the USPTO.

### *Frohwitter's Intentional Concealment of Parastation V5*

(clxxxi)   **Duty of Candor and Disclosure:** Frohwitter was substantively involved in the preparation and/or prosecution of the '442 Patent and therefore owed a duty of candor and disclosure to the USPTO.

(clxxxii)   **But-For Material Information:** Parastation V5 was prior art to the '442 Patent and discloses or renders obvious each element of the asserted claims.  *See, e.g.*, Statutory Bar Defense ¶¶ (i)-(iv) ('156 Patent), ¶¶ (v)-(viii) ('883 Patent), ¶¶ (ix)-(xii) ('442 Patent); Invalidity Contentions Exs. 156-12, 883-12, 442-13.  Had the

USPTO examiner been apprised of Parastation V5 and its status as prior art, the claims of the '442 Patent would have been rejected.

(clxxxiii) **Awareness of the Information and Appreciation of its Materiality:** Prior to or during prosecution of the '442 Patent, Frohwitter knew and understood that Parastation V5 was prior art. *See, e.g.*, ParTec_00000045, at -349; ParTec_01359319, at -329, -340; MSFT_PARTEC_000710259, -351–56. Frohwitter knew, believed, and understood that identifying Parastation V5 to the USPTO would have caused a rejection of the application.

(clxxxiv) **Deliberate Concealment:** Despite knowing that Parastation V5 was prior art and appreciating that Parastation V5 was but-for material to patentability, Frohwitter failed to disclose Parastation V5 to the USPTO examiner during prosecution. In view of additional evidence independently showing or establishing a scheme to defraud, the only reasonable inference that can be drawn from Frohwitter's failure to disclose Parastation V5 is that Frohwitter deliberately concealed it, specifically intending to deceive or to mislead the USPTO into issuing an invalid patent.

(clxxxv) The '442 Patent is therefore unenforceable owing to Frohwitter's inequitable conduct before the USPTO.

*Lippert's Intentional Concealment of Parastation V5*

(clxxxvi) **Duty of Candor and Disclosure:** Lippert was substantively involved in the preparation and/or prosecution of the '442 Patent and therefore owed a duty of candor and disclosure to the USPTO.

(clxxxvii) **But-For Material Information:** Parastation V5 was prior art to the '442 Patent and discloses or renders obvious each element of the asserted claims. *See, e.g.*,

Statutory Bar Defense ¶¶ (i)-(iv) ('156 Patent), ¶¶ (v)-(viii) ('883 Patent), ¶¶ (ix)-(xii) ('442 Patent); Invalidity Contentions Exs. 156-12, 883-12, 442-13.  Had the USPTO examiner been apprised of Parastation V5 and its status as prior art, the claims of the '442 Patent would have been rejected.

(clxxxviii)    **Awareness of the Information and Appreciation of its Materiality:** Prior to or during prosecution of the '442 Patent, Lippert knew and understood that Parastation V5 was prior art. *See, e.g.*, ParTec_00000045, at -340–431; ParTec_01359319, at -329, -340.  Lippert knew, believed, and understood that identifying Parastation V5 to the USPTO would have caused a rejection of the application.

(clxxxix)    **Deliberate Concealment:** Despite knowing that Parastation V5 was prior art and appreciating that Parastation V5 was but-for material to patentability, Lippert failed to disclose Parastation V5 to the USPTO examiner during prosecution.  In view of additional evidence independently showing or establishing a scheme to defraud, the only reasonable inference that can be drawn from Lippert's failure to disclose Parastation V5 is that Lippert deliberately concealed it, specifically intending to deceive or to mislead the USPTO into issuing an invalid patent.

(cxc)    The '442 Patent is therefore unenforceable owing to Lippert's inequitable conduct before the USPTO.

### *Gigerich's Intentional Concealment of Parastation V5*

(cxci)    **Duty of Candor and Disclosure:** Gigerich was substantively involved in the preparation and/or prosecution of the '442 Patent and therefore owed a duty of candor and disclosure to the USPTO.

(cxcii)  **But-For Material Information:** Parastation V5 was prior art to the '442 Patent and discloses or renders obvious each element of the asserted claims. *See, e.g.*, Statutory Bar Defense ¶¶ (i)-(iv) ('156 Patent), ¶¶ (v)-(viii) ('883 Patent), ¶¶ (ix)-(xii) ('442 Patent); Invalidity Contentions Exs. 156-12, 883-12, 442-13.  Had the USPTO examiner been apprised of Parastation V5 and its status as prior art, the claims of the '442 Patent would have been rejected.

(cxciii)  **Awareness of the Information and Appreciation of its Materiality:** Prior to or during prosecution of the '442 Patent, Gigerich knew and understood that Parastation V5 was prior art. *See, e.g.*, ParTec_00000045, at -340–431.  Gigerich knew, believed, and understood that identifying Parastation V5 to the USPTO would have caused a rejection of the application.

(cxciv)  **Deliberate Concealment:** Despite knowing that Parastation V5 was prior art and appreciating that Parastation V5 was but-for material to patentability, Gigerich failed to disclose Parastation V5 to the USPTO examiner during prosecution.  In view of additional evidence independently showing or establishing a scheme to defraud, the only reasonable inference that can be drawn from Gigerich's failure to disclose Parastation V5 is that Gigerich deliberately concealed it, specifically intending to deceive or to mislead the USPTO into issuing an invalid patent.

(cxcv)  The '442 Patent is therefore unenforceable owing to Gigerich's inequitable conduct before the USPTO.

### *Frohwitter's Intentional Concealment of SLURM*

(cxcvi)    **Duty of Candor and Disclosure:** Frohwitter was substantively involved in the preparation and/or prosecution of the '442 Patent and therefore owed a duty of candor and disclosure to the USPTO.

(cxcvii)    **But-For Material Information:** SLURM was prior art to the '442 Patent and discloses or renders obvious each element of the asserted claims. *See, e.g.*, Invalidity Contentions Ex. 442-6. Had the USPTO examiner been apprised of SLURM and its status as prior art, the claims of the '442 Patent would have been rejected.

(cxcviii)    **Awareness of the Information and Appreciation of its Materiality:** Prior to or during prosecution of the '442 Patent, Frohwitter knew and understood that SLURM was prior art. *See, e.g.*, ParTec_01359319, at -329, -340. Frohwitter knew, believed, and understood that identifying SLURM to the USPTO would have caused a rejection of the application.

(cxcix)    **Deliberate Concealment:** Despite knowing that SLURM was prior art and appreciating that SLURM was but-for material to patentability, Frohwitter failed to disclose SLURM to the USPTO examiner during prosecution. In view of additional evidence independently showing or establishing a scheme to defraud, the only reasonable inference that can be drawn from Frohwitter's failure to disclose SLURM is that Frohwitter deliberately concealed it, specifically intending to deceive or to mislead the USPTO into issuing an invalid patent.

(cc)    The '442 Patent is therefore unenforceable owing to Frohwitter's inequitable conduct before the USPTO.

### *Lippert's Intentional Concealment of SLURM*

(cci)     **Duty of Candor and Disclosure:** Lippert was substantively involved in the preparation and/or prosecution of the '442 Patent and therefore owed a duty of candor and disclosure to the USPTO.

(ccii)    **But-For Material Information:** SLURM was prior art to the '442 Patent and discloses or renders obvious each element of the asserted claims.  *See, e.g.*, Invalidity Contentions Ex. 442-6.  Had the USPTO examiner been apprised of SLURM and its status as prior art, the claims of the '442 Patent would have been rejected.

(cciii)   **Awareness of the Information and Appreciation of its Materiality:** Prior to or during prosecution of the '442 Patent, Lippert knew and understood that SLURM was prior art.  *See, e.g.*, ParTec_01359319, at -329, -340.  Lippert knew, believed, and understood that identifying SLURM to the USPTO would have caused a rejection of the application.

(cciv)    **Deliberate Concealment:** Despite knowing that SLURM was prior art and appreciating that SLURM was but-for material to patentability, Lippert failed to disclose SLURM to the USPTO examiner during prosecution.  In view of additional evidence independently showing or establishing a scheme to defraud, the only reasonable inference that can be drawn from Lippert's failure to disclose SLURM is that Lippert deliberately concealed it, specifically intending to deceive or to mislead the USPTO into issuing an invalid patent.

(ccv)     The '442 Patent is therefore unenforceable owing to Lippert's inequitable conduct before the USPTO.

**Infectious Unenforceability**

(ccvi)     The effect of the aforementioned inequitable conduct is not limited to the Asserted Patents, but rather taints the patent families of each Asserted Patent, under the doctrine of infectious unenforceability.

**Tenth Defense: Prosecution Laches**

No recovery is available to Plaintiffs under the '442 Patent because that patent is unenforceable for reason of prosecution laches, i.e., an unreasonable and prejudicial delay in prosecution, as demonstrated by at least the following facts:

(i)      The '156 Patent was filed as U.S. Patent Application No. 13/861,429 on April 12, 2013, which claims priority to PCT/EP2011/067888, a national stage application with a filing date of October 13, 2011.  The patent issued on November 27, 2018.  The '883 Patent was filed as U.S. Patent Application No. 17/196,665 on March 9, 2021, as a continuation of the '156 Patent.  The '883 Patent issued on March 19, 2024.  Both the '156 Patent and '883 Patent claim priority dates preceding August 1, 2017.

(ii)     The '442 Patent was filed as U.S. Patent Application No. 16/963,749 on March 9, 2021, as national stage entry of PCT/EP2019/051615 filed January 23, 2019,  which purports to claim priority to EP 18152903, allegedly filed January 23, 2018.

(iii)    The '442 Patent—which includes a single figure and less than five columns of disclosures—purports to be "a development of the system described in earlier application WO 2012/049247," the '156/'883 Patent Application, but does not have a priority claim to that application. *Id.*, 1:22-25.  The '442 Patent has a much later priority date and expiration date than the '156 and '883 Patents.

(iv)     Through the '442 Patent, Frohwitter and ParTec obtained claims that are so similar to the '156 and '883 Patents that each element of each asserted claim of the '442

Patent is disclosed or rendered obvious by the application underlying the '156 and '883 Patents. Plaintiffs are alleging that the '442 Patent covers the same products as the '156 Patent and '883 Patent.

(v)        Frohwitter and ParTec unreasonably delayed prosecution of those claims by filing them in new patent applications in 2018-2019, rather than diligently prosecuting all its claims in a single family.

(vi)       The '442 Patent's European application was filed in January 2018, around the same time that Frohwitter was negotiating a license with Microsoft. Those negotiations resulted in Microsoft having a license to Frohwitter's patents with priority dates before August 1, 2017. *See* MSFT_PARTEC_000710185.

(vii)      Filing the '442 Patent's European application in January 2018 had the effect of avoiding the August 1, 2017 cutoff while the license was still being negotiated. On information and belief, Frohwitter knew and understood at that time that the license cutoff date—August 1, 2017—was a material term in the negotiations with Microsoft.

(viii)     Filing the '442 Patent's priority application in January 2018 also had the effect of granting several additional years of United States patent coverage for purported inventions that are already the subject of the earlier-expiring claims of the '156 and '883 Patents.

(ix)       Frohwitter and Microsoft executed a license on April 9, 2018, including the August 1, 2017 cutoff date. MSFT_PARTEC_000710185. The United States application for the '442 Patent was filed in January 2019, relying on the January 2018 European application filed during the negotiations of the April 2018 license.

(x)      On information and belief, beginning April 9, 2018 and at all times subsequent, Frohwitter knew, understood, and believed that he and his other companies (including ParTec) were bound by the obligations to which IPCom and FIPA had agreed.  For example, Frohwitter knew and understood that IPCom and FIPA had bound him to an obligation ███████████████████████████ concerning any company owned by Frohwitter.

(xi)      Frohwitter and ParTec prosecuted the '442 Patent claims—whose later priority date avoids the express terms of the license to Microsoft—and is now asserting that all three patents cover Microsoft's product, allegedly in the same way, thereby prejudicing Microsoft.

(xii)      Frohwitter's and ParTec's unreasonable delay in prosecuting of the '442 Patent is not only prejudicial to Microsoft but amounts to an egregious misuse of the United States patent system in pursuit of more than twenty years' patent protection on the same invention.

(xiii)      All asserted claims of the '442 Patent are unenforceable for reason of prosecution laches.

## Eleventh Defense: Unclean Hands

The Asserted Patents are unenforceable, and Plaintiffs are entitled to no remedy, due and owing to Plaintiffs' unclean hands in relation to the equity sought by Plaintiffs.

## Twelfth Defense: Setoff

Plaintiffs' claims for monetary relief are cancelled and offset in whole or in part by the damages owed by Plaintiffs to Microsoft, under the doctrine of setoff.

## RESERVATION OF RIGHTS

Microsoft reserves all affirmative defenses available under Rule 8(c) of the Federal Rules

of Civil Procedure, the patent laws of the United States, and all other defenses, at law or in equity, that may now exist or in the future be available based on discovery and further investigation of the case.

## MICROSOFT'S COUNTERCLAIMS

Microsoft ("Counterclaimant") complains against ParTec AG and BF exaQC AG ("Counterclaim-Defendants") for damages and declarative relief by way of these counterclaims.

## INTRODUCTION

1.     Microsoft seeks damages for Counterclaim-Defendants' breach of an April 9, 2018 license agreement between their principal (Bernhard Frohwitter) and Microsoft covering patents with priority dates before August 1, 2017 ("Frohwitter License").  The license did not merely cover patents owned by IPCom, a particular entity that was litigating his patents.  Microsoft instead negotiated for a much broader license covering patents controlled by IPCom's parent entity, FIPA—Frohwitter's intellectual property agency that he operates through his law firm in Munich.

2.     Two of the patents asserted in this case claim priority dates in 2010, well before August 1, 2017.  The third patent derives from an application filed while the Frohwitter License was being negotiated and purports to cover a development of the system disclosed in the other two patents.  '442 Patent, 1:22-25.  All three patents are asserted against Microsoft's product, and those patents are alleged to cover Microsoft's product in the same way.  Frohwitter has controlled those patents since their inception through Counterclaim-Defendant ParTec AG, a company that Frohwitter also operates (as its CEO) from his law office in Munich.

3.     Rather than assign licensing rights to Frohwitter's IP agency (FIPA), Frohwitter created a new licensing agency in 2021—BF exaQC AG—and instead gave the exclusive licensing rights for ParTec's patents to that entity through a series of shell companies.  But Frohwitter has absolute control over BF exaQC AG, and he has stacked its board with insiders and fiduciaries— including the same lawyers with whom he ran IPCom.  BF exaQC AG is just FIPA under a different name, and Counterclaim-Defendants breached the license by asserting pre-2017 patents. Microsoft is entitled to damages.

125

4.      In reality, the distinction between Bernhard Frohwitter, his law firm, and his labyrinth of shell companies is one that exists only on paper—and only when Frohwitter wishes to make the distinction.  Microsoft therefore also seeks a declaration that Counterclaim-Defendants, IPCom, and FIPA are alter egos of Frohwitter—such that each is liable for the duties, obligations, acts, and omissions of the others—as a matter of substantial justice.

5.      Microsoft also seeks a declaration that it is licensed to the Asserted Patents— expressly as to the United States Patent Nos. 10,142,156 and 11,934,883, and impliedly to United States Patent No. 11,537,442.  Finally, Microsoft seeks a declaration that it does not infringe any asserted claim of the Asserted Patents and that each asserted claim is invalid and unenforceable.

## THE PARTIES

6.      Microsoft Corporation is a publicly traded corporation organized and existing under the laws of the State of Washington and headquartered at One Microsoft Way, Redmond, Washington, United States 98052.

7.      On information and belief, ParTec AG is a German corporation with its principal place of business in Germany.  ParTec AG has through its counsel consented to electronic service of process and may be served with process through this Court's CM/ECF system (and via email for sealed filings).

8.      On information and belief, BF exaQC AG is a German corporation with its principal place of business in Germany.  BF exaQC AG has through its counsel consented to electronic service of process and may be served with process through this Court's CM/ECF system (and via email for sealed filings).

## JURISDICTION AND VENUE

### *Subject-Matter Jurisdiction*

9.      This Court has subject-matter jurisdiction pursuant to at least 28 U.S.C. §§ 1331 (federal question), 1332 (complete diversity of citizenship), 1338 (patents), 1367 (supplemental jurisdiction), and 2201 (declaratory judgment).

10.     This Court has jurisdiction over Microsoft's federal declaratory counterclaims as they arise under federal law, including federal patent law. *See* §§ 1331, 1338.  Microsoft's counterclaims also form part of the same case and controversy as those raised in Counterclaim-Defendants' complaint, as they derive from a common nucleus of operative facts that would ordinarily (and should) be tried together. *See* § 1367(a).  This Court also has jurisdiction over Microsoft's declaratory counterclaims under the Federal Declaratory Judgment Act, which empowers this Court to declare the parties' rights and other legal relations in cases of actual controversy that are otherwise within the Court's jurisdiction. *See* § 2201(a).

11.     This Court has jurisdiction over Microsoft's common-law counterclaims as Microsoft has complete diversity of citizenship from Counterclaim-Defendants, who are German companies, and Microsoft seeks damages exceeding $75,000. *See* § 1332(a)(2).  Microsoft's common-law counterclaims also form part of the same case and controversy as those raised in Counterclaim-Defendants' complaint, and in Microsoft's federal declaratory counterclaims, as they derive from a common nucleus of operative facts that would ordinarily (and should) be tried together. *See* § 1367(a).

### *Personal Jurisdiction*

12.     This Court has personal jurisdiction over each Counterclaim-Defendant because each Counterclaim-Defendant has purposefully availed itself of the benefits of Texas law, giving rise to minimum contacts sufficient under the Texas long-arm statute and according with due process for the exercise of jurisdiction.  In specific, Counterclaim-Defendants have caused the

filing of this litigation against Microsoft, thus demonstrating a purposeful availment of the benefits and burdens of Texas law and of the jurisdiction of this Court.  Microsoft's counterclaims arise from and relate to Counterclaim-Defendants' filing of this lawsuit in this District.

13.    Further, Counterclaim-Defendants have the required specific minimum contacts with this District due to the actions of their controlling affiliates, including Counterclaim-Defendants' CEO Bernhard Frohwitter and his other entities, such as IPCom GmbH & Co. KG and FIPA Frohwitter Intellectual Property AG and their affiliates, in targeting the Eastern District of Texas for patent licensing.  *See, e.g.*, *IPCom GmbH & Co. KG v. AT&T et al.*, No. 2:20-cv-00322-JRG (E.D. Tex.); *IPCom GmbH & Co. KG v. Verizon Commc'ns et al.*, No. 2:20-cv-00323-JRG (E.D. Tex.).  Those litigations concerned certain patents that had been licensed to Microsoft, and Microsoft's counterclaims arise from and relate to a breach of that license.  As explained below, the facts concerning Frohwitter, FIPA, and IPCom's control over that litigation (in conjunction with other facts) establishes their similar control over the Asserted Patents here, which is a basis for Microsoft's claim of breach.

14.    Further, Counterclaim-Defendants caused the filing of this litigation against Microsoft, thus demonstrating a purposeful submission to the jurisdiction of this Court and waiving any objection to the exercise of personal jurisdiction in this Court.

15.    This Court's exercise of personal jurisdiction is fair, just, and reasonable and therefore does not offend the traditional notions of fair play and substantial justice.

### *Venue*

16.    Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to Microsoft's counterclaims, such as Counterclaim-Defendants' filing of this lawsuit, have taken place in this District.

17.     Venue is also proper in this Court under § 1391(c)(3) as Counterclaim-Defendants are not resident in the United States and therefore may be sued in any judicial district.   To the extent Counterclaim-Defendants argue otherwise, venue is also proper in this Court under § 1391(b)(3) because this Court has personal jurisdiction over Counterclaim-Defendants.

## FACTUAL BACKGROUND

### I.    MICROSOFT

18.     Microsoft is a computer technology company based in Redmond, Washington. Founded in New Mexico in 1975, Microsoft's fifty years of innovation are a cornerstone of modern computing and a driving force behind the United States's sustained leadership in that global field.

19.     Microsoft has been a technology leader since its founding. In the 1970s, Microsoft developed the BASIC programming language, which was a foundational development in early computer programming.   In the 1980s, Microsoft developed the MS-DOS operating system, which became one of the most popular operating systems for personal computers (PCs).   In the 1990s, Microsoft introduced the Windows operating system—initially developed from MS-DOS—and Windows became a successful platform in its own right.   Windows remains one of the most widely supported computing platforms, resulting from years of continued innovation by Microsoft.

20.     Beyond personal computing, Microsoft is also a foremost innovator in cloud computing, including cloud cluster computing.   In 1997, Microsoft introduced the Microsoft Cluster Server (MSCS) software architecture.   By 2006, Microsoft had released *Windows Compute Cluster Server 2003* (integrating cluster computation into *Windows Server 2003*), shown below. [35]

---

[35] *See Deploying Microsoft Windows Compute Cluster Server 2003* (November 2006), https://i.dell.com/sites/csdocuments/Business_solutions_power_Documents/de/de/ps4q06-20070153-Pepper_de.pdf



21.    Microsoft's development of cloud computing was a natural extension of its expertise and experience in enterprise computing and servers.  Microsoft built its cloud platforms atop its own prior developments—such as the Windows Server platform—together with integrating new innovations, such as virtualization by 2008.  Those developments and others led to the revolutionary cloud platform Microsoft Azure, officially launched in February 2010.

22.    Microsoft's development of cloud computing technology set a strong foundation for Microsoft's entry into artificial intelligence (AI), another field of innovation in which Microsoft is an important contributor.

23.    Rather than take from others—as alleged in this lawsuit by Bernhard Frohwitter's companies ParTec AG and BF exaQC AG—Microsoft's fifty-year established practice is to build on its own past inventions, and to develop new technologies and products based on Microsoft's own existing platforms.  That established practice is reflected in thousands of Microsoft patents and patent applications in the United States and worldwide.

## II.    BERNHARD FROHWITTER'S "SMALL EMPIRE" OF NON-PRACTICING ENTITIES

24.    Bernhard Frohwitter is German lawyer who "is best known"—according to an article published on the website of his own company IPCom—"as a shareholder of a small empire of non-practising entities (NPEs)."[36]  As the man behind ParTec, BF exaQC, and this lawsuit, "Frohwitter always led a dual existence as a lawyer and entrepreneur."[37]

25.    Frohwitter's business as an "entrepreneur" consists of acquiring patents and suing companies who make products.  In that context, Frohwitter consistently serves both roles as lawyer and client, blurring the lines to such a degree that the distinction essentially ceases to exist.  Frohwitter also has an established history of bending corporate structures to his whims, organizing and reorganizing entities as suits his litigation needs.

26.    Although ParTec purports to be a publicly traded software company, it appears to be an entity operated out of Frohwitter's law office.



**Businesses located at Possartstraße 20, 81769 Munich, Germany[38]**

[36] https://www.ipcom-munich.com/post/how-ipcom-kept-the-mobile-phone-industry-on-tenterhooks-for-13-years
[37] https://www.juve-patent.com/people-and-business/bernhard-frohwitters-foray-into-supercomputers-and-suit-against-nvidia/
[38] https://www.google.com/maps/@48.1436952,11.6066674,3a,73.9y,89.17h,87.91t/data=!3m7!1e1!3m5!1sZFltDohQ71qka-opaFIAAQ!2e0!6shttps:%2F%2Fstreetviewpixels-pa.googleapis.com%2Fv1%2Fthumbnail%3Fcb_client%3Dmaps_sv.tactile%26w%3D900%26h

27.    Frohwitter is also known as "the man behind IPCom."[39]    IPCom was an NPE controlled through Frohwitter's personal IP licensing agency, the Frohwitter Intellectual Property Agency ("FIPA").    A February 2020 article from IPCom's website describes Frohwitter as "co-owner of IPCom" whose "law [firm] is involved in all proceedings and coordinates the litigation throughout Europe."[40]    The February 2020 article from IPCom's website explains that Frohwitter acquired Hitachi patents through his agency, FIPA, in 2008.    According to the February 2020 article from IPCom's website, "FIPA is affiliated with IPCom under corporate law via a light network of subsidiaries."[41]    The February 2020 article from IPCom's website explains that IPCom and FIPA lost their leverage when the Hitachi and Bosch patents began to expire.[42]

28.    Frohwitter's most infamous exploit was the "dispute between IPCom and Nokia, in which the NPE allegedly demanded €12 billion and in which Frohwitter still acted as lawyer and CEO of IPCom."[43]    The December 2024 article reports that Frohwitter purportedly "later restricted himself entirely to the role of IPCom manager."

---

%3D600%26pitch%3D2.09079012766567%26panoid%3DZFltDohQ71qka-opaFIAAQ%26yaw%3D89.16585321606071!7i16384!8i8192?entry=ttu&g_ep=EgoyMDI1MD kyMy4wIKXMDSoASAFQAw%3D%3D
https://www.google.com/maps/@48.1436952,11.6066674,3a,15y,91.45h,84.74t/data=!3m7!1e1! 3m5!1sZFltDohQ71qka-opaFIAAQ!2e0!6shttps:%2F%2Fstreetviewpixels-pa.googleapis.com%2Fv1%2Fthumbnail%3Fcb_client%3Dmaps_sv.tactile%26w%3D900%26h %3D600%26pitch%3D5.261307288834615%26panoid%3DZFltDohQ71qka-opaFIAAQ%26yaw%3D91.4462601906202!7i16384!8i8192?entry=ttu&g_ep=EgoyMDI1MDk yMy4wIKXMDSoASAFQAw%3D%3D
[39] https://www.juve-patent.com/people-and-business/bernhard-frohwitters-foray-into-supercomputers-and-suit-against-nvidia/
[40] https://www.ipcom-munich.com/post/how-ipcom-kept-the-mobile-phone-industry-on-tenterhooks-for-13-years
[41] *Id.*
[42] *Id.*
[43] https://www.juve-patent.com/people-and-business/bernhard-frohwitters-foray-into-supercomputers-and-suit-against-nvidia/

29.     After Microsoft acquired certain business units from Nokia, Microsoft negotiated a license to Frohwitter's patents, which was executed on April 9, 2018. MSFT_PARTEC_000710185.  That license covers all patents with priority dates before August 1, 2017 that are owned or controlled by Frohwitter's companies, IPCom or FIPA.  *Id.*  The license is binding on those companies and their affiliates.  *Id.*

30.     Referring to ParTec's lawsuits (including this case against Microsoft), the December 2024 article observed: "Years ago, Bernhard Frohwitter shook up the mobile communications industry with the NPE IPCom. Now the lawyer and company has invested in supercomputers."[44]

### A.     Entities Within Frohwitter's Sphere Of Control

31.     Frohwitter owns, controls, and enforces his patent portfolio through an extremely unusual arrangement involving a complex, ever-shifting network of shell companies, all of which are ultimately controlled by Frohwitter, through his law firm and IP agencies.  On information and belief, this arrangement is intended to shield Frohwitter from liability while preserving control.

32.     Public data identifies Frohwitter as the central link between these entities.[45]



---

[44] https://www.juve-patent.com/people-and-business/bernhard-frohwitters-foray-into-supercomputers-and-suit-against-nvidia/
[45] https://www.northdata.com/FIPAAG%20GmbH,%20Pullach%20i%C2%B7%20Isartal/Amtsgericht%20M%C3%BCnchen%20HRB%20253520 (MSFT_PARTEC_000711741)

33.     This arrangement created a façade of independence for Frohwitter's assertion of the ParTec patents, resulting in the appearance that ParTec's patent licensing is not controlled by Frohwitter, FIPA, IPCom, or his law firm.  In reality, Counterclaim-Defendants—and therefore, the Asserted Patents—are controlled by the same cast of characters, a majority of whom are fiduciaries, insiders, or otherwise loyal to Frohwitter and his other companies, including IPCom and FIPA.

### 1.     Frohwitter Firm

34.     Frohwitter Patent- & Rechtsanwalte Intellectual Property Counselors (hereafter "Frohwitter Firm") is a German entity that purports to be engaged in the practice of law.[46]

35.     Frohwitter Firm is reported to operate from Possartstraße 20, 81679 Munich, Germany.  Although it purports to be a "one stop full service" firm on IP matters, on information and belief, Frohwitter Firm is also Bernhard Frohwitter's "one stop" for "full service" of his own business interests and investments, including prosecution and litigation of patents that he owns. Frohwitter consistently serves both roles as lawyer and client, blurring the lines to such a degree that the distinction essentially ceases to exist.

36.     As one example, Frohwitter uses his firm to prosecute patents that he acquired personally.    That was the case for the applications supporting the Asserted Patents. ParTec_00001955; ParTec_00000045, at -099.

---

[46] https://frohwitter.com/



37.      Likewise, as to litigation, a February 2020 article from IPCom's website describes Frohwitter as "co-owner of IPCom" whose "law [firm] is involved in all proceedings and coordinates the litigation throughout Europe." [47]

38.      Additionally, when Frohwitter acquired patents from Hitachi and Robert Bosch through FIPA/IPCom, the Frohwitter Firm represented all the parties to the transaction.[48]  But when asserting those patents in litigation through IPCom, Frohwitter refused to produce documents from the transaction premised on the fact that they were in the possession of Frohwitter Firm.[49]

39.      Frohwitter's "one stop full service" law firm at Possartstraße 20, 81679 Munich, Germany also appears to double as ParTec, despite claims that the latter is a publicly traded cluster computing company.

---

[47] https://www.ipcom-munich.com/post/how-ipcom-kept-the-mobile-phone-industry-on-tenterhooks-for-13-years
[48] *In re IPCom GmbH & Co. KG*, 428 F. App'x 894 (Fed. Cir. 2011).
[49] That argument was rejected at the Federal Circuit. *Id.*



**Businesses located at Possartstraße 20, 81769 Munich, Germany**

### 2.    Frohwitter Intellectual Property Agency (FIPA)

40.    The Frohwitter Intellectual Property Agency ("FIPA") is an entity or group of entities that, on information and belief, is responsible for holding and licensing Frohwitter's intellectual property assets.  On information and belief, FIPA has existed since at least 2003 under at least the following corporate forms:[50]

- Frohwitter – Beteiligungs GmbH
- Frohwitter – Intellectual Property Agency GmbH
- Frohwitter – Intellectual Property Agency GmbH & Co. KG
- FIPA Frohwitter Intellectual Property AG
- FIPAAG GmbH

41.    On information and belief, Frohwitter is the CEO and/or managing director of FIPA.  On information and belief, Frohwitter is also the controlling shareholder of FIPA.  For example, Frohwitter signed the license with Microsoft as "CEO" of FIPA, in 2018.  On information and belief, FIPA is or was the controlling shareholder of IPCom.

42.    Counterclaim-Defendants' own internal documents identify Frohwitter as being FIPA's CEO.  *See, e.g.*, ParTec_00501423; ParTec_00636862; ParTec_001265068.

---

[50] https://www.northdata.com/Frohwitter%20-%20Intellectual%20Property%20Agency%20GmbH,%20M%C3%BCnchen/HRB%20146528 (MSFT_PARTEC_000711755)

43.    On information and belief, Frohwitter operates or has operated FIPA from the same location as ParTec and his law firm, i.e., Possartstraße 20, 81679 Munich, Germany.[51]



44.    The foregoing facts indicate that FIPA is nothing more than an instrument of Frohwitter himself.

---

[51] https://www.northdata.com/Frohwitter%20-%20Intellectual%20Property%20Agency%20GmbH,%20M%C3%BCnchen/HRB%20146528 (MSFT_PARTEC_000711755)

### 3.    IPCom

45.    IPCom is an entity or group of entities responsible for litigating Frohwitter's intellectual property assets in the field of mobile telecommunications.  On information and belief, IPCom has existed since at least 2007 under at least the following corporate forms:[52]

- FRANDS GmbH
- IPCom Beteiligungs Gmbh
- IPCom Holding GmbH
- IPCom GmbH & Co. KG

46.    On information and belief, Frohwitter is or was the CEO and/or managing director of IPCom.  For example, Frohwitter signed the license with Microsoft as "Managing Director" of IPCom, in 2018.  On information and belief, Frohwitter is or was also the controlling shareholder of IPCom through FIPA.[53]

47.    An article from 2024 describes Frohwitter as "the man behind IPCom" and explains that Frohwitter and IPCom are behind ParTec's patent assertion: "Years ago, Bernhard Frohwitter shook up the mobile communications industry with the NPE IPCom. Now the lawyer ***and company*** has invested in supercomputers."[54]

48.    Counterclaim-Defendants' own internal documents identify Frohwitter as being IPCom's CEO.  *See, e.g.*, ParTec_00501423;  ParTec_00636862;  ParTec_001265068; ParTec_01274533; ParTec_01332021; ParTec_01628239; ParTec_01628286; ParTec_01629091.

---

[52] https://www.northdata.com/IPCom%20Holding%20GmbH,%20Pullach/ Amtsgericht%20M%C3%BCnchen%20HRB%20165099 (MSFT_PARTEC_000711778)
[53] https://www.northdata.com/IPCom%20Holding%20GmbH,%20Pullach/ Amtsgericht%20M%C3%BCnchen%20HRB%20165099 (MSFT_PARTEC_000711778) and https://www.northdata.com/?id=6298346062 (MSFT_PARTEC_000711733)
[54] https://www.juve-patent.com/people-and-business/bernhard-frohwitters-foray-into-supercomputers-and-suit-against-nvidia/

49.    IPCom has litigated its patents in this Court.  *See, e.g.*, *IPCom GmbH & Co. KG v. AT&T et al.*, No. 2:20-cv-00322-JRG (E.D. Tex.); *IPCom GmbH & Co. KG v. Verizon Commc'ns et al.*, No. 2:20-cv-00323-JRG (E.D. Tex.).

50.    A February 2020 article from IPCom's website explains that Frohwitter never landed a final victory, allegedly because IPCom's patents expired before he could land a major licensing deal in the mobile phone industry.  Further, it explains that IPCom can hardly be considered a financial success story because "Bernhard Frohwitter and IPCom also made tactical mistakes. 'Frohwitter wanted great success quickly and demanded too much money from Nokia,' says an insider. That would have made IPCom seem greedy."[55]

51.    However, the February 2020 article from IPCom's website also notes that "[a]nyone who knows Bernhard Frohwitter knows that he does not give up easily."  According to the article, "[e]ven now, Frohwitter's peers report that he continues to defend the validity of those patents, now owned by his NPEs IPCom and FIPA."  The article also reports on potential new campaigns from IPCom:

> "We also have other patents in our portfolio that we can enforce in court," says [an IPCom executive who was interviewed].  "We owe this to our current licensees, who have paid or are still paying fair royalties to IPCom based on the principle of equal treatment."  The NPE will most likely launch further campaigns, focusing more on the UK, China and the US.  Anyone who knows Bernhard Frohwitter knows that he does not give up easily. [56]

52.    One of IPCom's "current licensees"—Microsoft—is Frohwitter's latest target.

53.    The foregoing facts indicate that IPCom is or was nothing more than an instrument of Frohwitter himself.

---

[55] https://www.ipcom-munich.com/post/how-ipcom-kept-the-mobile-phone-industry-on-tenterhooks-for-13-years
[56] https://www.ipcom-munich.com/post/how-ipcom-kept-the-mobile-phone-industry-on-tenterhooks-for-13-years

4.    **ParTec**

54.    On information and belief, ParTec is a company allegedly founded in 1999 that produced open-source Linux software, Parastation.  Parastation V5 was in public use or on sale by 2009.  ParTec purports to own the Asserted Patents.

55.    On information and belief, Frohwitter allegedly became majority shareholder, CEO, and board chairman in 2004.   On information and belief, Frohwitter owns a majority of ParTec though a shell company, BF Tec Holdings GmbH.  ParTec_00501423, ParTec_00636862, ParTec_001265068,    ParTec_00636862,    ParTec_01274533;    ParTec_01332021; ParTec_01628239; ParTec_01628286; ParTec_01629091.

56.    As the dominant shareholder, Frohwitter has consistently exerted excessive control over ParTec.  For example, between 2021 and 2023, Frohwitter bound ParTec to his other company, BF exaQC AG.  Frohwitter executed a series of "agency agreements" that transferred control of ParTec's licensing operations to BF exaQC AG, a newly formed company owned and operated by Frohwitter and others loyal to him from IPCom/FIPA.    ParTec_00001954, ParTec_00001957, ParTec_00001974, ParTec_00001991, ParTec_00002005, ParTec_00002006, ParTec_00002011, ParTec_00002012, ParTec_00002019.  Frohwitter accomplished this transfer of control through a pair of shell companies – FL Systems and FL Chips – each controlled by Frohwitter.    ParTec_00001908,  ParTec_00001931,  ParTec_00001954,  ParTec_00001957, ParTec_00001974, ParTec_00001991, ParTec_00002005, ParTec_00002006, ParTec_00002011, ParTec_00002012, ParTec_00002019.  In fact, Frohwitter executed several agreements between and among ParTec, BF exaQC AG, FL Systems, and FL Chips as the signatory for all parties. Frohwitter continued binding ParTec to obligations to his other company, BF exaQC AG, after ParTec's July 2023 Initial Public Offering.

57.    On information and belief, Frohwitter has the ability to bind ParTec unilaterally—the board otherwise requires a quorum.  *See, e.g.*, ParTec_00003887.

```
If only one member of the Executive Board has been appointed, he or she shall represent the company alone. If several members of
the Executive Board have been appointed, the company is represented by the Chairman of the Executive Board alone or by two
members of the Executive Board.

b) Executive Board, management body, managing directors, personally liable partners, managing directors, authorised
representatives and special powers of representation:

Management Board: Moschny, Thomas, Wuppertal, *12.06.1974
Management Board: Rasig, Nurcan, Sinsheim, *30.05.1971
Management Board: Schmitz, Ina, Linnich, *30.06.1964
Management Board: Ulmer, Dominik, Steckborn / Switzerland,
*24.05.1966 Management Board: Westermann, Frank, Munich,
*08.07.1971

Authorised to act as sole representative:
Management Board: Kilger, Johann, Grünwald, *04.05.1963

Authorised to act as sole representative; with the authority to enter into legal transactions on behalf of the company as
representative of a third party:
Chairman of the Executive Board: Frohwitter, Bernhard, Munich, *24/09/1944
```

58.    On information and belief, around 2016, Frohwitter encumbered ParTec with a contractual obligation to assign ParTec's patent rights to Frohwitter or to any third-party elected by Frohwitter.  *See* ParTec_00001936; ParTec_00002006.

59.    An article from August 2025 suggests that there is a free-flow of money between Counterclaim-Defendant ParTec and the Frohwitter family, indicating a potential commingling of assets.  In a recent interview, Frohwitter stated, in reference to his family: "We have sold private assets to help Partec with liquid funds if necessary."[57]  On information and belief, Frohwitter has also given members of his family corporate appointments.

60.    The article from August 2025 further explains that ParTec's patent litigation is controlled by IPCom's attorneys and by the Frohwitter Firm.

> The **legal team also includes lawyer Roman Sedlmaier and patent attorney Jan Giegerich**. They were **previously at Frohwitter's side during his time at IPCom** before founding their own patent firm IPCGS. **Patent attorney David Molnia** from df-mp, **who previously**

---

[57] https://www.juve-patent.com/cases/frohwitter-puts-pressure-on-nvidia-with-third-upc-suit/

> **worked for IPCom**, is also representing PartTec. Lastly, patent attorney **Matthias Himmelsbach from Frohwitter's own firm is involved**, primarily handling the EPO proceedings.[58]

61.    On information and belief, Sedlmaier and Gigerich also have direct financial interests in Counterclaim-Defendants' litigations.  "According to Frohwitter, the law firms work exclusively on a contingency basis."[59]

62.    The foregoing facts indicate that ParTec AG is nothing more than an instrument of Frohwitter himself.

**5.    BF exaQC AG**

63.    On information and belief, BF exaQC AG is a licensing agency created by Frohwitter in 2021.  BF exaQC AG purports to have the exclusive right to license the Asserted Patents, through a series of agreements executed between and among other shell companies controlled by Frohwitter (FL Systems and FL Chips).

64.    As the dominant shareholder Frohwitter has consistently exerted excessive control over BF exaQC AG.  On information and belief, Frohwitter has the ability to bind BF exaQC AG unilaterally—the board otherwise requires a quorum.  *See, e.g.*, ParTec_0000398; ParTec_00003993.

---

[58] https://www.juve-patent.com/cases/frohwitter-puts-pressure-on-nvidia-with-third-upc-suit/
[59] https://www.juve-patent.com/people-and-business/bernhard-frohwitters-foray-into-supercomputers-and-suit-against-nvidia/

4.    a) General representation
            regulations:

If only one member of the Management Board has been appointed, he or she shall represent the company alone. If several Executive Board members have been appointed, the company shall be represented by two Executive Board members or by one Executive Board member together with an authorised signatory.

b) Executive Board, management body, managing directors, personally liable partners, managing directors, authorised representatives and special powers of representation:

Management Board: Falter, Hugo, Karlsruhe, *22.05.1959
Management Board: Frohwitter, Clemens, Munich, *09.06.1987

Authorised to act as sole representative:
Management Board: Kilger, Johann, Feldkirchen-Westerham, *04.05.1963

Authorised to act as sole representative; with the authority to enter into legal transactions on behalf of the company as representative of a third party:
Chairman of the Executive Board: Frohwitter, Bernhard, Munich, *24/09/1944

65.    Frohwitter also stacked that company's board with insiders, fiduciaries, and others loyal to him—including his family, his attorneys, and ParTec officers under his employ.



66.    Additionally, leading up to December 2023, Frohwitter executed a series of "agency agreements" that transferred control of ParTec's licensing operations to BF exaQC AG. ParTec_00001954, ParTec_00001957, ParTec_00001974, ParTec_00001991, ParTec_00002005, ParTec_00002006, ParTec_00002011, ParTec_00002012, ParTec_00002019.    Frohwitter accomplished this transfer of control through a pair of shell companies – FL Systems and FL Chips – each controlled by Frohwitter.    ParTec_00001954, ParTec_00001957, ParTec_00001974,

ParTec_00001991, ParTec_00002005, ParTec_00002006, ParTec_00002011, ParTec_00002012, ParTec_00002019.  In fact, Frohwitter executed agreements between and among ParTec, BF exaQC AG, FL Systems, and FL Chips as the signatory for all parties.

67.    The foregoing facts indicate that BF exaQC AG is nothing more than an instrument of Frohwitter himself.

**B.    Known Confederates of Bernhard Frohwitter**

68.    Frohwitter maintains control over his patents through a complex, ever-shifting network of shell companies operated by loyalists and insiders, whom he rewards with money, corporate appointments, investment opportunities, and other benefits.

**1.    Jan Gigerich**

69.    On information and belief, Jan Gigerich is a German Patent Attorney (*Patentanwalt*) and European Patent Attorney whose place of business is in Munich, Germany. Gigerich purports to have received an engineering degree from Karlsruhe Institute of Technology. Gigerich claims to have "15+ years in IP with profound experience in patent commercialization, negotiations, patent analysis, valuation and portfolio management; [representing] clients before the German and European patent authorities, and worldwide in licensing negotiations and when orchestrating international cases." [60]

70.    Through at least 2016, Gigerich was an employee of the Frohwitter Firm and, on information and belief, was subject to the direction and control of Frohwitter as his employer.[61] On information and belief, in his capacity as an employer, Frohwitter has or had the power to fire Gigerich for perceived insubordination, or for any reason, or no reason.

---

[60] https://www.ipcgs.com/who_we_are/jan.html
[61] https://web.archive.org/web/20160607195210/http://www.frohwitter.com/team.htm



71.    On information and belief, Gigerich has also represented Frohwitter and his companies, such as IPCom, as an attorney.   That representation began while Gigerich was employed at Frohwitter's firm and continued for years after.   On information and belief, Gigerich formed a law firm with Roman Sedlmaier around 2017 through which they continued to represent IPCom and its principal, Frohwitter.   An article from December 2024 explains that "Lawyer Roman Sedlmaier and patent attorney Jan Giegerich were already present at Frohwitter's side during his time at IPCom. They later founded their own law firm IPCGS."[62]

72.    Gigerich's website describes his role as an attorney, agent, and fiduciary for IPCom:[63]

- "Nokia vs. Bosch and IPCom – 'Representative for Bosch: Dr. Roman Sedlmaier...  for IPCom: ... **Jan Gigerich (patent attorney)**...'"

- "**Frohwitter law firm** accompanied the case against HTC. It also represents Bosch in licensing issues with Nokia. In addition, [the law firm] is working with **patent attorney Gigerich** in the dispute with Nokia."

---

[62] https://www.juve-patent.com/people-and-business/bernhard-frohwitters-foray-into-supercomputers-and-suit-against-nvidia/
[63] https://www.ipcgs.com/about_us.html

- "Dr. Roman Sedlmaier coordinates IPCom's worldwide litigations (with cases pending on three continents, so he spends a lot of time on airplanes and has acquired an in-depth cross-jurisdictional understanding of patent enforcement), and **patent attorney Jan Gigerich is involved with IPCom's prosecution and nullity/opposition proceedings**..."

- "According to JUVE information, **lawyers from the firm of IPCom** ... have negotiated the settlement [with Deutsche Telekom, according to Reuters: Telekom pays 'low-to-medium triple-digit' mln euros]. The patent processes had led IPCom with the two litigation firms ... Both belong to the core team of the Pullacher assertion company, as well as ... **patent attorney Jan Gigerich** ... **Representative IPCom:**... Dr. Roman Sedlmaier,... **Jan Gigerich (patent attorney)**"

73.    As Frohwitter's and Lippert's patent attorney, Gigerich was also entrusted with prosecution of ParTec's patents.  ParTec_00000045, at -099.



74.    In his capacity as an attorney, Gigerich held a relationship of trust and confidence with IPCom and its principal, Frohwitter.  As a fiduciary, Gigerich owed a duty of loyalty that required Gigerich to prioritize the interests of Frohwitter  and the latter's companies, IPCom and FIPA, over Gigerich's own personal interests.  Gigerich was also an agent or representative of IPCom and its principal, Frohwitter, meaning Gigerich was subject to direction and control by Frohwitter and his companies.

75.    Additionally, on information and belief, as a long-time confederate of Frohwitter, Gigerich owes Frohwitter personal loyalties.  On information and belief, Frohwitter has rewarded Gigerich for his loyalty with board appointments, investment opportunities, lucrative legal business including contingency fee arrangements, and other benefits.

76.    Further, the December 2024 article explains that Gigerich and others from IPCom "are now teaming up again to represent PartTec." [64]  One of the litigations referenced in that article is this lawsuit against Microsoft: "In June 2024, ParTec also filed a patent infringement suit against Microsoft Corporation in the US. At the heart of this legal dispute is also the infringement of ParTec's dMSA architecture. ParTec is basing the lawsuit on the [U.S. counterparts of the EU patents] in the Nvidia case."[65] Further, According to Frohwitter, the law firms work exclusively on a contingency basis."[66]

77.    Gigerich is also a member of the executive board of Counterclaim-Defendant BF exaQC AG, which purports to have full control over licensing of the Asserted Patents.[67]



---

[64] https://www.juve-patent.com/people-and-business/bernhard-frohwitters-foray-into-supercomputers-and-suit-against-nvidia/
[65] https://www.juve-patent.com/people-and-business/bernhard-frohwitters-foray-into-supercomputers-and-suit-against-nvidia/
[66] https://www.juve-patent.com/people-and-business/bernhard-frohwitters-foray-into-supercomputers-and-suit-against-nvidia/
[67] https://www.bf-exa-qc.com/legal-notice

2.    **Roman Sedlmaier**

78.    On information and belief, Roman Sedlmaier is a German Lawyer (*Rechtsanwalt*) whose place of business is in Munich, Germany.  Sedlmaier purports to have received a Master in Law and a Ph.D. in Economics from University of Munich.  Sedlmaier claims to have "15+ years in IP, with extensive experience in worldwide licensing, worldwide patent license negotiations, coordination of cross-boarder litigation and multijurisdictional litigation management" and experience with "Patent litigation before German regional courts, upper regional courts, German Federal Patent Court and in validity matters before the Federal High Court of Justice (BGH) as well as before the European Patent Office."[68]

79.    Through at least 2016, Sedlmaier was an employee of Frohwitter's law firm and, on information and belief, was subject to the direction and control of Frohwitter as his employer.[69]  On information and belief, in his capacity as an employer, Frohwitter has or had the power to fire Sedlmaier for perceived insubordination, or for any reason, or no reason.[70]



---

[68] https://www.ipcgs.com/who_we_are/roman.html
[69] https://web.archive.org/web/20160607195210/http://www.frohwitter.com/team.htm
[70] https://web.archive.org/web/20160607195210/http://www.frohwitter.com/team.htm

80.     On information and belief, Sedlmaier formed a law firm with Jan Gigerich around 2017 through which they continued to represent IPCom and its principal, Frohwitter.  Sedlmaier's website describes his role as an attorney, agent, and fiduciary for IPCom:[71]

- "Nokia vs. **Bosch and IPCom** – 'Representative for Bosch: **Dr. Roman Sedlmaier**...  for IPCom: ... Jan Gigerich (patent attorney)...'"

- "...**international litigations are coordinated by Dr. Roman Sedlmaier** ... This is a complex cross-jurisdictional effort, involving at some point **over 100 cases** (including numerous invalidation actions brought by Nokia and HTC in various countries)..."

- "**Dr. Roman Sedlmaier coordinates IPCom's worldwide litigations** (with cases pending on three continents, so he spends a lot of time on airplanes and has acquired an in-depth cross-jurisdictional understanding of patent enforcement), and patent attorney Jan Gigerich is involved with IPCom's prosecution and nullity/opposition proceedings..."

- "According to JUVE information, **lawyers from the firm of IPCom** ... have negotiated the settlement [with Deutsche Telekom, according to Reuters: Telekom pays 'low-to-medium triple-digit' mln euros].  The patent processes had led IPCom with the two litigation firms ... Both belong to the core team of the Pullacher assertion company, as well as ... patent attorney Jan Gigerich ... **Representative IPCom:... Dr. Roman Sedlmaier,**... Jan Gigerich (patent attorney)"

81.     An article from December 2024 explains that "Lawyer Roman Sedlmaier and patent attorney Jan Giegerich were already present at Frohwitter's side during his time at IPCom. They later founded their own law firm IPCGS." [72]

82.     Sedlmaier's website also explains that Sedlmaier was responsible for "co-ordinating IPCom's strategy since 2007."  For example, a court granted Sedlmaier access to confidential business information for the purpose of coordinating IPCom's strategy, which Sedlmaier's website refers to as joining "the confidentiality club."[73]

---

[71] https://www.ipcgs.com/about_us.html
[72] https://www.juve-patent.com/people-and-business/bernhard-frohwitters-foray-into-supercomputers-and-suit-against-nvidia/
[73] https://www.ipcgs.com/about_us.html

- "On 24 January of this year, Mr Justice Floyd ordered that **the confidentiality club should be expanded beyond external UK lawyers and relevant experts to include an external German lawyer (Dr. Sedlmaier)** who was said to have been **co-ordinating IPCom's strategy since 2007**."

83.    In his capacity as an attorney, Sedlmaier held a relationship of trust and confidence with IPCom and its principal, Frohwitter.  As a fiduciary, Sedlmaier owed a duty of loyalty that required Sedlmaier to prioritize the interests of Frohwitter and the latter's companies, IPCom and FIPA, over Sedlmaier's own personal interests.  Sedlmaier was also an agent or representative of IPCom and its principal, Frohwitter, meaning Sedlmaier was subject to direction and control by Frohwitter and his companies.

84.    Additionally, on information and belief, as a long-time confederate of Frohwitter, Sedlmaier owes Frohwitter personal loyalties.  On information and belief, Frohwitter has rewarded Sedlmaier for his loyalty with board appointments, investment opportunities, lucrative legal business including contingency fee arrangements, and other benefits.

85.    Further, the December 2024 article explains that Sedlmaier and others from IPCom "are now teaming up again to represent PartTec.[74]  One of the litigations referenced in that article is this lawsuit against Microsoft: "In June 2024, ParTec also filed a patent infringement suit against Microsoft Corporation in the US. At the heart of this legal dispute is also the infringement of ParTec's dMSA architecture. ParTec is basing the lawsuit on the [U.S. counterparts of the EU patents] in the Nvidia case."[75]  "According to Frohwitter, the law firms work exclusively on a contingency basis."[76]

---

[74] https://www.juve-patent.com/people-and-business/bernhard-frohwitters-foray-into-supercomputers-and-suit-against-nvidia/
[75] https://www.juve-patent.com/people-and-business/bernhard-frohwitters-foray-into-supercomputers-and-suit-against-nvidia/
[76] https://www.juve-patent.com/people-and-business/bernhard-frohwitters-foray-into-supercomputers-and-suit-against-nvidia/

86.    Sedlmaier is also a member of the executive board of Counterclaim-Defendant BF exaQC AG, which purports to have full control over licensing of the Asserted Patents.[77]



### 3.    Hugo Falter

87.    Hugo Falter is a ParTec employee whose precise title is unclear, but who has served a variety of executive functions in conjunction with Frohwitter.   Falter has held at least the following titles at ParTec:

- COO[78]
- CEO, or Co-CEO with Frohwitter[79]
- Supervisory Board Member[80]

88.    Falter is also a member of the executive board of Counterclaim-Defendant BF exaQC AG, which purports to have full control over licensing of the Asserted Patents. [81]

---

[77] https://www.bf-exa-qc.com/legal-notice
[78] *See, e.g.*, ParTec_00918843 (2009); ParTec_00501423; Counterclaim-Defendants' Initial Disclosures.
[79] ParTec_01427368, ParTec_00636862
[80] ParTec_01628269
[81] https://www.bf-exa-qc.com/legal-notice



89.    Additionally, on information and belief, as a long-time confederate of Frohwitter, Falter owes Frohwitter personal loyalties.  On information and belief, Frohwitter has rewarded Falter for his loyalty with corporate appointments, investment opportunities, and other benefits.

### 4.    Johann (Hans) Kilger

90.    Johann (Hans) Kilger is the CFO of ParTec.[82]  Through 2023, Kilger oversaw finance, investor relations, and public relations.  On information and belief, Kilger was promoted by to CFO by Frohwitter in 2023.

91.    Kilger is also a member of the executive board of Counterclaim-Defendant BF exaQC AG, which purports to have full control over licensing of the Asserted Patents.[83]



---

[82] https://par-tec.com/hans-kilger-bio/

[83] https://www.bf-exa-qc.com/legal-notice

92.     Additionally, on information and belief, as a long-time confederate of Frohwitter, Kilger owes Frohwitter personal loyalties.  On information and belief, Frohwitter has rewarded Kilger for his loyalty with corporate appointments, promotions, investment opportunities, and other benefits.

### 5.     Clemens Frohwitter

93.     Clemens Frohwitter is a member of the executive board of Counterclaim-Defendant BF exaQC AG, which purports to have full control over licensing of the Asserted Patents. [84]



94.     Clemens Frohwitter is or was the Head of Finance for ParTec around January 2024. ParTec_00001897.

95.     On information and belief, Clemens Frohwitter is Bernhard Frohwitter's family member.[85]

---

[84] https://www.bf-exa-qc.com/legal-notice
[85] https://www.gettyimages.com/detail/news-photo/bernhard-frohwitter-and-his-son-clemens-frohwitter-during-news-photo/1152455380

96.    Public data reports that Clemens Frohwitter is involved in numerous companies controlled by the elder Frohwitter:[86]



97.    As a family member, Clemens Frohwitter is an insider with respect to Bernhard Frohwitter's companies.  On information and belief, as a family member, Clemens Frohwitter owes Bernhard Frohwitter personal and familial loyalty.  On information and belief, the relationship between the two Frohwitters is one of trust and confidence, such that Clemens Frohwitter is a fiduciary to Bernhard Frohwitter, owes a duty to prioritize Bernhard Frohwitter's best interests, and/or is otherwise subject to Bernhard Frohwitter's control.  On information and belief, Bernhard Frohwitter has rewarded Clemens Frohwitter for his loyalty with board appointments, investment opportunities, and other benefits.

---

[86] https://www.northdata.com/Frohwitter,%20Clemens,%20M%C3%BCnchen/c64 (MSFT_PARTEC_000711727)

### 6. Charlotte Frohwitter-Lohle

98.     Charlotte Frohwitter-Lohle is the Head of Strategic Investment of Counterclaim-Defendant ParTec AG, which purports to own the Asserted Patents.[87]  On information and belief, in that capacity, Charlotte Frohwitter-Lohle has control over ParTec AG's funding and spending.

99.     Charlotte Frohwitter-Lohle is also the Director of Strategic Investment of Counterclaim-Defendant BF exaQC AG, which purports to have full control over licensing of the Asserted Patents. *See, e.g.*, ParTec_01274533, at -549-53; ParTec_01332021; ParTec_01629091. On information and belief, in that capacity, Charlotte Frohwitter-Lohle has control over BF exaQC AG's funding and spending.

100.    On information and belief, Charlotte Frohwitter-Lohle is Bernhard Frohwitter's family member.

101.    As a family member, Charlotte Frohwitter-Lohle is an insider with respect to Bernhard Frohwitter's companies.  On information and belief, as a family member, Charlotte Frohwitter-Lohle owes Bernhard Frohwitter personal and familial loyalty.  On information and belief, the relationship between the two Frohwitters is one of trust and confidence, such that Charlotte Frohwitter-Lohle is a fiduciary to Bernhard Frohwitter, owes a duty to prioritize Bernhard Frohwitter's best interests, and/or is otherwise subject to Bernhard Frohwitter's control. On information and belief, Bernhard Frohwitter has rewarded Charlotte Frohwitter-Lohle for her loyalty with corporate appointments, investment opportunities, and other benefits.

### 7. Thomas Lippert

102.    Thomas Lippert is a named inventor on all three Asserted Patents.

---

[87] https://de.linkedin.com/in/charlotte-frohwitter-l%C3%B6hle-6bb16a34a

103.    Lippert is reportedly a researcher at Julich Supercomputing Centre (JSC) in Germany.  An article from December 2024 describes this litigation against Microsoft and explains that "Lippert applied for patents 14 years ago and is listed as the inventor on many patents that now belong to ParTec" and "Frohwitter is co-inventor of [certain patents] together with Lippert."[88]  The article further explains that "Frohwitter's law firm filed most of the patents for ParTec."[89]

104.    On information and belief, in or around 2003, Lippert and Frohwitter arrived at secret handshake agreement whereby Frohwitter would receive unrestricted personal ownership of Lippert's patents, in exchange for allowing Frohwitter to handle and execute patent applications in Lippert's name.  ParTec_00001955.  This backroom deal resulted in patent applications being filed worldwide, including the Asserted Patents.  ParTec_00001955.  On information and belief, Frohwitter also promised Lippert money for the exploitation of those inventions.  ParTec_00001955.

105.    On information and belief, rather than acquire Lippert's patent interests directly, or through his agency FIPA, Frohwitter acquired them indirectly by purchasing ParTec—a small software company—and prosecuting the patents through ParTec.  This had the effect of concealing or obscuring Frohwitter's involvement and ownership in the ParTec patent portfolio, while ascribing an air of legitimacy to their backroom deal.

106.    On information and belief, pursuant to Frohwitter's promise of money, which induced Lippert into the arrangement, Frohwitter invested many millions of euros to fund Lippert's pursuits.  ParTec_00001955.

---

[88] https://www.juve-patent.com/people-and-business/bernhard-frohwitters-foray-into-supercomputers-and-suit-against-nvidia/
[89] https://www.juve-patent.com/people-and-business/bernhard-frohwitters-foray-into-supercomputers-and-suit-against-nvidia/

107.    Lippert is also an advisor to the executive board of Counterclaim-Defendant BF exaQC AG, which purports to have full control over licensing of the Asserted Patents. *See, e.g.*, ParTec_01274533, at -549; ParTec_01332021; ParTec_01629091.

108.    On information and belief, as a long-time confederate of Frohwitter, Lippert owes Frohwitter personal loyalties.  On information and belief, Frohwitter has rewarded Lippert for his loyalty with money, corporate appointments, investment opportunities, and other benefits.

### C.    Frohwitter's Shell Game

109.    Although Frohwitter has arranged the organization of separate entities to maintain the façade of independent investments, on information and belief, these entities are merely paper versions of Frohwitter himself.

110.    For example, despite Frohwitter's attempts to position ParTec as a publicly traded software company, Frohwitter is ParTec's majority shareholder (through a holding company, BF Tec Holdings GmbH).  He even operates ParTec out of his law office.[90]

---

[90] https://www.google.com/maps/@48.1436952,11.6066674,3a,73.9y,89.17h,87.91t/data=!3m7!1e1!3m5!1sZFltDohQ71qka-opaFIAAQ!2e0!6shttps:%2F%2Fstreetviewpixels-pa.googleapis.com%2Fv1%2Fthumbnail%3Fcb_client%3Dmaps_sv.tactile%26w%3D900%26h%3D600%26pitch%3D2.09079012766567%26panoid%3DZFltDohQ71qka-opaFIAAQ%26yaw%3D89.16585321606071!7i16384!8i8192?entry=ttu&g_ep=EgoyMDI1MDkyMy4wIKXMDSoASAFQAw%3D%3D and https://www.google.com/maps/@48.1436952,11.6066674,3a,15y,91.45h,84.74t/data=!3m7!1e1!3m5!1sZFltDohQ71qka-opaFIAAQ!2e0!6shttps:%2F%2Fstreetviewpixels-pa.googleapis.com%2Fv1%2Fthumbnail%3Fcb_client%3Dmaps_sv.tactile%26w%3D900%26h%3D600%26pitch%3D5.261307288834615%26panoid%3DZFltDohQ71qka-opaFIAAQ%26yaw%3D91.4462601906202!7i16384!8i8192?entry=ttu&g_ep=EgoyMDI1MDkyMy4wIKXMDSoASAFQAw%3D%3D



**Businesses located at Possartstraße 20, 81769 Munich, Germany**

111.    On information and belief, Frohwitter also operates FIPA from this same address as the Frohwitter law firm and ParTec AG.  Public data confirms Frohwitter as the link between these entities.[91]





---

[91] https://www.northdata.com/Frohwitter%20-%20Intellectual%20Property%20Agency%20GmbH,%20Pullach/Amtsgericht%20M%C3%BCnchen%20HRB%20146528 (MSFT_PARTEC_000711755)

112.    Numerous facts indicate that Frohwitter's use of corporate forms is nothing more than an elaborate shell game intended to preserve Frohwitter's control while insulating him from the consequences of his actions.

### 1.    Excessive Control By Dominant Shareholder

113.    Frohwitter exerts significant control over all his entities directly or indirectly—including through ownership, corporate positions, and his command of a band of loyal insiders. On information and belief, this control has allowed Frohwitter to engage in transactions with his other companies (such as between ParTec, BF exaQC AG, FL Systems, and FL Chips), reflecting Frohwitter's outsized influence over those companies' funding and spending.

114.    As the dominant shareholder, Frohwitter has consistently appointed himself as CEO and chair of each company within his small empire.  On information and belief, that control is often written into each company's organic documents.  For example, on information and belief, Frohwitter has the ability to act unilaterally on behalf of the companies where their boards otherwise require a quorum.  *See, e.g.*, ParTec_0000398; ParTec_00003993.

115.    Frohwitter also exercises excessive control over his companies through the appointment of insiders and other loyal confederates as directors and officers.  For example, on information and belief, the majority of the executive board for BF exaQC AG are family members or fiduciaries of Frohwitter, and the remaining board members serve as officers of ParTec (of which Frohwitter is CEO).  On information and belief, two of the directors (Gigerich and Sedlmaier) are among Frohwitter's innermost circle, owing to their past loyalty to Frohwitter through IPCom and reflecting their continued loyalty to him through the present day.

116.    Further indicating the overlap in control and excessive dominance is the fact that numerous ParTec documents refer to Frohwitter as being IPCom's CEO or FIPA's CEO.  BF

exaQC similarly identifies Frohwitter's connections to IPCom, referring to Frohwitter as the company's greatest asset. *See, e.g.*, ParTec_00501423, ParTec_00636862, ParTec_001265068, ParTec_00636862, ParTec_01274533; ParTec_01332021; ParTec_01628239; ParTec_01628286; ParTec_01629091.

**2.    Undercapitalization**

117.    On information and belief, at least ParTec AG and BF exaQC AG are undercapitalized with respect to their putative operations.

118.    In 2023—after Frohwitter bound ParTec to his newly formed licensing agency BF exaQC AG—ParTec experienced a precipitous decline in revenue.[92]



119.    One article from August 2025 reported that this lawsuit against Microsoft was prompted by "difficult times for ParTec," and Frohwitter himself confirmed the company is in a

---

[92] https://www.northdata.com/ParTec%20AG,%20M%C3%BCnchen/HRB%20263870 (20263870)

"tense situation."[93]  Public sources reveal that ParTec's employees are not receiving "salary payments."

> In the US, Partec is taking legal action against Microsoft, accusing the company of infringing its intellectual property with supercomputers for AI as part of the Azure cloud computing platform.

> **Difficult times for Partec**

> Partec's new lawsuit comes amid reports of the company's difficult economic situation. Various German business magazines and online portals have recently reported on outstanding licence income and salary payments. The share price of the listed supercomputing company has fallen sharply. At the end of October 2024, when Partec filed its first UPC lawsuit, the share was worth €99; today it stands at €23.90. In an interview with JUVE Patent, Bernhard Frohwitter acknowledges that his company is currently in a tense situation.

120.     Those facts are confirmed in ParTec's internal documents, including an April 2025 presentation exemplifying the situation with an ominous quote from Julius Caesar. ParTec_01636889, -890.



---

[93] https://www.juve-patent.com/cases/frohwitter-puts-pressure-on-nvidia-with-third-upc-suit/

121.    ParTec's witness confirmed in sworn testimony that ██████████████

███████████████████████████████████████. *See*, *e.g.*,

Pickartz Dep. 149:6-153:9.



122.    On information and belief, BF exaQC AG, FL Chips, and FL Systems are shell companies and similarly are undercapitalized with respect to their operations.  For example, although BF exaQC AG purports to be the licensing agency for ParTec's patents, the licensing efforts are conducted by BF exaQC AG's board members, Sedlmaier and Gigerich, acting as both lawyer and client, on a contingency basis. [94]

### 3.    Disregard Of Corporate Form

123.    Frohwitter has shown repeated disregard for corporate forms, often organizing and reorganizing his entities as suits the convenience of his litigation needs.

124.    On information and belief, FIPA has been organized and reorganized into at least the following corporate forms:

- Frohwitter – Beteiligungs GmbH
- Frohwitter – Intellectual Property Agency GmbH
- Frohwitter – Intellectual Property Agency GmbH & Co. KG
- FIPA Frohwitter Intellectual Property AG
- FIPAAG GmbH

---

[94] https://www.juve-patent.com/people-and-business/bernhard-frohwitters-foray-into-supercomputers-and-suit-against-nvidia/

125.    On information and belief, FIPA has been organized and reorganized into at least the following corporate forms:

- FRANDS GmbH
- IPCom Beteiligungs Gmbh
- IPCom Holding GmbH
- IPCom GmbH & Co. KG

126.    Frohwitter has controlled these entities, as well as Counterclaim-Defendants, through other shell companies such as BF Tec Holding GmbH and various "J.A.C.C." entities.[95]





[95] https://www.northdata.com/BF%20Tec%20Holding%20GmbH,%20M%C3%BCnchen/HRB%20235484 (MSFT_PARTEC_000711755) and
https://www.northdata.com/J%C2%B7A%C2%B7C%C2%B7C%C2%B7%20TECHNO-TRANS%20GmbH,%20M%C3%BCnchen/HRB%20138392 (MSFT_PARTEC_000711781)

127.    On information and belief, Frohwitter reorganized IPCom prior to suing cell carriers AT&T and Verizon.[96]  By changing corporate forms, Frohwitter engineered a fictitious resignation that would allow him to claim he is no longer its CEO.[97]  On information and belief, that reorganization had the effect of destroying Frohwitter's electronically stored information.[98]

128.    In that litigation, Frohwitter enforced the corporate distinction to refuse discovery of documents—including preexisting licenses to IPCom's Asserted Patents—claiming they were solely in the possession of the Frohwitter Firm.[99]  At the same time, Frohwitter readily ignored the corporate distinction by continuing to negotiate with the cell carrier defendants on behalf of IPCom through the Frohwitter Firm.[100]

129.    Frohwitter has also used corporate shell games seeking to dodge preexisting licensing obligations.  On information and belief, prior to suing the cell carriers, Frohwitter corruptly amended FIPA/IPCom's assignment agreement with Hitachi to remove Hitachi's obligation to assist with enforcement.[101]  On information and belief, Frohwitter then refused to consent to Hitachi's production of Hitachi's preexisting licenses.[102] On information and belief, Frohwitter maintained those documents in the custody of Frohwitter Firm but "refused" to give them to IPCom.[103]  On information and belief, the majority of the licenses were never produced in that case.[104]  On information and belief, one of those licenses was eventually uncovered

---

[96] *IPCom GmbH & Co. KG v. AT&T*, No. 2:20-cv-00322-JRG (E.D. Tex.), Dkt. 207, at 2-6.
[97] *Id.* at 6-7.
[98] *Id.* at 6-8.
[99] *Id.* at 1-8.
[100] *Id.* at 6-8.
[101] *Id.* at 4-6.
[102] *Id.* at 1-8.
[103] *Id.* at 5-8.
[104] *Id.* at 6-8.

(through third-party discovery), and it revealed that some of the defendants' accused products were licensed through a previous agreement between Hitachi and Nortel (a bankrupt former AT&T subsidiary).[105]  On information and belief, IPCom was forced to drop its infringement allegations against those products.[106]  On information and belief, Frohwitter abused corporate forms to corruptly conceal those licenses, with the intent to avoid preexisting legal and contractual obligations.

130.    Those facts were presented to this Court as an issue of spoliation under the posture of unclean hands, and this Court found triable issues of fact over Frohwitter's intent to deceive.[107]

131.    With respect to ParTec, Frohwitter disregarded corporate formalities by assigning the Asserted Patents to himself through ParTec pursuant to a secret handshake agreement with Lippert that was purportedly made in 2003, on information and belief, that was never memorialized until August 2017 (over fourteen years later).  ParTec_00001955.

132.    On information and belief, Frohwitter in 2016 encumbered ParTec with a contractual obligation to assign its patent rights to Frohwitter or any third-party chosen by Frohwitter.  *See* ParTec_00001936; ParTec_00002006.  ParTec remained under that obligation at all subsequent times, including in 2018 when the Frohwitter License was signed.

133.    On information and belief, rather than assign ParTec's licensing rights to his existing intellectual property agency (FIPA), Frohwitter created BF exaQC AG in 2021 as a new IP licensing agency, and then caused ParTec to assign its licensing rights to that entity.  That had the effect of obscuring his and FIPA's control over the Asserted Patents.  On information and

---

[105] *Id.* at 18-19.
[106] *Id.*
[107] *IPCom GmbH & Co. KG v. AT&T et al.*, No. 2:20-cv-00322-JRG (E.D. Tex.), Dkt. 307, at 2.

belief, Frohwitter knew, understood, and believed that FIPA was bound by prior obligations that affected his other companies.

134.    Notwithstanding these attempts to obscure the legal ownership and control of the Asserted Patents, on information and belief, the beneficial ownership and control has always remained with Frohwitter, through Frohwitter Firm and FIPA.

### 4.    Self-Dealing and Dealing to Insiders

135.    On information and belief, Frohwitter has used his control over his "small empire" to engage in significant self-dealing and for the benefit of others loyal to him, including his family and his IPCom/FIPA confederates.

136.    For example, leading up to December 2023, Frohwitter executed a series of "agency agreements" that transferred control of ParTec's licensing operations to BF exaQC AG, a newly formed company owned operated by Frohwitter and others loyal to him and to others from IPCom/FIPA.    ParTec_00001954, ParTec_00001957, ParTec_00001974, ParTec_00001991, ParTec_00002005, ParTec_00002006, ParTec_00002011, ParTec_00002012, ParTec_00002019. Between 2021 and 2023.  Frohwitter accomplished this transfer of control through a pair of shell companies – FL Systems and FL Chips – each controlled by Frohwitter.  ParTec_00001954, ParTec_00001957, ParTec_00001974, ParTec_00001991, ParTec_00002005, ParTec_00002006, ParTec_00002011, ParTec_00002012, ParTec_00002019.   Between 2021 and 2023.   In fact, Frohwitter executed many agreements between and among ParTec, BF exaQC AG, FL Systems, and FL Chips as the signatory for all parties.  Frohwitter continued to bind ParTec to obligations to his other company, BF exaQC, after ParTec's July 2023 Initial Public Offering—such as a transaction in December 2023.  That arrangement can only be described as an insider transaction and, on information and belief, an abdication of corporate fiduciary duties.

137.    An article from August 2025 suggests that there is a free-flow of money between Counterclaim-Defendant ParTec and the Frohwitter family, indicating a potential commingling of assets.  In a recent interview, Frohwitter stated, in reference to his family: "We have sold private assets to help Partec with liquid funds if necessary."[108]

138.    Frohwitter has also installed members of his family as directors and officers of Counterclaim-Defendants, on information and belief, to solidify and maintain control.

139.    Frohwitter has also installed agents and fiduciaries loyal to himself and to IPCom to key controlling roles in Counterclaim-Defendants—including IPCom lawyers Sedlmaier and Gigerich—on information and belief, to solidify and maintain control.

140.    The article from August 2025 further explains that ParTec's patent litigation is controlled by IPCom's attorneys.

> The **legal team also includes lawyer Roman Sedlmaier and patent attorney Jan Giegerich**. They were **previously at Frohwitter's side during his time at IPCom** before founding their own patent firm IPCGS. **Patent attorney David Molnia** from df-mp, **who previously worked for IPCom**, is also representing PartTec. Lastly, patent attorney **Matthias Himmelsbach from Frohwitter's own firm is involved**, primarily handling the EPO proceedings.[109]

Sedlmaier and Gigerich are also board members of BF exaQC AG, so this arrangement can only be described as an insider transaction.  On information and belief, Sedlmaier and Gigerich also have direct financial interests in Counterclaim-Defendants' litigations.  "According to Frohwitter, the law firms work exclusively on a contingency basis."[110]

141.    Therefore, Counterclaim-Defendants are nothing more than another instance of Frohwitter corruptly dealing to himself and to his loyal insiders.

---

[108] https://www.juve-patent.com/cases/frohwitter-puts-pressure-on-nvidia-with-third-upc-suit/
[109] https://www.juve-patent.com/cases/frohwitter-puts-pressure-on-nvidia-with-third-upc-suit/
[110] https://www.juve-patent.com/people-and-business/bernhard-frohwitters-foray-into-supercomputers-and-suit-against-nvidia/

### 5.    Deceptive Or Misleading Conduct

142.    On information and belief, Frohwitter also uses shell arrangements to conceal evidence that he believes to be unfavorable to his patent litigation, prosecution, and enforcement efforts.  To that end, Frohwitter also has an established history of using these companies to avoid jurisdiction in the United States and to place evidence beyond the reach of her Courts.

143.    In 2011, during litigation with HTC, IPCom was ordered by a District Court to produce documents concerning IPCom's purchase of patents from another German company, Robert Bosch GmbH.  *In re IPCom GmbH & Co. KG*, 428 F. App'x 894 (Fed. Cir. 2011).  IPCom (owned and controlled by Frohwitter) had refused because the documents were "in the Frohwitter firm's custody."  The refusal was based on the fact the "Frohwitter firm assisted both sides in the transaction."  *Id.*  In other words, IPCom refused to produce correspondence between itself and a third party because IPCom's ***CEO*** was also serving as the ***lawyer*** for IPCom ***and*** the third party in a negotiated transaction.  *Id.*  IPCom also argued that German laws allowed IPCom to withhold the documents in a United States Court.  The case went to the United States Court of Appeals for the Federal Circuit, which observed:

> IPCom cannot use German discovery laws to shield itself from producing documents that can be used to attack the validity or enforceability of its patents. If an inventor wants the protections afforded under the U.S. patent laws, that inventor must comply with all applicable rules and regulations to secure and maintain those rights. Notably, that includes the duty of candor and disclosure requirements during patent prosecution. To the extent that IPCom could lose its U.S. patent rights for failure to satisfy these obligations based on an assertion (if proven) of inequitable conduct, we agree that IPCom should not be able to shield itself from such a result by protecting otherwise discoverable documents from disclosure under the guise of international comity.

*Id.*

144.    Later, during litigation with Lenovo and Motorola, IPCom tried to avoid personal jurisdiction in the Northern District of California by submitting a declaration that, on information and belief, was false or misleading.[111]  On information and belief, the declaration asserted that IPCom had never even threatened to bring litigation of any United States patent. [112]  But Lenovo's pleading explains that declaration was false or misleading because IPCom had in fact threatened *Microsoft* with litigation of United States patents. [113]  By the time of the Lenovo litigation, Microsoft had ***already paid*** Frohwitter for a license to his patents, including those owned or controlled by IPCom and FIPA.

145.    Shortly after, IPCom sued cellular carriers AT&T, Verizon, and other cell carriers in this Court, i.e., the United States District Court for the Eastern District of Texas, Marshall Division.[114]  In the carrier litigation, IPCom and Frohwitter were credibly accused of spoliation and other acts of deceit.[115]  The accusations were sufficiently credible that this Court found triable issues of fact over Bernhard Frohwitter's intent to deceive.[116]

146.    On information and belief, rather than confront those allegations before this Court, IPCom settled the cell carrier litigation.[117]

---

[111] *Lenovo (United States) Inc. v. IPCom GmbH & Co., KG*, No. 19-cv-1389-EJD-VKD (N.D. Cal.), Dkt. 194, at 42-45.

[112] *Id.*

[113] *Id.* ("But first, IPCom did *threaten* to bring the '844 patent to the Federal Circuit in its letter to Microsoft, and IPCom acknowledged later in deposition that this letter could communicate to Microsoft that IPCom would litigate the '844 patent.").

[114] *IPCom GmbH & Co. KG v. AT&T et al.*, No. 2:20-cv-00322-JRG (E.D. Tex.); *IPCom GmbH & Co. KG v. Verizon Commc'ns et al.*, No. 2:20-cv-00323-JRG (E.D. Tex.).

[115] *IPCom GmbH & Co. KG v. AT&T et al.*, No. 2:20-cv-00322-JRG (E.D. Tex.), Dkt. 207.

[116] *IPCom GmbH & Co. KG v. AT&T et al.*, No. 2:20-cv-00322-JRG (E.D. Tex.), Dkt. 307.

[117] *IPCom GmbH & Co. KG v. AT&T et al.*, No. 2:20-cv-00322-JRG (E.D. Tex.), Dkt. 319-330.

III.    **FROHWITTER AND COUNTERCLAIM-DEFENDANTS BREACHED THE AGREEMENT NOT TO SUE MICROSOFT ON PRE-2017 PATENTS**

A.    **Frohwitter Gives Microsoft A License Through IPCom and FIPA**

147.    On April 9, 2018 when Frohwitter signed a license agreeing to release Microsoft from liability for his companies' patents with priority dates before August 1, 2017. MSFT_PARTEC_000710185 (the "Frohwitter License").    That license followed years of negotiation.

148.    The license Microsoft negotiated was not limited to patents owned by IPCom, but rather is much broader and covers any patents controlled by Frohwitter's IP agency (FIPA) and their affiliates.

149.    Microsoft complied with its obligations under the Frohwitter License, which was to pay Frohwitter an agreed ▮▮▮▮▮▮▮▮▮▮▮ MSFT_PARTEC_000710185, § 7.1.

150.    The Frohwitter License was granted by IPCom GmbH & Co. KG and FIPA Frohwitter Intellectual Property AG on their behalf and on behalf of their "Affiliates," which has the following definition:



*Id.* § 1.1.  The agreement is also binding on successors and assigns. *Id.* § 10.9.

151.    The "Licensed Patents" under the Frohwitter License include (i) a particular non-exhaustive list of licensed patents and (ii) ██████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

██████████████  *Id.* § 1.3.

152.    The release of liability for the Licensed Patents was granted by IPCom and FIPA

███████████████████████████████████████

██████████████  *Id.*

153.    The license broadly covers any Microsoft software, product, technology, equipment, or service.



*Id.* § 6.1.

154.    The IPCom Releasing Parties (IPCom, FIPA, and Affiliates) made a promise not to sue Microsoft on the Licensed Patents.



*Id.* § 3.1.

155.    IPCom (including FIPA and Affiliates) also made several representations and warranties about its ownership of the Licensed Patents and its ability to bind the relevant parties.



*Id.* §§ 10.3, 12.4.

156.    IPCom and FIPA also undertook an obligation

█████████████ *Id.* § 3.4. ████████████████████ was binding on all of Frohwitter's other companies, establishing that IPCom and FIPA controlled those other companies through Frohwitter at the time of the negotiation as well as at least for the duration of ███████████ *Id.* at Schedule 3.

**B.      Frohwitter Breaches The License Through ParTec and BF exaQC AG**

157.    Counterclaim-Defendants are bound by the Frohwitter License and breached the license by asserting the '156 and '883 Patents.

158.    Counterclaim-Defendants and Bernhard Frohwitter are "Affiliates" (as that term is used in the Frohwitter License) of IPCom GmbH & Co. KG and of FIPA Frohwitter Intellectual Property AG.  Counterclaim-Defendants and IPCom GmbH & Co. KG and/or FIPA Frohwitter Intellectual Property AG are (or were) under common control (as that term is used in the Frohwitter License) of Bernhard Frohwitter.  Additionally or alternatively, Counterclaim-Defendants and Bernhard Frohwitter are controlled by (as that term is used in the Frohwitter License) IPCom GmbH & Co. KG and/or FIPA Frohwitter Intellectual Property AG.  Additionally or alternatively, IPCom GmbH & Co. KG and/or FIPA Frohwitter Intellectual Property AG controlled (as that term is used in the Frohwitter License) Counterclaim-Defendants through Bernhard Frohwitter. Additionally or alternatively, Counterclaim-Defendants and Bernhard Frohwitter are successors and/or assigns (as that term is used in the Frohwitter License) of IPCom GmbH & Co. KG and of FIPA Frohwitter Intellectual Property AG.  Additionally or alternatively, IPCom GmbH & Co. KG, FIPA Frohwitter Intellectual Property AG, and Counterclaim-Defendants each are alter egos of Bernhard Frohwitter, such that IPCom's and FIPA's obligations, duties, acts, and/or omissions should justly be imputed to Frohwitter and to Counterclaim-Defendants.

159.    The Asserted Patents are owned and/or controlled (as those terms are used in the Frohwitter License), directly or indirectly, by Bernhard Frohwitter, IPCom GmbH & Co. KG

and/or FIPA Frohwitter Intellectual Property AG.  Additionally or alternatively, the Asserted Patents are owned and/or controlled (as those terms are used in the Frohwitter License), directly or indirectly, by Counterclaim-Defendants, who are controlled by IPCom GmbH & Co. KG and/or FIPA Frohwitter Intellectual Property AG, through Bernhard Frohwitter.  Additionally or alternatively, the Asserted Patents are owned and/or controlled (as those terms are used in the Frohwitter License), directly or indirectly, by Counterclaim-Defendants and Bernhard Frohwitter, who are successors and/or assigns of IPCom GmbH & Co. KG and/or FIPA Frohwitter Intellectual Property AG.  Additionally or alternatively, the Asserted Patents are owned and/or controlled (as those terms are used in the Frohwitter License), directly or indirectly, by alter egos of IPCom GmbH & Co. KG and/or FIPA Frohwitter Intellectual Property AG, such that IPCom's and FIPA's obligations, duties, acts, and/or omissions should justly be imputed to Frohwitter and to Counterclaim-Defendants.

160.    The '156 and '883 Patents, which have priority dates before August 1, 2017, are therefore "Licensed Patents" (as that term is used in the Frohwitter License).  Accordingly, Counterclaim-Defendants' assertion of those patents is a breach of the license.

161.    Alternatively, to the extent the Asserted Patents are determined not to be "Licensed Patents," Counterclaim-Defendants have a duty to indemnify Microsoft pursuant to the warranty provisions of the Frohwitter License.

162.    Microsoft has suffered damages (in excess of $75,000) by being forced to incur the costs of defending against the '156 and '883 Patents.

## **CAUSES OF ACTION**

163.    Microsoft incorporates the allegations stated in respect to its affirmative defenses by reference as though each such allegation were individually restated herein.

**First Counterclaim:**
**BREACH OF CONTRACT**
(Common Law)
**Against ParTec AG and BF exaQC AG**

164.    Microsoft incorporates all preceding paragraphs by reference as though individually restated herein.

165.    Microsoft executed a valid and enforceable written contract with Bernhard Frohwitter on behalf of IPCom GmbH & Co. KG and FIPA Frohwitter Intellectual Property AG, and their Affiliates on April 9, 2018 (the "Frohwitter License").  The Frohwitter License has been produced in this matter at MSFT_PARTEC_000710185 and is incorporated by reference hereto.

166.    Microsoft performed its obligations under the Frohwitter License.

167.    Counterclaim-Defendants and Bernhard Frohwitter are parties to, or are otherwise bound by, the Frohwitter License.

168.    By causing this suit to be filed asserting "Licensed Patents" (as that term is used in the Frohwitter License), Counterclaim-Defendants and Frohwitter are liable for breach of the Frohwitter License.

169.    Counterclaim-Defendants' and Frohwitter's breach of the license is the direct and proximate cause of damage to Microsoft in an amount to be determined at trial.

**Second Counterclaim:**
**BREACH OF EXPRESS WARRANTIES**
(Common Law)
**Against ParTec AG and BF exaQC AG**

170.    Microsoft incorporates all preceding paragraphs by reference as though individually restated herein.

171.    To the extent it is determined that Microsoft does not have an express license to any Asserted Patents that have a priority date before August 1, 2017, Counterclaim-Defendants and Frohwitter are liable for breach of the express warranties of the Frohwitter License.

172.    To the extent it is determined that Microsoft does not have an express license to any Asserted Patents that have a priority date before August 1, 2017, Counterclaim-Defendants and Frohwitter are liable to indemnify Microsoft for damages directly and proximately caused by the failure of the Frohwitter License to cover such patents, in an amount to be determined at trial.

### Third Counterclaim:
### DECLARATORY JUDGMENT: ALTER EGO
(28 U.S.C. § 2201)
### Against ParTec AG and BF exaQC AG

173.    Microsoft incorporates all preceding paragraphs by reference as though individually restated herein.

174.    The foregoing acts, omissions, occurrences, and/or transactions have given rise to a live, actual controversy between Microsoft on the one hand and Counterclaim-Defendants on the other hand as to whether Counterclaim-Defendants, IPCom, and FIPA are alter egos of Bernhard Frohwitter, such that each is liable for the duties, obligations, acts, and/or omissions of the others.

175.    Counterclaim-Defendants, IPCom, and FIPA are alter egos of Bernhard Frohwitter.

176.    Pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. § 2201 et seq., Microsoft requests a declaration by this Court that Counterclaim-Defendants, IPCom, and FIPA are alter egos of Bernhard Frohwitter are alter egos of Bernhard Frohwitter and a judgment that each is liable for the duties, obligations, acts, and/or omissions of the others.

### Fourth Counterclaim:
### DECLARATORY JUDGMENT: NONINFRINGEMENT
(28 U.S.C. § 2201 and 35 U.S.C. § 282(b)(1))
### Against ParTec AG and BF exaQC AG

177.    Microsoft incorporates all preceding paragraphs by reference as though individually restated herein.

178.    The foregoing acts, omissions, occurrences, and/or transactions have given rise to a live, actual controversy between Microsoft on the one hand and Counterclaim-Defendants on the

other hand as to Counterclaim-Defendants' assertion that Microsoft infringes the asserted claims of United States Patent Nos. 10,142,156; 11,537,442; and 11,934,883.

179.    Microsoft does not infringe any asserted claim of any of United States Patent Nos. 10,142,156; 11,537,442; or 11,934,883.  Microsoft has not infringed any of those claims, not literally and not by equivalence, not directly and not indirectly, not by inducement and not by contribution, or in any manner.  Microsoft incorporates by reference its response to Counterclaim-Defendants' Interrogatory No. 6.

180.    Pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. § 2201 et seq., Microsoft requests a declaration by this Court that Microsoft has not infringed any asserted claim in any manner and is not liable to Plaintiffs for any allegations of infringement.

**Fifth Counterclaim:**
**<u>DECLARATORY JUDGMENT: LICENSE AND RELEASE</u>**
(28 U.S.C. § 2201 and 35 U.S.C. § 282(b)(1), (4))
**Against ParTec AG and BF exaQC AG**

181.    Microsoft incorporates all preceding paragraphs by reference as though individually restated herein.

182.    The foregoing acts, omissions, occurrences, and/or transactions have given rise to a live, actual controversy between Microsoft on the one hand and Counterclaim-Defendants on the other hand as to whether Microsoft is licensed to the Asserted Patents.

183.    Microsoft is expressly licensed to the '156 Patent and '883 Patent under the April 9, 2018 Frohwitter License.

184.    Microsoft is impliedly licensed to the '442 Patent to the extent it is broader in scope than the asserted claims of the expressly licensed '156 Patent and '883 Patent.  Plaintiffs contend that all three Asserted Patents are practiced by Parastation, and Plaintiffs point to identical features within Parastation as practicing the limitations of all three patents.  *See, e.g.*, Plaintiffs' Response

to Interrogatory No. 18.  Further, Plaintiffs' infringement allegations assert all three patents against the same Microsoft accused product, and points to the same features within Microsoft's products for its allegations under all three Asserted Patents.   To the extent that Plaintiffs' apparent application of the '442 Patent's claim scope is accepted, that patent would be necessary for a licensee (such as a Parastation user, or other licensee) to practice the claims of the '156 and '883 Patents.  Therefore, to the extent Plaintiffs' apparent application of the claim scope for the '442 Patent is accepted, the April 9, 2018 express license (MSFT_PARTEC_000710185) results in an implied license with respect to the '442 Patent.

185.    Pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. § 2201 et seq., Microsoft requests a declaration by this Court that Microsoft is expressly and/or impliedly licensed to each Asserted Patent.

**Sixth Counterclaim:**
**<u>DECLARATORY JUDGMENT: INVALIDITY</u>**
(28 U.S.C. § 2201 and 35 U.S.C. § 282(b)(2))
**Against ParTec AG and BF exaQC AG**

186.    Microsoft incorporates all preceding paragraphs by reference as though individually restated herein.

187.    The foregoing acts, omissions, occurrences, and/or transactions have given rise to a live, actual controversy between Microsoft on the one hand and Counterclaim-Defendants on the other hand as to the validity of the Asserted Patents.

188.    Each asserted claim of each Asserted Patent is invalid.  Microsoft incorporates its invalidity defense, including its defenses as to on-sale bar and inventorship, and the other bases for invalidity recited in Microsoft's invalidity contentions, by reference as though each supporting allegation were individually restated herein.

189.    As one example, without limitation, each Asserted Patent is invalid under the relevant statutory bars for public uses and/or commercial sales.  *See, e.g.*, Statutory Bar Defense ¶¶ (i)-(iv) ('156 Patent), ¶¶ (v)-(viii) ('883 Patent), ¶¶ (ix)-(xii) ('442 Patent).

190.    As another example, without limitation, each Asserted Patent is invalid for incorrect inventorship and/or for claiming derived subject matter.  The inventorship is not correctable.  *See, e.g.*, Inventorship Defense ¶¶ (i)-(vii) (Eicker), ¶¶ (vii)-(xii) (Rinke), ¶¶ (xiii)-(xviii) (Wolf), ¶¶ (xix)-(xxiv) (Becker)

191.    Pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. § 2201 et seq., Microsoft requests a declaration by this Court that each asserted claim of each Asserted Patent is invalid.

### Seventh Counterclaim:
### DECLARATORY JUDGMENT: INEQUITABLE CONDUCT
(28 U.S.C. § 2201 and 35 U.S.C. § 282(b)(1))
**Against ParTec AG and BF exaQC AG**

192.    Microsoft incorporates all preceding paragraphs by reference as though individually restated herein.

193.    The foregoing acts, omissions, occurrences, and/or transactions have given rise to a live, actual controversy between Microsoft on the one hand and Counterclaim-Defendants on the other hand as to whether the asserted claims of the Asserted Patents are unenforceable due to inequitable conduct during prosecution.

194.    The asserted claims of each Asserted Patent are unenforceable due to inequitable conduct during prosecution.  Microsoft incorporates its inequitable conduct defense by reference as though each supporting allegation were individually restated herein.  *See, e.g.*, inequitable conduct defense, *supra*, ¶¶ (i)-(ccvi).

195.    The taint of the inequitable conduct is not limited to the Asserted Patents but extends to all patents in each Asserted Patent's family, under the doctrine of infectious unenforceability.

196.    Pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. § 2201 et seq., Microsoft requests a declaration by this Court that the Asserted Patents are unenforceable due to inequitable conduct.

### Eighth Counterclaim:
### DECLARATORY JUDGMENT: PROSECUTION LACHES
(28 U.S.C. § 2201 and 35 U.S.C. § 282(b)(1))
**Against ParTec AG and BF exaQC AG**

197.    Microsoft incorporates all preceding paragraphs by reference as though individually restated herein.

198.    The foregoing acts, omissions, occurrences, and/or transactions have given rise to a live, actual controversy between Microsoft on the one hand and Counterclaim-Defendants on the other hand as to whether the asserted claims of the '442 Patent is unenforceable due to prosecution laches.

199.    The asserted claims of the '442 Patent are unenforceable due to prosecution laches. Microsoft incorporates its prosecution laches defense by reference as though each supporting allegation were individually restated herein. *See, e.g.*, prosecution laches defense, *supra*, ¶¶ (i)-(xiii).

200.    Pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. § 2201 et seq., Microsoft requests a declaration by this Court that the asserted claims of the '442 Patent are unenforceable due to prosecution laches.

**Ninth Counterclaim:**
**DECLARATORY JUDGMENT: UNCLEAN HANDS**
(28 U.S.C. § 2201 and Equity)
**Against ParTec AG and BF exaQC AG**

201.    Microsoft incorporates all preceding paragraphs by reference as though individually restated herein.

202.    The foregoing acts, omissions, occurrences, and/or transactions have given rise to a live, actual controversy between Microsoft on the one hand and Counterclaim-Defendants on the other hand as to whether the Asserted Patents are unenforceable due to Plaintiffs' unclean hands.

203.    The Asserted Patents are unenforceable, and Plaintiffs are entitled to no remedy, due and owing to Plaintiffs' unclean hands in relation to the equity sought by Plaintiffs.

204.    Pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. § 2201 et seq., Microsoft requests a declaration by this Court that the Asserted Patents are unenforceable for reason of unclean hands.

## JURY DEMAND

Pursuant to the Seventh Amendment to the United States Constitution and Federal Rule of Civil Procedure 38, Microsoft demands a jury trial on all claims so triable, including all claims triable by jury at common law.

## PRAYER FOR RELIEF

Microsoft respectfully prays for this Court to order, adjudge, and decree that:

A.  Counterclaim-Defendants and Bernhard Frohwitter are jointly and severally liable for breach of contract.

B.  ParTec, BF exaQC, IPCom, and FIPA are alter egos of Bernhard Frohwitter, such that is each is liable for the duties, obligations, acts, and/or omissions of the others.

C.  Microsoft is awarded a judgment of damages for breach of contract, pre- and post-judgment interest, and its costs of suit as the prevailing party.

D.  Microsoft does not infringe any asserted claim of any Asserted Patent, and Microsoft is not liable for any infringement.

E.  Microsoft is licensed to each Asserted Patent (expressly as to the '156 and '883 Patents, and impliedly as to the '442 Patent).

F.  Each asserted claim of each Asserted Patent is unenforceable.

G.  Each asserted claim of each Asserted Patent is invalid.

H.  Counterclaim-Defendants' complaint for patent infringement is dismissed with prejudice in its entirety and Counterclaim-Defendants shall take nothing.

I.  This is an exceptional case under 35 U.S.C. § 285 and Microsoft is awarded reasonable attorneys' fees as the prevailing party.

J.  Microsoft is entitled to any other relief the Court deems fair, just, and reasonable.

Dated: September 26, 2025

Respectfully submitted,
By: */s/ Melissa R. Smith*
Melissa R. Smith
State Bar No. 24001351
melissa@gillamsmithlaw.com
GILLAM & SMITH LLP
303 South Washington Avenue
Marshall, TX 75670
Tel: (903) 934-8450
Fax: (903) 934-9257

Betty Chen
LEAD ATTORNEY
State Bar No. 24056720
bchen@desmaraisllp.com
DESMARAIS LLP
101 California Street
San Francisco, CA 94111
Tel: (415) 573-1900
Fax: (415) 573-1901

Jeffrey Seddon (*pro hac vice*)
jseddon@desmaraisllp.com
Caitrianne Feddeler (*pro hac vice*)
cfeddeler@desmaraisllp.com
DESMARAIS LLP
230 Park Avenue
New York, NY 10169
Tel: 212-808-1041
Fax: 212-351-3401

*Counsel for Microsoft Corporation*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that this document was served via email upon counsel of record for all parties who are deemed to have consented to electronic service.

Dated: September 26, 2025     By: *<u>/s/ Melissa R. Smith</u>*
               Melissa R. Smith