# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TEXAS
## MARSHALL DIVISION

| | |
|---|---|
| PARTEC AG and BF EXAQC AG, | |
| Plaintiffs, | Civil Action No. 2:24-cv-00433-RWS-RSP |
| vs. | **JURY TRIAL DEMANDED** |
| MICROSOFT CORPORATION, | |
| Defendant. | |

## PLAINTIFFS' OPENING CLAIM CONSTRUCTION BRIEF

# TABLE OF CONTENTS

I.     INTRODUCTION ................................................................................................ 1

II.    OVERVIEW OF PATENTED TECHNOLOGY ................................................. 1

      1.    The '156 and '883 Patents ................................................................. 2

      2.    The '442 Patent ................................................................................. 3

III.   LEGAL PRINCIPLES OF CLAIM CONSTRUCTION ..................................... 4

IV.   AGREED TERMS ................................................................................................ 6

V.    DISPUTED TERMS FOR CONSTRUCTION ................................................... 6

      1.    "Assigned to and shared by more than one of the plurality of hardware computation nodes" ('156 claims 1, 14) .................................................. 6

      2.    "Assignment metric" ('156 claims 1–2, 13–15; '883 claims 1–2, 13–15) ...................................................................................................... 9

      3.    "Booster" ('156 claims 1, 4, 6–8, 12–15; '883 claims 1–2, 6–7, 11–13, 15) ............................................................................................. 14

      4.    "Computer cluster-booster [system/arrangement]" ('156 claims 1, 14) / "computer cluster [system/arrangement]" ('883 claims 1, 13) ............................ 19

      5.    "First computing iteration" / "further computing iteration" ('442 claims 1, 3, 7, 9) ...................................................................................... 23

      6.    "Outsource the [second] part of the computation task to the assigned selected [hardware] booster under control of the first [hardware] computation node" ('883 claims 1, 13) .................................................. 26

VI.   CONCLUSION ................................................................................................... 30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*3M Innovative Props. Co. v. Tredegar Corp.*,
725 F.3d 1315 (Fed. Cir. 2013)..................................................................................5, 30

*Aspex Eyewear, Inc. v. Marchon Eyewear, Inc.*,
672 F.3d 1335 (Fed. Cir. 2012)................................................................................19, 21

*Astute Tech., LLC v. Learners Digest Int'l LLC*,
2014 WL 1385191 (E.D. Tex. Apr. 2, 2014).................................................................27

*Aventis Pharms. Inc. v. Amino Chemicals Ltd.*,
715 F.3d 1363 (Fed. Cir. 2013).......................................................................................5

*Boehringer Ingelheim Vetmedica, Inc. v. Schering-Plough Corp.*,
320 F.3d 1339 (Fed. Cir. 2003).....................................................................................19

*CAE Screenplates Inc. v. Heinrich Fiedler GmbH & Co. KG*,
224 F.3d 1308 (Fed. Cir. 2000).....................................................................................15

*Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*,
289 F.3d 801 (Fed. Cir. 2002)..................................................................................22, 23

*Dayco Prods., Inc. v. Total Containment, Inc.*,
258 F.3d 1317 (Fed. Cir. 2001).......................................................................................7

*Eli Lilly & Co. v. Apotex, Inc.*,
837 F. App'x 780 (Fed. Cir. 2020) .................................................................................8

*ERBE Elektromedizin GmbH v. ITC*,
566 F.3d 1028 (Fed. Cir. 2009).....................................................................................26

*Estech Sys. IP, LLC v. Carvana LLC*,
2023 WL 3681720 (E.D. Tex. Jan. 30, 2023).........................................................8, 27, 28

*Gebo Cermex, Inc. v. ACMI USA, Inc.*,
2020 WL 9602347 (N.D. Ga. Jan. 27, 2020).................................................................11

*Genuine Enabling Tech. LLC v. Nintendo Co.*,
29 F.4th 1365 (Fed. Cir. 2022) .....................................................................................29

*IMS Tech., Inc. v. Haas Automation, Inc.*,
206 F.3d 1422 (Fed. Cir. 2000)................................................................................20, 21

*Jaipuria v. Linkedin Corp.*,
    2013 WL 12146130 (E.D. Tex. May 15, 2013) ....................................................11

*Kara Tech. Inc. v. Stamps.com Inc.*,
    582 F.3d 1341 (Fed. Cir. 2009) ...........................................................................11

*Liebel-Flarsheim Co. v. Medrad, Inc.*,
    358 F.3d 898 (Fed. Cir. 2004) .......................................................................13, 17

*N. Am. Vaccine, Inc. v. Am. Cyanamid Co.*,
    7 F.3d 1571 (Fed. Cir. 1993) ...............................................................................18

*N. Telecom Ltd. v. Samsung Elecs. Co.*,
    215 F.3d 1281 (Fed. Cir. 2000) ...........................................................................18

*Omega Eng'g, Inc., v. Raytek Corp.*,
    334 F.3d 1314 (Fed. Cir. 2003) .............................................................................5

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) (*en banc*) ..........................................................5, 6

*Primos Inc. v. Hunter's Specialties Inc.*,
    451 F.3d 841 (Fed. Cir. 2006) .............................................................................13

*Renishaw PLC v. Marposs Societa' per Azioni*,
    158 F.3d 1243 (Fed. Cir. 1998) .............................................................................4

*SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*,
    242 F.3d 1337 (Fed. Cir. 2001) ...........................................................................29

*Shoes by Firebug LLC v. Stride Rite Children's Grp., LLC*,
    962 F.3d 1362 (Fed. Cir. 2020) .................................................................19, 20, 21

*SRI Int'l v. Matsushita Elec. Corp. of Am.*,
    775 F.2d 1107 (Fed. Cir. 1985) (en banc) ............................................................12

*TI Grp. Auto. Sys. (N. Am.), Inc. v. VDO N. Am., L.L.C.*,
    375 F.3d 1126 (Fed. Cir. 2004) .............................................................................8

*Traxxas, L.P. v. Hobbico, Inc.*,
    2017 WL 4347709 (E.D. Tex. Sept. 29, 2017) .....................................................12

*Trs. of Columbia Univ. v. Symantec Corp.*,
    811 F.3d 1359 (Fed. Cir. 2016) ...........................................................................13

*Vitronics Corp. v. Conceptronic, Inc.*,
    90 F.3d 1576 (Fed. Cir. 1996) ..................................................................... *passim*

# EXHIBIT LIST

| Exhibit No. | Description |
|---|---|
| Exhibit A | U.S. Patent No. 10,142,156 |
| Exhibit B | U.S. Patent No. 11,934,883 |
| Exhibit C | U.S. Patent No. 11,537,442 |
| Exhibit D | Excerpts of the file history for U.S. Patent No. 10,142,156 |
| Exhibit E | Excerpts of the file history for U.S. Patent No. 11,934,883 |
| Exhibit F | Excerpts of the file history for U.S. Patent No. 11,537,442 |
| Exhibit G | Excerpts of a filing in European opposition proceedings relating to European Patent 2 628 080, produced with beginning Bates MSFT_PARTEC_000490125 |
| Exhibit H | Excerpts of Collins English Dictionary (10th ed. 2009), produced with beginning Bates ParTec_Microsoft_00000698 |
| Exhibit I | Excerpts of The American Heritage Dictionary (2nd College ed. 1991), produced with beginning Bates ParTec_Microsoft_00000730 |
| Exhibit J | Excerpts of Merriam-Webster's Collegiate Dictionary (11th ed. 2009), produced with beginning Bates ParTec_Microsoft_00000709 |
| Exhibit K | Excerpts of the Dictionary of Computing (5th ed. 2004), produced with beginning Bates ParTec_Microsoft_00000706 |
| Exhibit L | Excerpts of the Microsoft Computer Dictionary (5th ed. 2002), produced with beginning Bates MSFT_PARTEC_000490194 |
| Exhibit M | Paper titled "An Accelerated Cluster-Architecture for the Exascale" by Thomas Lippert and Norbert Eicker, produced with beginning Bates MSFT_PARTEC_000490082 |
| Exhibit N | Presentation titled "Exa-Boosters for Cluster Computers" by Thomas Lippert, produced with beginning Bates ParTec_00001388 |
| Exhibit O | Document titled "Sketch of a Research and Development Project for the upcoming EC Call 7, 'Objective ICT-2011.9.13 Exascale computing, software and simulation,'" produced with beginning Bates ParTec_00001444 |
| Exhibit P | Excerpts from the transcript of the September 10, 2025 deposition of ParTec employee Simon Pickartz, Ph.D. |

Emphases added unless otherwise indicated.

## I.    INTRODUCTION

At issue are six disputed terms from three Asserted Patents: U.S. Patent Nos. 10,142,156 (the "'156 Patent"), 11,934,883 (the "'883 Patent"), and 11,537,442 (the "'442 Patent"). Plaintiff ParTec AG is a German company involved in designing some of Europe's fastest supercomputers and the owner of the Asserted Patents. BF exaQC ("BFX") is ParTec's licensing agent. Plaintiffs contend the disputed terms do not require construction beyond their plain and ordinary meanings. Microsoft, conversely, attempts to avoid liability by urging overly restrictive interpretations that improperly rewrite the plain claim language, add limitations that have no place in the disputed terms, and violate multiple canons of claim construction. The Court should adopt Plaintiffs' constructions and reject Microsoft's improper interpretations.

## II.    OVERVIEW OF PATENTED TECHNOLOGY

The Asserted Patents generally teach systems and methods for dynamic resource management in heterogenous computing systems. Before the inventions described in the patents, general-purpose processors in heterogenous systems were supplemented by permanently assigned boosters or accelerators. Ex. A ('156) at 1:36–40; Ex. B ('883) at 1:37–41. This sort of fixed assignment resulted in the over- or under-allocation of resources, which was costly, energy inefficient, and not particularly fault resilient. Ex. A ('156) at 1:40–46; Ex. B ('883) at 1:41–47.

The patented inventions solved those problems by teaching systems and methods for the dynamic assignment of general-purpose processors and boosters to one another. Ex. A ('156) at 2:21–25; Ex. B ('883) at 2:23–27. The inventions also teach systems and methods for dynamically assigning tasks between general-purpose processors and associated boosters using information learned during processing. Ex. C ('442) at 1:66–2:18. The teachings of the Asserted Patents facilitate the more efficient use of computing resources, enabling advances in, *inter alia*,

1

scalability, resilience, and energy efficiency. Ex. A ('156) at 3:9–17, 10:11–20; Ex. B ('883) at 3:9–17, 9:64–10:6.

### 1. The '156 and '883 Patents

The '156 and '883 Patents are from the same family and share a common specification. They are directed to a computing system comprised of computation nodes ("CN") that communicate with boosters ("B") using a communication infrastructure ("IN"), with a Resource Manager ("RM") used to assign the boosters and computation nodes to one another. An embodiment of this arrangement can be seen in Figure 2:



The resource manager establishes a "static assignment" of the booster(s) to the computation nodes at the "start" of "processing a computation task." Ex. A ('156) at 2:55–57; Ex. B ('883) at 2:55–57. The resource manager then "may establish a dynamic assignment at runtime, which means during processing of the computation task." Ex. A ('156) at 2:58–60; Ex. B ('883) at 2:58–60. After the assignment is made, the computation nodes "outsourc[e] parts of" the "computation tasks" to the assigned booster(s). Ex. A ('156) at 2:61–64; Ex. B ('883) at 2:61–64.

The '156 and '883 Patents describe an "assignment metric" to "serve[] as a basis for the decision which booster is coupled with which computation node." Ex. A ('156) at 3:47–51; Ex. B ('883) at 3:47–51. The assignment metric taught in the'156 and '883 Patents can take various

forms. For example, the assignment metric "may be created as a function of a load balancing, which detects workload of the computer cluster arrangement, especially of the boosters." Ex. A ('156) at 3:56–59; Ex. B ('883) at 3:56–59. Or the assignment metric might "detect computing capacities of boosters" or "detect computation task requirements." Ex. A ('156) at 3:59–62; Ex. B ('883) at 3:59–62. In one embodiment, the assignment metric may be "formed according to at least one of [a] group of metric specification techniques, the group comprising: a temporal logic, an assignment matrix, an assignment table, a probability function and a cost function." Ex. A ('156) at 4:2–5, 5:4–7; Ex. B ('883) at 4:2–5, 5:4–7. In a "further" embodiment, the assignment metric "is specified as a function of at least one of a group of assignment parameters, the group comprising: resource information, cost information, complexity information, scalability information, a computation log record, compiler information, priority information and a time stamp." Ex. A ('156) at 5:11–17; Ex. B ('883) at 5:11–17.

### 2. The '442 Patent

The '442 Patent is also directed to a heterogeneous computing system, and it is noted that it is "a development of the system" taught by the '156 Patent. Ex. C ('442) at 1:23–28. An example embodiment comprising computation nodes 20 ("CN") in communication with booster nodes 22 ("BN") using communication infrastructure 24 is shown in Figure 1 of the '442:



Whereas the '156 and '883 are directed to the dynamic assignment of computation nodes and boosters to each other, the '442 teaches the efficient computation of tasks in a heterogenous computing system by distributing sub-tasks between computation nodes and booster nodes across computing iterations based on information learned during processing. The '442 describes computation nodes and booster nodes "arranged to compute a computation task … comprising a plurality of sub-tasks." Ex. C ('442) at 2:3–5. In "a first computing iteration," certain "sub-tasks are assigned to and processed by" the computation nodes and booster nodes "in a first distribution." *Id.* at 2:5–8. Then, "using information relating to the processing" of the sub-tasks in the earlier iteration, "a further distribution" of sub-tasks "between the computation nodes and booster nodes for processing … in a further computing iteration" is generated. *Id.* at 2:8–13.

In one embodiment, "the information" used for the dynamic assignment of sub-tasks "is provided by respective daemons operating in each of the computation and booster nodes. The information provided allows an application manager to determine if the distribution of sub-tasks between computation nodes and booster nodes can be adapted or improved upon for a further computing iteration." Ex. C ('442) at 2:13–18. In another embodiment, "[a] resource manager may determine the assignment of tasks and sub-tasks to the computation nodes and booster nodes for the first iteration as a function of the computation task and further parameters." *Id.* at 2:19–22. An "application manager" may then "process[] the information" used for the dynamic assignment of sub-tasks "as input to the resource manager such that the resource manager dynamically alters further distributions during the computing of the computation task." *Id.* at 2:22–25.

## III.    LEGAL PRINCIPLES OF CLAIM CONSTRUCTION

"[T]he claim construction inquiry … begins and ends in all cases with the actual words of the claim." *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1248 (Fed. Cir. 1998).

"[T]he words of a claim are generally given their ordinary and customary meaning," which "is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312–13 (Fed. Cir. 2005) (*en banc*) (quotation omitted). A person of ordinary skill in the art "is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Id.* at 1313. "Thus, the specification is always highly relevant to the claim construction analysis" and must be reviewed "to determine whether the inventor has used any terms in a manner inconsistent with their ordinary meaning." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). But the specification "cannot be used to narrow a claim term to deviate from the plain and ordinary meaning unless the inventor acted as his own lexicographer or intentionally disclaimed or disavowed claim scope." *Aventis Pharms. Inc. v. Amino Chemicals Ltd.*, 715 F.3d 1363, 1373 (Fed. Cir. 2013).

In some cases, the prosecution history of a patent can also "inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution." *Phillips*, 415 F.3d at 1317. The Federal Circuit has cautioned, however, that prosecution history "often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Id*. Courts accordingly "indulge a heavy presumption that claim terms carry their full ordinary and customary meaning, unless the patentee unequivocally imparted a novel meaning to those terms or expressly relinquished claim scope during prosecution." *Omega Eng'g, Inc., v. Raytek Corp*., 334 F.3d 1314, 1323 (Fed. Cir. 2003) (quotation and citations omitted). Any disavowal of claim scope made during patent prosecution "must be both clear and unmistakable." *3M Innovative Props. Co. v. Tredegar Corp*., 725 F.3d 1315, 1325 (Fed. Cir. 2013).

Courts may lastly consider extrinsic evidence, but such evidence is "less reliable" and "less significant" than the intrinsic record. *Phillips*, 415 F.3d at 1317–18 (quotation omitted). Thus, extrinsic evidence "may be used only to help the court come to the proper understanding of the claims; it may not be used to vary or contradict the claim language." *Vitronics*, 90 F.3d at 1584.

## IV.    AGREED TERMS

The parties have agreed to the construction of the following term and respectfully ask the Court to adopt it:

| Term | Claim | Agreed Construction |
|---|---|---|
| A method of operating a heterogeneous computing system comprising a plurality of computation nodes and a plurality of booster nodes, at least one of the plurality of computation nodes and a plurality of booster nodes being arranged to compute a computation task, the computation task comprising a plurality of sub-tasks, the method comprising: | '442 Patent: claim 1 | The underlined language in the preamble is limiting. |

## V.    DISPUTED TERMS FOR CONSTRUCTION

### 1.    "Assigned to and shared by more than one of the plurality of hardware computation nodes" ('156 claims 1, 14)

| Plaintiffs' Construction | Microsoft's Construction |
|---|---|
| Plain and ordinary meaning | "simultaneously assigned to and useable by more than one of the plurality of hardware computation nodes" |

At issue in this disputed term is whether the modifier "simultaneously" should be added to "assigned" and whether "useable" should replace "shared." There is no reason to insert these unnecessary and unsupported phrases into the claim language. "Assigned" and "shared" are common words that will be readily understood by the jury. And it is a long-established rule that

"adding limitations to claims not required by the claim terms themselves, or unambiguously required by the specification or prosecution history, is impermissible." *Dayco Prods., Inc. v. Total Containment, Inc.*, 258 F.3d 1317, 1327 (Fed. Cir. 2001). Nothing in the '156 supports Microsoft's construction that a booster must be "simultaneously" "assigned" and "useable" by two nodes.

The terms "simultaneous" and "useable" do not appear in the claim language or specification of the '156 Patent in any relevant way. Useable does not appear at all, and the only reference to simultaneity arises in an unrelated discussion describing the typical operation of computation nodes, not the relationship of boosters and computation nodes to one another. *See* Ex. A ('156) at 5:66–6:1. When the specification of the '156 discusses the "assignment" of a booster to computation nodes, it uses the same language as Claim 1 and does not expressly or implicitly require "simultaneous" "useability." For example, the specification discloses "a resource manager (RM) being arranged to **assign** at least one booster (B) to at least one of said plurality of computation nodes (CN) for computation of said second part of said computation task." *Id.* at 6:49–54. The specification also teaches that "each of the boosters B **can be shared by** any of the computation nodes CN …. Each booster, or at least a part of the boosters, can be virtualized and **made available** to the computation nodes virtually." *Id.* at 8:39–43. The specification similarly states that "each of the boosters B can be **shared** by any of the computation nodes CN." *Id.* at 8:39–43. "Hence, a **sharing** of accelerators, here in form of boosters, by computation nodes is feasible." *Id.* at 2:51–52. Accordingly, nothing in the '156 Patent supports Microsoft's attempt to add the modifier "simultaneously" or replace "shared" with "useable."

Nor is there evidence from the file history to justify Microsoft's attempts to rewrite the claim language. When the patentee discussed the relevant aspect of the '156 during prosecution, the patentee used the same language as appears in Claims 1 and 14: "assigned" and "shared."

For example, the patentee explained that "claims 1 and 14 recite that a booster of a plurality of boosters is **assigned** to a computation node." Ex. D ('156 File History) at 0445.[1] The patentee similarly explained that, in the claimed invention, "a single accelerator is **assigned** to and **shared** by more than one of the [computation nodes]." *Id.* at 0484. The patentee did not use the terms "simultaneously" or "useable" that Microsoft seeks to add or substitute.

Lastly, Microsoft's alterations would unnecessarily introduce ambiguity. It is unclear specifically what is required for a booster to be "simultaneously" "useable" by two or more computation nodes—because Microsoft's proposed construction is untethered from any intrinsic evidence that would answer this question. Microsoft's proposed revisions to the claim term would thus improperly change the claim language and introduce ambiguity where none currently exists. *See Estech Sys. IP, LLC v. Carvana LLC*, 2023 WL 3681720, at *9 (E.D. Tex. Jan. 30, 2023) (rejecting construction that "introduces unnecessary ambiguity into the claims").

Unable to marshal intrinsic evidence to support its construction, it appears Microsoft intends to ask the Court to rewrite the plain claim language based on a statement ParTec made while defending the validity of the European counterpart to the '156 Patent. Doing so would be doubly improper. First, the Federal Circuit has repeatedly cautioned against relying on statements made in foreign patent proceedings. *See, e.g., TI Grp. Auto. Sys. (N. Am.), Inc. v. VDO N. Am., L.L.C.*, 375 F.3d 1126, 1136 (Fed. Cir. 2004) ("The varying legal and procedural requirements for obtaining patent protection in foreign countries might render consideration of certain types of representations inappropriate for consideration in a claim construction analysis of a United States counterpart." (quotation omitted)); *Eli Lilly & Co. v. Apotex, Inc.*, 837 F. App'x 780, 785 (Fed.

---

[1] Page numbers in file history citations are to the Bates numbers of the produced versions.

Cir. 2020) ("[W]e have cautioned against relying on the prosecution of foreign applications in
interpreting claim terms of U.S. patents and patent applications.").

Second, even if the Court considers ParTec's European submission, ParTec stated merely
that the invention "connects" computation nodes and boosters so that "a resource manager **can**
take advantage of the already existing shareability of the boosters and **allow** multiple computation
nodes to use a booster simultaneously." Ex. G (MSFT_PARTEC_000490125) at 0141. ParTec's
use of permissive language emphasizes that the system taught by the invention "can" "allow" the
simultaneous usage of a booster by two or more compute nodes, not that it *requires* such a feature.
Moreover, the passage in which this statement appears was intended to distinguish prior art, where
"boosters were permanently assigned to their respective computation nodes," from the dynamic
assignment taught by the patented inventions—and were "preliminary remarks" at that. *Id.* at
0139–40. The passage was not directed at defining what it means for a booster to be "assigned to
and shared by more than one of the plurality of hardware computation nodes" or intended to be
any sort of disclaimer. Thus, even if the Court chooses to consider extrinsic evidence from a
foreign proceeding, the lone statement Microsoft appears to hang its hat on fails to support its
proposed construction unambiguously. And even unambiguous extrinsic evidence "may not be
used to vary or contradict the claim language." *Vitronics*, 90 F.3d at 1584.

2.    **"Assignment metric" ('156 claims 1–2, 13–15; '883 claims 1–2, 13–15)**

| Plaintiffs' Construction | Microsoft's Construction |
|---|---|
| Plain and ordinary meaning | "measurements represented as a group of several parameters" |

The Court should construe "assignment metric" to have its plain and ordinary meaning. An
"assignment" is "the act of assigning or state of being assigned." Ex. H (Collins English Dictionary
(10th ed. 2009)) (definition of "assignment"); *see also* Ex. I (The American Heritage Dictionary

(2nd College ed. 1991)) (assignment: "the act of assigning; something assigned, as a task"). A metric is a "standard of measurement." Ex. J (Merriam-Webster's Collegiate Dictionary (11th ed. 2009)) (definition of "metric"); *accord* Ex. I (The American Heritage Dictionary (2nd College ed. 1991)). Thus, an "assignment metric" is a metric or measurement used for the act of assigning.

Both the '156 Patent and '883 Patent use "assignment metric" in this ordinary sense to mean a metric or measurement for assignment. The language of the claims demonstrates this. Claim 1 of the '156 Patent recites a "**resource manager being arranged to assign** the at least one hardware booster to the at least one hardware computation node, including:" (1) "at a start of processing of said computation task, **establishing an initial assignment** by using a predetermined **assignment metric**" and, (2) "during said processing of said computation task[,] (i) updating the predetermined assignment metric, and (ii) **establishing a dynamic assignment by using** the predetermined **assignment metric** that was updated." Ex. A ('156) at Claim 1. Claim 1 of the '883 is similar, reciting a "resource manager" that "**initialize[s]** a static assignment" and then a "dynamic assignment," the assignments being "accomplish[ed] … as a function of a predetermined **assignment metric**." Ex. B ('883) at Claim 1. "Assignment metric" in the asserted claims is thus used in its plain and ordinary sense to mean a metric or measurement for making assignments.

The shared specification of the '156 and '883 Patents likewise demonstrates that "assignment metric" is used in its ordinary sense. The specification explains that the "assignment metric" "**serves as a basis for the decision which booster is coupled with which computation node**." Ex. A ('156) at 3:49–51; Ex. B ('883) at 3:49–51. And the specification describes the "assignment metric" as a metric or measurement for making assignments:

- "[A] resource manager being arranged **to assign** at least one booster to at least one of the plurality of computation nodes …, the **assignment being accomplished** as a function of a predetermined **assignment metric**." Ex. A ('156) at 2:42–46; Ex. B ('883) at 2:42–46.

10

- "[A] resource manager (RM) being arranged **to assign** at least one booster (B) to at least one of said plurality of computation nodes (CN) …, the **assignment being accomplished** as a function of a predetermined **assignment metric**." Ex. A ('156) at 6:49–54; Ex. B ('883) at 6:43–48.

The shared specification of the '156 and '883 Patents thus confirms that "assignment metric" is used in its ordinary sense to mean a metric or measurement for assignment.

Rather than accepting the plain and ordinary meaning of "assignment metric," Microsoft asks the Court to graft an additional limitation onto the term by construing "assignment metric" not just as a "measurement" for assignment, but "measurements **represented as a group of several parameters**." The Court should reject Microsoft's proposed construction and addition to "assignment metric" for three reasons.

First, Microsoft's proposed construction should be rejected because it seeks to add a limitation—"represented as a group of several parameters"—that already appears elsewhere in the claims of the '156 and '883 Patents into the term "assignment metric." Start with the '156 Patent. Claim 1 recites that the "resource manager" establishes "an initial assignment by using a predetermined assignment metric" and, separately, that the assignment metric used for the initial assignment is "specified as a function of **at least one of a group of assignment parameters**." Ex. A ('156) at Claim 1. Microsoft's proposed construction seeks to read the emphasized, separate portion of Claim 1 into the earlier recited "assignment metric," which is improper. *See Kara Tech. Inc. v. Stamps.com Inc.*, 582 F.3d 1341, 1348 (Fed. Cir. 2009) ("declin[ing] to read … a limitation into" a disputed term that appeared elsewhere in the patent's claims); *Gebo Cermex, Inc. v. ACMI USA, Inc.*, 2020 WL 9602347, at *67 (N.D. Ga. Jan. 27, 2020) (improper to import "a limitation from another claim element"); *Jaipuria v. Linkedin Corp.*, 2013 WL 12146130, at *6 (E.D. Tex. May 15, 2013) ("Considering there is a separate claim element that addresses the key configuration, it would be improper to import such a limitation to this term.").

11

What's more, accepting Microsoft's construction would cause Claim 1 of the '156 to read: "an initial assignment by using predetermined **measurements represented as a group of several parameters** specified as a **function of at least one of a group of assignment parameters**." That is confusing and redundant, confirming Microsoft's construction cannot be correct. *See Traxxas, L.P. v. Hobbico, Inc.*, 2017 WL 4347709, at *11 (E.D. Tex. Sept. 29, 2017) (rejecting defendants' proposed construction where "[a] number of the elements … [were] present in the claims, and repeating those limitations" was "redundant, unnecessary, and confusing").

Consider next the '883 Patent. The "parameters" language does not appear in independent Claim 1, which recites a "resource manager" that "initialize[s] a static assignment" and then a "dynamic assignment," the assignments being "accomplish[ed] … as a function of a predetermined assignment metric." Ex. B ('883) at Claim 1. The "parameters" language does, however, appear in dependent Claim 5, which adds that the "predetermined assignment metric is specified as a function of **at least one of a group of assignment parameters**." *Id.* at Claim 5. Microsoft's proposed construction would thus read an aspect of dependent Claim 5 ("group of several parameters") into Claim 1 of the '883 Patent, which cannot be done. *See SRI Int'l v. Matsushita Elec. Corp. of Am.*, 775 F.2d 1107, 1122 (Fed. Cir. 1985) (en banc) ("It is settled law that when a patent claim does not contain a certain limitation and another claim does, that limitation cannot be read into the former claim in determining either validity or infringement.").

Second, beyond running afoul of the claim language, Microsoft's proposed construction runs counter to the specification. The shared specification of the '156 and '883 recites that, "[a]ccording to a **further aspect** of the present invention, the predetermined assignment metric is specified as a function of at least one of a **group of assignment parameters**." Ex. A ('156) 5:11–13; *accord id.* at 6:62–64; Ex. B ('883) at 5:11–13; *id.* at 6:55–58. Thus, the language Microsoft

is trying to import into "assignment metric"—"represented as a group of several parameters"—comes from a preferred embodiment. "[I]t is improper to read limitations from a preferred embodiment described in the specification—even if it is the only embodiment—into the claims absent a clear indication in the intrinsic record that the patentee intended the claims be so limited." *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 913 (Fed. Cir. 2004). And here, it is not the only embodiment. There are other preferred embodiments that do not recite the "parameters" language that Microsoft wants to add to "assignment metric"—instead speaking of "metric specification techniques." Ex. A ('156) at 4:1–3 ("In an **embodiment of the present invention** the determined assignment metric is formed according to at least one of group of **metric specification techniques**…."); Ex. B ('883) at 4:1–3; *accord* Ex. A ('156) at 6:55–60; Ex. B ('883) at 6:49–54. These latter embodiments are captured in dependent Claim 2 of the '156, Ex. A ('156) at Claim 2, and dependent Claim 4 of the '883, Ex. B ('883) at Claim 4. Microsoft's construction would potentially read these embodiments and dependent claims out of the '156 and '883 Patents, further confirming its construction is improper. *See Trs. of Columbia Univ. v. Symantec Corp.*, 811 F.3d 1359, 1370 (Fed. Cir. 2016) (should not construe an "independent claim to exclude material covered by [a] dependent claim"); *Primos Inc. v. Hunter's Specialties Inc.*, 451 F.3d 841, 848 (Fed. Cir. 2006) ("[W]e ... should not normally interpret a claim term to exclude a preferred embodiment.").

Third, it appears that Microsoft's construction is largely derived from a statement in the prosecution history that "independent claim 1 as amended clarifies that Applicant's assignment metric is a **function of a group of assignment parameters**." Ex. D ('156 File History) at 0272. That statement is not a disclaimer for the term "assignment metric," however, because it refers to

a different element in Claim 1 of the '156. Specifically, the quoted statement refers to the following element the patentee was proposing to add to the claim:



*Id.* at 0265. That element was later moved to where it now appears in issued Claim 1:



*Id.* at 0476–77. Thus, the reference is to language and a limitation that appears elsewhere in Claim 1 of the '156 Patent. As demonstrated above, it is improper to import language appearing elsewhere in the Asserted Claims into a construction of "assignment metric."

### 3. "Booster" ('156 claims 1, 4, 6–8, 12–15; '883 claims 1–2, 6–7, 11–13, 15)

| Plaintiffs' Construction | Microsoft's Construction |
| --- | --- |
| Plain and ordinary meaning | "one or more booster nodes" |

The Court should reject Microsoft's improper and unnecessary attempt to re-write the term "booster" to "booster nodes" and construe "booster" to have its plain and ordinary meaning.

The Asserted Patents use "booster" to refer to a device for increasing power or effectiveness—*i.e.*, for providing "acceleration." *E.g.*, Ex A ('156) at 2:47–48 ("boosters" provide "**acceleration** functionality"); *id.* at 2:51–53 ("sharing of **accelerators**, here in form of boosters"); *id.* at 5:64–65 ("boosters are implemented to process specific problems at **high speed**"); *id.* at 11:63–67 ("an **acceleration** of computation of computation tasks being computed by at least one booster B is performed"); *accord* Ex B ('883) at 2:47–48, 2:51–53, 5:64–65, 11:49–52. This is the plain and ordinary meaning of "booster." Ex. I (The American Heritage Dictionary (2nd College ed. 1991)) ("booster": a "device for increasing power or effectiveness"); Ex. J (Merriam-Webster's Collegiate Dictionary (11th ed. 2009)) (booster: "an auxiliary device for increasing force, power, or effectiveness").

If the patentee wanted to use the term "booster node," the patentee plainly knew how to do so and could have done so. The issued claims of the '156 and '883 repeatedly use the term "node": for example, repeatedly reciting "computation **nodes**." *See, e.g.*, Ex. A ('156) at Claim 1 ("a plurality of hardware computation **nodes**"); *id.* at Claim 14 ("a plurality of hardware computation **nodes**"); Ex. B ('883) at Claim 1 ("a plurality of hardware computation **nodes**"). Yet, despite using the term "node" repeatedly in other aspects of the asserted claims, the patentee elected not to use the term with "booster." This choice should be respected and weighs against re-writing "booster" to "booster nodes." *See CAE Screenplates Inc. v. Heinrich Fiedler GmbH & Co. KG*, 224 F.3d 1308, 1317 (Fed. Cir. 2000) ("In the absence of any evidence to the contrary, we must presume that the use of these different terms in the claims connotes different meanings.").

Moreover, the patentee never used the term "booster node" in the claim language of the '156 or '883 Patents even though it is used when describing one embodiment in the shared specification. As recited in that embodiment, "[a] booster B **may for example** comprise 1 to

10.000 booster nodes BN." Ex. A ('156) at 12:65–66; Ex. B ('883) at 12:51–52. Figure 9 depicts

this embodiment, with a booster B comprised of three booster nodes BN:



Many other embodiments, however, simply use the term "booster." *See* Ex. A ('156) at

2:47–50 ("In this computer cluster arrangement acceleration functionality is being provided by

independent **boosters**. The described computer cluster arrangement allows a loose coupling of

those **boosters** to computation nodes…."); *id.* at 5:21–23 ("According to a further aspect of the

present invention, the assignment of at least one **booster** to one of the plurality of computation

nodes…."); *id.* at 5:29–30 ("According to a

further aspect of the present invention, each

computation node and each **booster**

interfaces…."); *id.* at 5:59–61 ("According

to a further aspect of the present invention,

the at least one **booster** comprises at least

one group of components…."); *accord* Ex.

B ('883) at 2:47–50; *id.* at 5:21–23; *id.* at

5:29–30; *id.* at 5:59–61. Fig. 2 is exemplary.



16

Two conclusions should be drawn from the specification's use of "booster nodes" in a single preferred embodiment, while "booster" is used in others. First, the patentee could have used "booster node" in the claim language had that limitation been intended. The patentee instead used "booster." The patentee's choice must be respected. Second, Microsoft's construction would improperly "read limitations from a preferred embodiment" into the claim language while ignoring the other embodiments. *Liebel-Flarsheim*, 358 F.3d at 913.

Beyond running afoul of the claim language and specification, Microsoft's construction is also contradicted by the file history. During prosecution of the '883 Patent, for example, the patentee used the term "booster," not "booster nodes":

> [T]he present application refers to **boosters** as accelerators ("a sharing of accelerators, here in form of **boosters**"). Further, the terms "computation nodes" and "**boosters**/accelerators" are technical terms in the field of (high performance) computing which have a clear and unambiguous meaning, in particular with regard to their technical design and configuration. A further definition of the design is also given in [the specification]: "Processors being applied in **boosters** typically comprise an extensive arithmetic logic unit and a simple control structure when being compared to computation nodes processors."

Ex. E ('883 File History) at 0902. The file history is thus consistent with the use of "booster" in the claim language, not "booster nodes."

Lacking support in the Asserted Patents or their file histories, Microsoft is left with dubious extrinsic evidence. Microsoft has cited a series of papers and presentations either authored or co-authored by the inventor of the '156 and '883 Patents that discuss the claimed invention or similar concepts. *See* Dkt. No. 86-1 at 6–7. In the documents Microsoft cites and similar documents, the inventor sometimes describes a "booster" as being comprised of "booster nodes" and in other instances does not. *Compare* Ex. M (MSFT_PARTEC_000490082) at 0087–88 & Fig.1 ("The Booster element is buil[t] out of Booster nodes (BN)."), *with* Ex. N (ParTec_00001388) (no

mention of "booster nodes"), *and* Ex. O (ParTec_00001444) at 1447 (showing "compute nodes (CN)" connected to "three … boosters," each labelled "ESB").

This extrinsic evidence cannot justify re-writing "booster" to "booster nodes" for at least two reasons. First, even if the inventor had uniformly used the term "booster node" outside the context of the patent, "[a] patent is to be interpreted by what it states rather than by what the inventor wrote in a scientific" or other publication. *N. Am. Vaccine, Inc. v. Am. Cyanamid Co.*, 7 F.3d 1571, 1578 (Fed. Cir. 1993) (finding error where district court considered an article and a speech by the inventor in its claim construction analysis); *see also N. Telecom Ltd. v. Samsung Elecs. Co.*, 215 F.3d 1281, 1295–96 (Fed. Cir. 2000) (rejecting argument that an article published by a named inventor on the patent two weeks after filing was relevant extrinsic evidence in claim construction). Second, the extrinsic evidence does not even uniformly describe the "booster" as being comprised of "booster nodes." Sometimes it does and other times it does not. This is consistent with the preferred embodiments from the specification, some of which describe a booster as comprised of booster nodes, *see* Ex. A ('156) at 12:65–66; Ex. B ('883) at 12:51–52, and others that do not, *see* Ex. A ('156) at 7:27–32; Ex. B ('883) at 7:21–26. Thus, to the extent this extrinsic evidence has any relevance, it simply confirms that the patentee knew how to say "booster node" if desired. The patentee did not, so it would be legal error to re-write the claim language as Microsoft requests.

Microsoft has also cited the *non-expert* testimony of ParTec employee Simon Pickartz. *See* Dkt. No. No. 86-1 at 7. This testimony should have no bearing on the proper construction of "booster." Neither *expert* nor *inventor* testimony can "vary or contradict the claim language" of the Asserted Patents by re-writing "booster" to "booster nodes." *Vitronics*, 90 F.3d at 1584. The even less probative testimony of a *non*-expert, *non*-inventor certainly cannot. In all events,

Dr. Pickartz did not, at any point, testify about the meaning of "booster" or any other terms in the Asserted Patents. When showed the patents, Dr. Pickartz testified he was unfamiliar with them. Ex. P (Pickartz Dep. Tr.) at 112:8–113:23, 119:2–120:5.

Microsoft finally has cited references to a variety of patent applications and patents that appear in the prosecution history. *See* Dkt. No. 86-1, at 5 (listing U.S. Patent Application Nos. 2004/0098447, 2004/0257370, 2005/0097300; and U.S. Patent Nos. 6,922,832; 7,051,188; 7,093,147, 7,137,040, 7,406,692). None of these patents uses the term "booster" and only three rely on the general term "node." Thus, to the extent these patents are relevant evidence, they do not support Microsoft's construction. *See Boehringer Ingelheim Vetmedica, Inc. v. Schering-Plough Corp.*, 320 F.3d 1339, 1347 (Fed. Cir. 2003) ("[A] patentee does not renounce the ordinary meaning of a term merely by submitting a reference that employs a different meaning.").

### 4. "Computer cluster-booster [system/arrangement]" ('156 claims 1, 14) / "computer cluster [system/arrangement]" ('883 claims 1, 13)

| Plaintiffs' Construction | Microsoft's Construction |
|---|---|
| Preamble not limiting. If limiting, plain and ordinary meaning. | Limiting |

The Court should reject Microsoft's argument that the "computer cluster-booster [system/arrangement]" and "computer cluster [system/arrangement]" language in the preambles of Claims 1 and 14 of the '156 Patent and Claims 1 and 13 of the '883 Patent are limiting. "[A]s a general rule preamble language is not treated as limiting." *Aspex Eyewear, Inc. v. Marchon Eyewear, Inc.*, 672 F.3d 1335, 1347 (Fed. Cir. 2012). Preamble language only limits "if it recites essential structure or steps, or is necessary to give life, meaning, and vitality to the claim." *Shoes by Firebug LLC v. Stride Rite Children's Grp., LLC*, 962 F.3d 1362, 1367 (Fed. Cir. 2020)

(quotation omitted). In contrast, preamble language "is not limiting where a patentee defines a structurally complete invention in the claim body." *Id.* (quotation omitted).

The Federal Circuit's decision in *IMS Technology* is instructive. There, the Federal Circuit considered a claim that recited "[a] programmable microcomputer *control apparatus* for controlling the relative motion between a tool and a workpiece comprising" various claim elements. *IMS Tech., Inc. v. Haas Automation, Inc.*, 206 F.3d 1422, 1427 (Fed. Cir. 2000) (emphasis in original). The Federal Circuit explained that if "the preamble adds no limitations to those in the body of the claim, the preamble is not itself a claim limitation and is irrelevant to proper construction of the claim." *Id.* at 1434. It then rejected the argument that the phrase "control apparatus" was limiting, reasoning that the "phrase 'control apparatus' in the preamble merely gives a descriptive name to the set of limitations in the body of the claim that completely set forth the invention." *Id.*

The same is true here. Claims 1 and 14 of the '156 Patent and Claims 1 and 13 of the '883 Patent describe structurally complete inventions and use "computer cluster-booster [system/arrangement]" and "computer cluster [system/arrangement]" merely to provide descriptive names for the claimed inventions, not to add limitations. Claim 1 of the '156 is representative. The body of the claim describes a structurally complete invention: "a plurality of hardware computation nodes," "a plurality of hardware boosters," "a resource manager," and soon. Ex. A ('156) at Claim 1. "Computer cluster-booster system" in the preamble simply gives a name to the system described in the body of the claim. The same is true of the other claims: Claim 14 of the '156 Patent and Claims 1 and 13 of the '883 Patent. *See* Ex. A ('156) at Claim 14; Ex. B ('883) at Claims 1, 13. Because "computer cluster-booster [system/arrangement]" and "computer cluster [system/arrangement]" "add[] no limitation to those in the body of the claim" and instead merely

provide "descriptive names[s]" to the structurally complete inventions set forth in the body, this preamble language is not limiting. *IMS Tech.*, 206 F.3d at 1434. "Computer cluster-booster [system/arrangement]" and "computer cluster [system/arrangement]" do not "recite[] essential structure or steps," nor are they "necessary to give life, meaning, and vitality to the claim." *Shoes by Firebug LLC*, 962 F.3d at 1367 (preamble not limiting); *see also Aspex Eyewear*, 672 F.3d at 1347 (preamble language was not limiting because it was "not needed to give meaning to the claims, which recite structurally complete inventions without the preamble language").

It appears Microsoft intends to support its argument largely by relying on the file history of the '156 Patent—seemingly to suggest the patentee defined the preamble as limiting during prosecution. The patentee did not. To be sure, the patentee contrasted the intended use of the claimed invention from that of alleged prior art references on two occasions. *See* Ex. D ('156 File History) at 0309 ("As an initial matter, Krishnamurthy 770 and Krishnamurthy 127 are directed to different types of computer architectures, each processing data in a different manner than" the claimed inventions); *id.* at 0473 ("Dillenberger describes a parallel-distributed processing system [0013] in a symmetric multiprocessing (SMP) environment" whereas the "claimed invention is a cluster computing system."). In neither case, however, did the patentee rely on this distinction generally or the preamble specifically as the basis for traversing the prior art references.

In the case of the Krishnamurthy references, the patentee mentioned the different types of computer architecture as context for describing a material distinction between the inventions: the Krishnamurthy references "utilize **data parallel** processing in contrast with the **task parallel** processing achieved by" the patented technology. Ex. D ('156 File History) at 0310 (emphasis in original). The amendments the patentee then made in response reinforce this understanding:

> Applicant does not agree with the characterization of these [Krishnamurthy]
> references being directed to cluster computing as described in the Office Action,

but nonetheless has further amended the independent claims 1 and 14 to clarify the interaction between Applicant's computation nodes and boosters.

In particular, Applicant has amended independent claim 1 (and similarly independent claim 14) to recite that the at least one booster is *"arranged to compute at least a second, specific part of said computation task after having been assigned to at least one computation node and under control of that at least one computation node,"* and that *"the plurality of computation nodes and the plurality of boosters are configured as part of a computer cluster arrangement such that during processing of said computation task, assignments of communication nodes and boosters can be provided such that at least (i) at least one of the plurality of computation nodes is arranged to communicate with at least one of the plurality of boosters, (ii) at least one of the plurality of boosters is shareable by more than one of the plurality of computation nodes, and (iii) each of the boosters is assignable to each of the computation nodes."* Neither Krishnamurthy 770 nor Krishnamurthy 127, alone or any combination thereof, discloses these features.

Ex. D ('156 File History) at 0310–11 (emphasis in original). The patentee did not rely, let alone clearly rely, on the preamble to traverse the Krishnamurthy references.

Likewise, the patentee did not rely on the preambles as the basis for traversing Dillenberger. Although a comment in an interview summary noted that Dillenberger does not teach "a cluster computing system," that remark merely provides context for one of the patentee's bases for traversal: that Dillenberger does not teach a system where different components are "connected to each other … running its own instance of an operating system." Ex. D ('156 File History) at 0473. And in the amendments and remarks submitted following that interview, the patentee focused arguments on various limitations relating to the resource manager and assignment metric, not the preamble. *See, e.g.*, *id.* at 0484 ("Dillenberger does not teach or suggest that any reassignment of accelerator(s) to host system(s) is established during processing of any workloads or jobs thereof."); *id.* ("Dillenberger does not teach or suggest that a single accelerator is assigned to and shared by more than one of the host systems.").

At a minimum, nothing in the prosecution history approaches a "clear reliance" on preamble language necessary to infer a limiting construction. *Catalina Mktg. Int'l, Inc. v.*

*Coolsavings.com, Inc.*, 289 F.3d 801, 808 (Fed. Cir. 2002). And regardless of how Microsoft attempts to spin the file history, the fact remains that the challenged preambles are not "necessary to give life, meaning, and vitality" to the claim and thus are not limiting. *Id.* (quotation omitted).

### 5. "First computing iteration" / "further computing iteration" ('442 claims 1, 3, 7, 9)

| Plaintiffs' Construction | Microsoft's Construction |
|---|---|
| Plain and ordinary meaning | "an initial execution of the plurality of sub-tasks" / "a repeated execution of the plurality of sub-tasks" |

The Court should construe "first computing iteration" and "further computing iteration" in the '442 Patent as having their plain and ordinary meaning and should reject Microsoft's attempts to re-write these terms.

In computing, an "iteration" is an application of a program or set of instructions to a task or problem. Ex. J (Merriam-Webster's Collegiate Dictionary (11th ed. 2009)) (iteration: "a procedure in which a repetition of a sequence of operations yields results successively closer to a desired result"; "the repetition of a sequence of computer instructions a specified number of times or until a condition is met"; "one execution of a sequence of operations or instructions in an iteration"); Ex. K (Dictionary of Computing (5th ed. 2004)) (iteration: "the repeated application of a program to solve a problem"). The evidence Microsoft has submitted recognizes this. Ex. L (Microsoft Computer Dictionary (5th ed. 2002)) (iterate: "to execute one or more statements or instructions repeatedly").

The '442 Patent uses "computing iteration" to denote the "processing" or "computation" of sub-tasks in different execution phases or distributions—*i.e.*, the application of a program or set of instructions to the particular sub-tasks being executed in a given distribution—with the distributions being adapted based on feedback or information learned during runtime. Claim 1

demonstrates this. It recites, "in a first computing iteration, assigning and **processing**" certain sub-tasks by "computation nodes" and "booster nodes" "in a first distribution." Ex. C ('442) at Claim 1. Then, "using information relating to the **processing**" of the sub-tasks in the earlier iteration, generating a "further distribution" of sub-tasks "between" the "computation nodes" and "booster nodes" "for **processing** thereby in a further computing iteration." *Id.* The specification is to the same effect. *E.g.*, *id.* at 2:5–12 (teaching that, in "a first computing iteration," certain "sub-tasks are assigned to and **processed** by" computation nodes and booster nodes "in a first distribution" and then, "using information relating to the **processing**" of the sub-tasks in the earlier iteration, a "further distribution" of sub-tasks "between the computation nodes and booster nodes for **processing** … in a further computing iteration" is generated): *id.* at 2:43–44 ("**computing** of the tasks"); *id.* at 3:59 ("a task is **computed**"); *id.* at 4:18–31 (in an exemplary embodiment, an application manager divides sub-tasks between computation nodes and boosters in "a first iteration," the sub-tasks are executed and "the results of the **execution** of the sub-task are collected together with" information from "daemons concerning the **processing** of the sub-tasks and the status of the nodes," and the "application manager" then dynamically alters the assignment of sub-tasks "for a subsequent iteration" or processing). Thus, "first computing iteration" and "further computing iteration" in the '442 Patent have their plain and ordinary meaning. They refer to an application of a set of instructions to the particular sub-tasks being processed in a first phase or distribution and a further application of a set of instructions to the particular sub-tasks being processed in a further phase or distribution.

Microsoft's proposed constructions seek to re-write these claim terms and should be rejected by the Court. Starting with "an initial execution of the plurality of sub-tasks," nothing in Claims 1 or 9 of the '442 Patent, from which Claims 3 and 7 depend, require that the "first

computing iteration" be the "**initial**" execution of any sub-tasks, as Microsoft proposes. Claims 1 and 9 recite "**a** first computing iteration" and "**a** further computing iteration," not "**the** first [*i.e.*, initial] computing iteration" and "a further computing iteration." Ex. C ('442) at Claims 1, 9. Thus, Claims 1 and 9 require one computing iteration, "a first," to precede another, "a further." But they do not require that the earlier iteration be the "initial" or "*the* first" one. The specification is the same. *Id.* at 2:5 ("**a** first computing iteration"); *id.* at 4:23–24 ("**a** first iteration"). Microsoft's proposed construction for "first computing iteration" thus runs afoul of the claim language and specification and must be rejected.

Microsoft next asks the Court to construe a "further computing iteration" as "a repeated **execution of the plurality of sub-tasks**." But "iteration," as already demonstrated, refers to the repeated application *of a program or set of instructions*. It does not refer to or require that the sub-tasks in every distribution be identical—a limitation Microsoft's construction would introduce. And by requiring that the same sub-tasks be repeated in each computing iteration, Microsoft's construction would directly contradict the teachings of the '442 Patent. The '442 Patent recites that "further sub-tasks" may be called "during … processing." Ex. C ('442) at 4:48–52 ("As well as adjusting the distribution of sub-tasks between computation nodes and boosters based on a scalability of the sub-task, the distribution may also be influenced by information learned about the processing of the sub-task and **any need to call further sub-tasks during the processing**."). The '442 also teaches that "[a] job to be computed by the system may comprise a number of tasks **some of which** or all **may be repeated** a number of times during the execution of the job." *Id.* at 3:44–46. Thus, the '442 Patent specifically teaches that it may *not* be the same sub-tasks repeated in each iteration or execution phase. Some, but not all, may be repeated. And some may be added to the mix. Considering these teachings, Microsoft's construction—requiring "repeated execution"

of the same sub-tasks—should be rejected. *See ERBE Elektromedizin GmbH v. ITC*, 566 F.3d 1028, 1034 (Fed. Cir. 2009) ("We generally do not construe claim language to be inconsistent with the clear language of the specification.").

Microsoft may rely on statements in the '442 file history distinguishing the application that became the '156 Patent from the invention of the '442 Patent. But none of the statements Microsoft has alluded to requires that the earlier computing iteration recited in the '442 Patent be "*the* initial" execution of any sub-tasks or that the further iteration must repeat the same sub-tasks. The file history merely acknowledges that the '442 requires multiple iterations, while the '156 does not speak to iterations. Ex. F ('442 File History) at 1210 (Claims 1 and 9 recite "**multiple computing iterations**"); *id.* (another reference "fails to cure the missing disclosure of **multiple computing iterations**"). If anything, the '442's file history—like its specification—weighs against Microsoft's proposed construction because it contemplates the "call[ing] of further sub-tasks during the processing." *Id.* at 1211. Microsoft's attempt to limit the "further computing iteration" to the execution of the same sub-tasks cannot be correct if new sub-tasks may be introduced.

### 6.    "Outsource the [second] part of the computation task to the assigned selected [hardware] booster under control of the first [hardware] computation node" ('883 claims 1, 13)

| Plaintiffs' Construction | Microsoft's Construction |
|---|---|
| Plain and ordinary meaning | "move the [second] part of the computation task from the first [hardware] computation node to the assigned booster, without implicating the resource manager" |

Claim 1 of the '883 Patent recites a "resource manager being arranged to," in part, "provide assignment information to" a "hardware computation node … so as to enable the … hardware computation node to **outsource**" a part of a computation task to an assigned "hardware booster." Ex. B ('883) at Claim 1. Claim 13 is similar. Ex. B ('883) at Claim 13. Microsoft's proposed

construction seeks to substitute "move" for "outsource" and to add the limitation that the outsourcing must occur "without implicating the resource manager." The Court should reject Microsoft's construction and instead find that this term carries its plain and ordinary meaning.

**"Move" Should Not Be Substituted for "Outsource."** There is no reason to substitute the word "move" for "outsource," as Microsoft proposes. The jury will readily understand a common word like "outsource." The specification, like the at-issue claims, uses "outsource" not "move." Ex. B ('883) at 8:40–43 ("[P]roblems can be **outsourced** from one of the computation nodes CN to the boosters B, be computed by the booster and the result may be delivered back to the computation node."). And it is unclear what difference Microsoft perceives, if any, between these two words. As this Court has stated, "it is not helpful to simply substitute (without specification support) one word for another word, particularly when the substitution is no more helpful than that of the term's ordinary meaning." *Astute Tech., LLC v. Learners Digest Int'l LLC*, 2014 WL 1385191, at *21 (E.D. Tex. Apr. 2, 2014). Accordingly, the Court should not re-write "outsource" as "move."

**"Without Implicating the Resource Manager" Should Not Be Added.** The Court should not add a nonexistent limitation to the disputed term. The patent does not use "implicate" or "implicating," so it is unclear what would and would not be sufficient to meet Microsoft's nonexistent limitation—introducing unnecessary ambiguity. *See Estech*, 2023 WL 3681720, at *9 (rejecting construction that "introduces unnecessary ambiguity into the claims"). And whatever "without implicating the resource manager" means, it cannot be squared with the language of Claims 1 and 13 of the '883 Patent. Those claims recite a "resource manager" that "**provide[s] assignment information** to the first hardware computation node … **so as to enable the first hardware computation node to outsource** the part of the computation task to the assigned

selected hardware booster ….." Ex. B ('883) at Claim 1; *see also id.* at Claim 13 (similar). The resource manager thus is *implicated* in outsourcing tasks from the "first hardware computation node" to the "assigned selected hardware booster," at a minimum, by providing assignment information. Microsoft's construction can be rejected on this basis alone.

Microsoft's construction should also be rejected because it would exclude preferred embodiments disclosed in the specification. In one embodiment, "[t]he **resource manager RM**" is called upon to "transmit the second part of the computation task to the booster B" from the "**computation node CN**," "without the necessity that the computation node CN directly contacts the booster B." Ex. B ('883) at 11:16–19 & Fig. 5. In another, "a computation node CN receives a computation task and requests a booster B for outsourcing at least a part of the received computation task. Therefore, a **resource manager RM is accessed, which forwards the part of the computation task to a selected booster B**." *Id.* at 11:37–42 & Fig. 6. Microsoft's construction would necessarily exclude these embodiments, which "implicate" the resource manager in the outsourcing of the part of the computation task from the computation node to the booster. Constructions that exclude preferred embodiments are "rarely, if ever correct." *Vitronics*, 90 F.3d at 1583. This is another reason to reject Microsoft's construction.

In support of its proposed construction, Microsoft has cited a different preferred embodiment than those quoted:

> In the **present embodiment** the **resource manager RM does not pass the at least one part of the computation task to the booster B**, but the computation node CN requests an address or a further identification of a booster B, which is arranged to compute the specific at least one part of the computation task.

Ex. B ('883) at 11:60–65. This preferred embodiment does not support Microsoft's position for at least two reasons. First, the resource manager is "implicated" even in this preferred embodiment. The resource manager is requested to provide an "address" or "identification" of the booster to

facilitate the outsourcing, thereby *implicating* the resource manager. Second, even if the foregoing preferred embodiment disclosed a resource manager that was not "implicated" in the outsourcing of the part of the computation task, at best, Microsoft would be seeking to import a limitation from a single preferred embodiment while ignoring other embodiments, committing "one of the cardinal sins of patent law." *SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1340 (Fed. Cir. 2001).

Microsoft also cites the '883 Patent's prosecution history, presumably the following statement the patentee made while traversing the Krishnamurthy reference:

> A further limitation is that the output/outsourcing is performed "under control of the first hardware computation node." Accordingly, after the assignment is performed by the resource manager, the fi[r]st hardware computation node **can** make use of the assignment and outsource parts of the computation tasks to the assigned boosters (**without further need to implicate the resource manager**).
>
> …
>
> One advantage of the present invention is that after a booster has been assigned to a computation node, the computation node **can** make use of the booster and outsource parts of the computation tasks to the booster under said assignment. Such an outsourcing **can** be done repeatedly under the assignment.

Ex. E ('883 File History) at 0904–05. This statement is not "so clear as to show reasonable clarity and deliberateness, and so unmistakable as to be unambiguous evidence of disclaimer." *Genuine Enabling Tech. LLC v. Nintendo Co.*, 29 F.4th 1365, 1374 (Fed. Cir. 2022) (quotation omitted). As the use of permissive language ("can") repeatedly in the above passage indicates, the patentee stated only that it is *possible* for the computation node to outsource tasks to a booster without *further* implicating the resource manager. The patentee did not state that it is a *requirement* that the task be outsourced from the computation node to the booster without implicating the resource manager *at all*. There was thus no "clear and unmistakable" disavowal of claim scope in the file history that would support Microsoft's construction—particularly considering that the '883

29

specification specifically discloses multiple embodiments where the resource manager is implicated. *3M Innovative*, 725 F.3d at 1325. A much clearer statement is required to disavow all those teachings.

## VI.    CONCLUSION

For the foregoing reasons, the Court should reject Microsoft's proposed constructions and adopt Plaintiffs' constructions.

Dated: October 31, 2025                Respectfully submitted,

                                 */s/ Alexander W. Aiken*
                                 Justin A. Nelson – Lead Counsel
                                 Texas State Bar No. 24034766
                                 SUSMAN GODFREY, L.L.P.
                                 1000 Louisiana Street, Suite 5100
                                 Houston, Texas 77002
                                 Telephone: (713) 651-9366
                                 Facsimile: (713) 654-6666
                                 jnelson@susmangodfrey.com

                                 Matthew R. Berry
                                 Washington State Bar No. 37364
                                 Alexander W. Aiken
                                 Washington State Bar No. 55988
                                 SUSMAN GODFREY, L.L.P.
                                 401 Union St., Suite 3000
                                 Seattle, Washington 98101
                                 Telephone: (206) 516-3880
                                 Facsimile: (206) 516-3883
                                 mberry@susmangodfrey.com
                                 aaiken@susmangodfrey.com

                                 Jacob Levin
                                 New York State Bar No. 6247589
                                 SUSMAN GODFREY L.L.P.
                                 One Manhattan West
                                 New York, NY 10001
                                 Telephone: (212) 336-8330
                                 Facsimile: (212) 336-8340

jlevin@susmangodfrey.com

Claire Abernathy Henry
Texas State Bar No. 24053063
MILLER, FAIR, HENRY PLLC
1507 Bill Owens Parkway
Longview, TX 75604
Telephone: (903) 757-6400
Fax: (903) 757-2323
claire@millerfairhenry.com

S. Calvin Capshaw
Texas State Bar No. 03783900
CAPSHAW DERIEUX LLP
114 E. Commerce Ave.
Gladewater, TX 75647
Telephone: (903) 845-5770
ccapshaw@capshawlaw.com

*Counsel for Plaintiffs ParTec AG and BF exaQC AG*

31

**CERTIFICATE OF SERVICE**

This is to certify that on October 31, 2025, all counsel of record were served a copy of the foregoing via CM/ECF.

_/s/ Alexander W. Aiken_
Alexander W. Aiken